IN THE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No. 1:17-CV-21192-Williams/Torres

JUAN JOSÉ RENDÓN DELGADO,                    )
                                             )
              Plaintiff,                      )
                                             )
v.                                           )
                                             )
BLOOMBERG L.P.; BLOOMBERG                     )        ORAL ARGUMENT REQUESTED
BUSINESSWEEK; JORDAN ROBERTSON;              )
and MICHAEL RILEY,                           )
                                             )
              Defendants.                     )
_____            )

---

Defendants' Motion to Dismiss the
Amended Complaint and Memorandum of Law

---

Thomas R. Julin                  Jeffrey B. Korn
Timothy J. McGinn                Jonathan D. Waisnor
Fla. Bar Nos. 325376 & 1000377   Admitted *Pro Hac Vice*

Gunster, Yoakley & Stewart, P.A.  Willkie Farr & Gallagher LLP
600 Brickell Avenue, Suite 3500   787 Seventh Avenue
Miami, FL 33131                   New York, NY 10019
305.376.6007 Fax 6010            212.728.8000
tjulin@gunster.com               jkorn@willkie.com

Attorneys for the Defendants

<u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ........................................................................... iii

REQUEST FOR HEARING ........................................................................... ix

PRELIMINARY STATEMENT ........................................................................1

FACTUAL BACKGROUND ...........................................................................3

      A.     Rendón is a Well Known Political Operative. .........................................3

      B.     After an Exhaustive Investigation, Bloomberg
              Publishes Sepúlveda's Account of His Hacking
              of Elections in Latin America—and Rendón's Denials...........................4

      C.     Rendón Demands That Bloomberg Retract the Article
              But Does Not Identify Any Particular False Statements. ........................7

      D.     Rendón Files His Original Complaint, in Which He Admits He is
              ***Countryless***, Then Scrambles to Manufacture Subject-Matter Jurisdiction. ..........8

      E.     Rendón Files His Amended Complaint and
              Asserts Four New Claims Against Bloomberg L.P. .................................9

ARGUMENT ................................................................................................10

I.     The Court Does Not Have Subject-Matter Jurisdiction Over Rendón's Claims ...............10

      A.     Rendón's Original Complaint Established His
              Statelessness and This Court's Lack of Subject-Matter Jurisdiction....................11

      B.     The Act of State Doctrine Bars the Court From Considering
              or Accepting Rendón's Assertion of Venezuelan Citizenship.............................13

      C.     The Venezuelan Government's Revocation of
              Rendón's Citizenship is Effective Under Venezuelan Law.................................15

II.    Rendón Did Not Satisfy the Condition
     Precedent Created by Section 770.01, Florida Statutes ....................................16

      A.     Counts I, II, and III Should be Dismissed Because
              Rendón's Notice Did Not Identify the Alleged False
              and Defamatory Statements With the Requisite Specificity..................................17

      B.     Counts IV, V, VI, and VII Should be Dismissed Because Rendón's
              Retraction Notice Did Not Identify the Interviews as False and
              Defamatory. ........................................................................18

C.      All Counts Should be Dismissed With Respect to Robertson and Riley
        Because Rendón Did Not Serve a Retraction Notice on Either of Them. ............19

D.      The Negligent Supervision Claim in Count VIII is a
        Defamation Claim That Fails for Noncompliance with Section 770.01...............19

III.    Rendón Has Not Stated a Claim Upon Which Relief Can be Granted Because
        Bloomberg's Reporting is Privileged, Rendón Has Not Plausibly Alleged Actual
        Malice, Rendón Has Not Plausibly Alleged the Falsity of Numerous Statements
        Challenged in the Amended Complaint, and the Amended Counts Against
        Bloomberg L.P. are Time-Barred ......................................................................20

        A.      The Reporting is Protected by the Neutral Reporting Privilege. ..........................20

        B.      The Amended Complaint Does Not Plausibly
                Allege That Bloomberg Acted With Actual Malice. ..............................................23

        C.      Rendón Does Not Plausibly Allege the
                Falsity Of Numerous Statements That He Challenges. ........................................27

        D.      Amended Counts IV, V, and VI Should be
                Dismissed Because They Do Not Relate Back to
                the Original Complaint and Are Therefore Time-Barred. ....................................28

CONCLUSION........................................................................................................29

EXHIBIT A................................................................................................................x

CERTIFICATE OF SERVICE ................................................................................ xii

ii

## TABLE OF AUTHORITIES

Cases                                                                                    Page(s)

*Abu-Zeineh v. Fed. Labs., Inc.*,
   975 F. Supp. 774 (W.D. Pa. 1994) ......................................................................11

*Ageloff v. Kiley*,
   318 F. Supp. 2d 1157 (S.D. Fla. 2004) ..............................................................12

*Bair v. Palm Beach Newspapers, Inc.*,
   No. 76-4394 CA (2) 01 A, BL 60 (Fla. 15th Cir. Ct. June 1, 1982) .......................21

*Bair v. Palm Beach Newspapers, Inc.*,
   444 So. 2d 1131 (Fla. 4th DCA 1984) ................................................................22

*Banco Nacional de Cuba v. Sabbatino*,
   376 U.S. 398 (1964) ........................................................................................13

*Bayliss v. Cox Radio, Inc.*,
   No. 8:10-cv-1030-T-27MAP, 2010 BL 242294 (M.D. Fla. Oct. 13, 2010) ............18

*Blair Holdings Corp. v. Rubinstein*,
   133 F. Supp. 496 (S.D.N.Y. 1955) ....................................................................11

*Buckner v. Lower Fla. Keys Hosp. Dist.*,
   403 So. 2d 1025 (Fla. 3d DCA 1981) .................................................................27

*Chevaldina v. Katz*,
   No. 17-22225-CIV-WILLIAMS, 2018 BL 59889 (S.D. Fla. Feb. 19, 2018) ...........10

*City of Coconut Creek v. City of Deerfield Beach*,
   840 So. 2d 389 (Fla. 4th DCA 2003) .................................................................18

*Colliton v. Cravath, Swaine & Moore LLP*,
   No. 08 Civ 0400 (NRB), 2008 WL 4386764 (S.D.N.Y. Sept. 24, 2008) ..............12

*Comparelli v. Republica Bolivariana de Venezuela*,
   891 F.3d 1311 (11th Cir. 2018) ........................................................................14

*Cummings v. Dawson*,
   444 So. 2d 565 (Fla. 1st DCA 1984) .................................................................16

*Dickey v. CBS Inc.*,
   583 F.2d 1221 (3d Cir. 1978) ...........................................................................22

*Edwards v. Nat'l Audubon Soc'y*,
   556 F.2d 113 (2d Cir. 1977) ........................................................................22, 26

iii

*El Amin v. Miami Herald Publ'g Co.*,
   No. 80-19892, 1983 BL 812 (Fla. 11th Cir. Ct. Jan. 17, 1983) ..............................................21

*Elegele v. Harley Hotels, Inc.*,
   689 So. 2d 1305 (Fla. 5th DCA 1997) ....................................................................................20

*Elof Hansson Paper & Board, Inc. v. Parodi Caldera*,
   Case No. 11-20495-CIV-UNGARO, 2011 BL 145894
   (S.D. Fla. June 27, 2011) ........................................................................................................19

*Factor v. Pennington Press, Inc.*,
   238 F. Supp. 630 (N.D. Ill. 1964) ..........................................................................................11

*Fin. Sec. Assur., Inc. v. Stephens, Inc.*,
   500 F.3d 1276 (11th Cir. 2007) ..............................................................................................17

*First Nat'l City Bank v. Banco Nacional de Cuba*,
   406 U.S. 759 (1972)................................................................................................................13

*Flintkote Co. v. Dravo Corp.*,
   678 F.2d 942 (11th Cir. 1982) ................................................................................................22

*Gannett Fla. Corp. v. Montesano*,
   308 So. 2d 599 (Fla. 1st DCA 1975) ......................................................................................17

*Gause v. Chase Home Fin. LLC*,
   No. 09-CV-4886 (JS), 2010 BL 416718 (E.D.N.Y. Mar. 9, 2010) .........................................12

*Gertz v. Robert Welch, Inc.*,
   418 U.S. 323 (1974)................................................................................................................23

*Gifford v. Bruckner*,
   565 So. 2d 887 (Fla. 2d DCA 1990) ................................................................................16, 18

*Glen v. Club Mediterranee S.A.*,
   365 F. Supp. 2d 1263 (S.D. Fla. 2005) ..................................................................................14

*Hallett v. Ohio*,
   711 F. App'x 949 (11th Cir. 2017) .........................................................................................10

*Hallmark Builders, Inc. v. Gaylord Broad. Co.*,
   733 F.2d 1461 (11th Cir. 1984) ..............................................................................................27

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
   491 U.S. 657 (1989)................................................................................................................26

*Hatjioannou v. Tribune Co.*,
   No. 82-5383, 1982 BL 421 (Fla. 13th Cir. Ct. Nov. 15, 1982) ..............................................21

iv

*Hulander v. Sunbeam Television Corp.*,
  364 So. 2d 845 (Fla. 3d DCA 1978) ...................................................17

*Huszar v. Gross*,
  468 So. 2d 512 (Fla. 1st DCA 1985) .................................................22

*Iraola & CIA, S.A. v. Kimberly-Clark Corp.*,
  232 F.3d 854 (11th Cir. 2000) .........................................................10

*Jews for Jesus, Inc. v. Rapp*,
  997 So. 2d 1098 (Fla. 2008).............................................................16

*Kantor v. Wellesley Galleries, Ltd.*,
  704 F.2d 1088 (9th Cir. 1983) .........................................................11

*Klayman v. City Pages*,
  Case No: 5:13-cv-143-Oc-22PRL, 2013 WL 12157865
  (M.D. Fla. Nov. 15, 2013) ...............................................................18

*Klayman v. Judicial Watch, Inc.*,
  22 F. Supp. 3d 1240 ..................................................................19, 20

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
  511 U.S. 375 (1994)...................................................................10, 13

*Krupski v. Costa Crociere S.p.A.*,
  560 U.S. 538 (2010)..........................................................................28

*Life of the S. Ins. Co. v. Carzell*,
  851 F.3d 1341 (11th Cir. 2017) .......................................................10

*Lil' Joe Wein Music, Inc. v. Jackson*,
  245 F. App'x 873 (11th Cir. 2007) .....................................................3

*Little v. Breland*,
  93 F.3d 755 (11th Cir. 1996) ...........................................................24

*Mancini v. Personalized Air Conditioning & Heating, Inc.*,
  702 So. 2d 1376 (Fla. 4th DCA 1997) ..............................................19

*Matimak Trading Co. v. Khalily*,
  118 F.3d 76 (2d Cir. 1997)...............................................................11

*McElmurray v. Consol. Gov't of Augusta-Richmond Cty.*,
  501 F.3d 1244 (11th Cir. 2007) .......................................................10

*Medvedieff v. Cities Serv. Oil Co.*,
  35 F. Supp. 999 (S.D.N.Y. 1940)................................................11, 14

v

*Mezerhane v. Republica Bolivariana de Venezuela*,
    785 F.3d 545 (11th Cir. 2015) ................................................................. 14

*Michel v. NYP Holdings, Inc.*,
    816 F.3d 686 (11th Cir. 2016) .................................................... 23, 25, 26

*MYD Marine Distribs, Inc. v. Donovan Marine, Inc.*,
    No. 07-61624-CIV, 2009 BL 53369 (S.D. Fla. Mar. 16, 2009) ............ 20

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964) .................................................................................. 23

*Nelson v. Associated Press, Inc.*,
    667 F. Supp. 1468 (S.D. Fla. 1987) ........................................................ 17

*Newman-Green, Inc. v. Alfonzo-Larrain*,
    490 U.S. 826 (1989) .................................................................................. 11

*Oetjen v. Cent. Leather Co.*,
    246 U.S. 297 (1918) .................................................................................. 14

*Orchid Quay, LLC v. Suncor Bristol Bay, LLC*,
    178 F. Supp. 3d 1300 (S.D. Fla. 2016) ................................................... 10

*Orlando Sports Stadium, Inc. v. Sentinel Star Co.*,
    316 So. 2d 607 (Fla. 4th DCA 1975) ......................................... 16, 17, 18

*Palm Beach Strategic Income LP v. Stanley P. Salzman, P.C.*,
    No. 10-CV-261 (JS)(AKT), 2011 BL 115910 (E.D.N.Y. May 2, 2011) ............... 12

*Pardo v. State*,
    596 So. 2d 665 (Fla. 1992) ...................................................................... 22

*Price v. Viking Penguin, Inc.*,
    881 F.2d 1426 (8th Cir. 1989) ................................................................. 22

*Rebozo v. Wash. Post Co.*,
    637 F.2d 375 (5th Cir. 1981) ................................................................... 24

*Ricaud v. Am. Metal Co.*,
    246 U.S. 304 (1918) .................................................................................. 13

*Sadat v. Mertes*,
    615 F.2d 1176 (7th Cir. 1980) ................................................................. 14

*Sarver v. Jackson*,
    344 F. App'x 526 (11th Cir. 2009) .......................................................... 27

*Scarfo v. Ginsberg*,
    175 F.3d 957 (11th Cir. 1999) ......................................................................11, 13

*Shoemaker v. Malaxa*,
    241 F.2d 129 (2d Cir. 1957) (per curiam) ..............................................................11

*Silvester v. Am. Broad. Cos.*,
    839 F.2d 1491 (11th Cir. 1988) ...................................................................24, 25

*Smith v. Russell*,
    456 So. 2d 462 (Fla. 1984)...........................................................................23

*Smith v. Taylor Cty. Publ'g Co.*,
    No. 81-2876, 1982 BL 93 (Fla. 2d Cir. Ct. Mar. 11, 1982)...................................21

*Smith v. Taylor Cty. Publ'g Co.*,
    443 So. 2d 1042 (Fla. 1st DCA 1983) .................................................................22

*Suzuki Motor Corp. v. Consumers Union of U.S., Inc.*,
    330 F.3d 1110 (9th Cir. 2003) ...........................................................................26

*Thomas v. Patton*,
    No. 16-20005-CA-00377-XXXX-MA, 2005 BL 88517
    (Fla. 4th Cir. Ct. Oct. 21, 2005) ........................................................................21

*Tobinick v. Novella*,
    No. 9:14-CV-80781, 2015 BL 70836 (S.D. Fla. Mar. 16, 2015)......................16, 18

*Tucker v. Hous. Auth. of Birmingham Dist.*,
    229 F. App'x 820 (11th Cir. 2007) .....................................................................13

*Turner v. Wells*,
    879 F.3d 1254 (11th Cir. 2018) ....................................................................23, 25

*United States v. Wong Kim Ark*,
    169 U.S. 649 (1898)........................................................................................14

*Wade v. Stocks*,
    No. 81-26, 1981 BL 169 (Fla. 2d Cir. Ct. Oct. 9, 1981)........................................21

*Wallace v. N.Y. City Dep't of Corr.*,
    No. 95 CV 4404, 1996 WL 586797 (E.D.N.Y. 1996) ..........................................12

<u>Statutes</u>

28 U.S.C. § 1332(a) ..............................................................................................10

Fed. R. Civ. P. 12(b)(1)..........................................................................................1

Fed. R. Civ. P. 12(b)(6)...............................................................................................................1

Fed. R. Civ. P. 15(c)(1)(C)(ii)..................................................................................................28

Fla. Stat. § 770.01 ............................................................................................... *passim*

GUNSTER, YOAKLEY & STEWART, P.A. / WILLKIE, FARR & GALLAGHER LLP

## REQUEST FOR HEARING

This is a dispositive motion.  Oral argument would assist the Court because this libel case, which is based on a lengthy, thorough news report, seriously threatens the reporting of news of great public concern.

GUNSTER, YOAKLEY & STEWART, P.A. / WILLKIE, FARR & GALLAGHER LLP

Defendants Bloomberg L.P.,[1] Jordan Robertson, and Michael Riley (collectively, "Bloomberg") move pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) to dismiss the Amended Complaint for lack of subject-matter jurisdiction and for failure to state a claim upon which relief can be granted.

## PRELIMINARY STATEMENT

On March 31, 2016, with the American presidential primaries in full swing, *Bloomberg Businessweek* published an article entitled "How to Hack an Election." (Am. Compl. (DE-43) Ex. A (the "Article").) In the Article, Bloomberg reported the account of Andres Sepúlveda, who had been convicted, after a highly publicized arrest and trial, of hacking the 2014 Colombian presidential election. During a series of exclusive interviews, Sepúlveda admitted for the first time that he had engaged in similar hacking activities throughout Latin America for almost a decade prior to his arrest.

The Article reports Sepúlveda's claim that he first became involved in election hacking in 2005, after he met J.J. Rendón, the so-called "Karl Rove of Latin American politics," while working on a campaign for the party of Álvaro Uribe, the former president of Colombia. From there, the Article reports Sepúlveda's detailed account of how, as directed and paid by Rendón, he engaged in computer hacking and manipulated social media to influence the outcome of numerous elections throughout Latin America. The Article also includes Rendón's side: it makes clear that he "denies using Sepúlveda for anything illegal, and categorically disputes the account Sepúlveda gave *Bloomberg Businessweek* of their relationship, but admits knowing him and using him to do website design." (Article at 62.)

As a threshold matter, Rendón's Amended Complaint should be dismissed for lack of subject-matter jurisdiction. Rendón is neither a citizen of a State nor a citizen or subject of a foreign state. As he alleged in his original Complaint, the Venezuelan government stripped him of his citizenship, and he is therefore "***countryless***." Rendón now claims that Venezuela's action is of no force or effect under Venezuelan law, even though he has obtained no administrative or judicial ruling to that effect from a Venezuelan court or entity. Rendón's new allegation that he is a citizen of Venezuela plainly and irreconcilably contradicts his original allegation that Venezuela stripped him of his citizenship, and this Court should disregard Rendón's allegation of

---

[1]   The Amended Complaint also names as a defendant *Bloomberg Businessweek*, which is not a legal entity, but rather the trade name of a publication owned by Bloomberg L.P.

Venezuelan citizenship accordingly.  Furthermore, the act of state doctrine bars this Court from declaring the Venezuelan government's stripping Rendón of his citizenship to have been invalid. *See* Point I.

Rendón's Amended Complaint also should be dismissed because Rendón failed to give the defendants the pre-filing notice required by Section 770.01, Florida Statutes.  Rendón's notice to Bloomberg L.P. did not identify any of the statements that he now alleges to be false and defamatory and failed to even mention the interviews which he now claims were defamatory.  Rendón's failure to serve a satisfactory pre-filing notice bars all of his claims against Bloomberg L.P.  *See* Point II.A and Point II.B.  Additionally, Rendón sent no notice at all to the individual defendants.  His claims against them therefore fail as a matter of law.  *See* Point II.C.  Rendón's purported negligent supervision claim is merely a thinly-disguised defamation claim that fails because Rendón did not comply with Section 770.01 and pursuant to Florida's single publication rule.  *See* Point II.D.

Additionally, Rendón's Amended Complaint should be dismissed because it does not state a claim.  *First*, Bloomberg's reporting is protected by the neutral reporting privilege.  The Article makes clear that it is reporting Sepúlveda's account of Rendón's involvement in election hacking activities.  Sepúlveda's allegations are plainly newsworthy.  The Amended Complaint acknowledges that Sepúlveda's trial for election hacking in Colombia was widely reported, both in Colombia and internationally.  That Sepúlveda engaged in similar hacking conduct throughout Latin America, and has claimed Rendón directed and paid him to engage in such election hacking, is equally and indisputably newsworthy.  Bloomberg neutrally and disinterestedly reported Sepúlveda's statements and Rendón's denials.  This sort of reporting on a matter of profound public interest—the sanctity of democratic processes—is privileged under Florida law and the First Amendment.  *See* Point III.A.

*Second*, the Amended Complaint should be dismissed because Rendón does not and cannot allege that Bloomberg published with actual malice.  Rendón affirmatively alleges that he is a famous political strategist and describes himself as a well-known advocate for free and open elections throughout Latin America.  Accordingly, he is a "public figure" and cannot prevail on his defamation claim unless he can allege and then prove by clear and convincing evidence that Bloomberg published with "actual malice"—*i.e.*, that Bloomberg <u>knew</u> its reporting was false or <u>actually entertained serious doubts</u> about its truth.  Rendón cannot do so.  As the Article makes

2

clear, and the Amended Complaint does not dispute, Bloomberg (i) thoroughly researched and independently verified Sepúlveda's account before it was published and (ii) reported his hacking conviction and Rendón's denials so that readers could draw their own conclusions as to Sepúlveda's veracity.  This is fatal to Rendón's defamation claim.  *See* Point III.B.

*Third*, Rendón cannot claim that several statements he challenges about Sepúlveda's conduct are false.  According to Rendón, he had no interaction or relationship with Sepúlveda beyond a single web design project in 2005.  Taking this allegation as true, it is impossible for Rendón plausibly to allege as false the Article's reporting of Sepúlveda's admissions about his own hacking activities in several Latin American elections.  Rendón's Amended Complaint should be dismissed to the extent it alleges any such statements are false and defamatory.  *See* Point III.C.

*Fourth*, amended Counts IV, V, and VI do not relate back to the date of Rendón's original Complaint and are barred by the statute of limitations.  *See* Point III.D.

FACTUAL BACKGROUND[2]

A.    Rendón is a Well Known Political Operative.

Plaintiff Rendón is a prominent political consultant, famous throughout Latin America, who claims to have directed or consulted on a number of high-profile political campaigns, including the campaigns of Juan Manuel Santos and Álvaro Uribe in Colombia, Enrique Peña Nieto in Mexico, Hipólito Mejía in the Dominican Republic, and Porfirio Lobo Sosa and Juan Orlando Hernández in Honduras.  (Am. Compl. ¶¶ 2, 8, 22–24, 29–31.)  According to the *Miami New Times*, which profiled him in 2010, he is known as "Latin America's Karl Rove."[3]

According to the Amended Complaint, Rendón is also an outspoken advocate for "democratic ideals and an advocate for free and open elections and governments throughout the

---

[2]    With the exception of Rendón's allegation that he is a citizen of Venezuela, *see* Point I, *infra*, Bloomberg accepts the well-pled factual allegations of the Amended Complaint as true (to the extent not contradicted by the Amended Complaint's attachments or the matters it incorporates by reference), solely for purposes of this motion, and reserves its right to challenge the veracity of those allegations at the appropriate time if this action is not dismissed.

[3]    Tim Elfrink, "J.J. Rendón is Latin America's Karl Rove," *Miami New Times*, July 1, 2010 (Korn Decl. Ex. 1); *see also* Article at 62 (identifying Rendón as "a Miami-based political consultant who's been called the Karl Rove of Latin America").  This Court may take judicial notice of publicly available news articles.  *See, e.g.*, *Lil' Joe Wein Music, Inc. v. Jackson*, 245 F. App'x 873, 879 (11th Cir. 2007).

world," and has been recognized by "several governments and respected organizations and institutions throughout his career." (*Id.* ¶¶ 8, 29–30.) He has attracted such notoriety for promoting democracy that the President of Venezuela labeled him "Public Enemy No. 1." (*Id.* ¶ 49.) Rendón alleges that he currently resides in Miami, Florida, where he also operates his political consulting firms, JJ Rendón & Associates and Strategic Creativity, LLC.[4] (*Id.* ¶ 26.)

B.      After an Exhaustive Investigation, Bloomberg
         Publishes Sepúlveda's Account of His Hacking
         of Elections in Latin America—and Rendón's Denials.

On March 31, 2016, following a nine-month investigation, Bloomberg published an article entitled "How to Hack an Election." (*Id.* ¶¶ 64, 80 & Exs. A, B.) The Article was authored by Jordan Robertson, Michael Riley, and Andrew Willis and initially published on Bloomberg's website. (*Id.* ¶¶ 12–14, 97, 121.) The Article was republished in the April 4–10, 2016, U.S. and international print editions of *Bloomberg Businessweek* magazine. (*Id.* ¶¶ 136, 151.) In addition, on April 1, 2016, Bloomberg's Mexico City Bureau Chief, Carlos Manuel Rodríguez, discussed the Article in three interviews—a CNN En Español news segment, a notiguía.TV online show, and a Radio Fórmula show. (*Id.* ¶¶ 166, 181, 196.) That same day, Bloomberg reporter Jordan Robertson made statements regarding the Article on the PRI Public International radio show.[5] (*Id.* ¶ 211.)

---

[4]      Rendón's tactics in the political arena have been the subject of substantial criticism and public commentary. From a review of publicly available court filings, the instant case against Bloomberg and its reporters is at least the <u>fifth</u> defamation lawsuit that Rendón has filed in Florida. *See Rendón v. Funes*, No. 2014-2756-CA-01 (Fla. 11th Cir. Ct., filed Jan. 31, 2014) (allegations that the president of El Salvador defamed Rendón by stating that he, among other things, "orchestrates dirty war campaigns in all of Latin America" dismissed for lack of jurisdiction); *Rendón v. La W Radio et al.*, No. 2009-067449-CA-01 (Fla. 11th Cir. Ct., filed Sept. 11, 2009) (allegations that Caracol Radio and two of its journalists defamed Rendón by reporting that he had tried to blackmail a party official voluntarily dismissed); *Rendón v. Linares*, No. 10-23300-CA-01 (Fla. 11th Cir. Ct., filed Apr. 19, 2010) (allegations that former Mexican government official defamed Rendón by, among other things, claiming he "is an international delinquent that orchestrates dirty war campaigns in all of Latin America" dismissed for failure to prosecute); *Rendón v. Perdomo*, No. 2014-003564-CA-01 (Fla. 11th Cir. Ct., filed Feb. 7, 2014) (allegations that, during the Salvadoran presidential election, Minister of Justice and Security for the Republic of El Salvador defamed Rendón by calling him a rapist dismissed for failure to prosecute on May 6, 2015). (*See* Korn Decl. Exs. 2–9.)

[5]      For convenience, the online and print editions of the Article will be referred to collectively herein as the "Article," and the four interviews will be referred to as the "Interviews."

The controversy surrounding Sepúlveda's election hacking activities—including whether Sepúlveda worked with Rendón—predates Bloomberg's reporting by two years.  On May 19, 2014, CNN reported the following statement by former Colombian President Uribe: "(Sepúlveda) is an alleged 'hacker' who has worked with (Venezuelan political strategist) J.J. Rendón, who's close to President Santos."[6]  Numerous other articles in the Latin American and international press closely followed Sepúlveda's arrest and conviction.[7]   The Amended Complaint acknowledges that these were high-profile events that "became international news and were widely reported on in Colombia and in international media outlets." (*Id.* ¶ 39.)  This is unsurprising, given that the media had focused its attention on the possibility that democratic governments and elections might be compromised by computer hacking well before the Article was published and well before the circumstances surrounding the 2016 U.S. presidential election became the subject of daily news coverage in this country.[8]  Rendón was also the subject of public controversy when he resigned from Colombian President Santos's re-election campaign "amid allegations he took US$12m from some of Colombia's top drug lords in exchange for helping to negotiate their surrender."[9]

---

[6]   Rafael Romo, "Alleged hacker video roils last days of Colombian presidential campaign," *CNN*, May 19, 2014 (Korn Decl. Ex. 10).

[7]   Natalie Roterman, "Opposition Hacker Andrés Sepúlveda Sentenced To 10 Years In Prison For Spying On Colombia Peace Process," *Latin Times*, Apr. 12, 2015 (reporting on Sepúlveda's conviction and ten-year sentence for election-related hacking) (Korn Decl. Ex. 11); Jim Wyss, "Detained Colombia hacker outlines alleged political plot against peace process," *Miami Times*, Aug. 25, 2014 (describing Sepúlveda's account of the hacking operation that led to his arrest and trial) (Korn Decl. Ex. 12); Sibylla Brodzinsky, "Scandals taint Colombian presidential race," *The Guardian*, May 12, 2014 ("Colombia's attorney general charged . . . Andres Sepúlveda, with illegally intercepting communications of government and Farc negotiators in an attempt to sabotage the peace talks.") (Korn Decl. Ex. 13).

[8]   Michelle Martin & Erik Kirschbaum, "Pro-Russian group claims cyber attack on German government websites," *Reuters*, Jan. 7, 2015 (discussing attack by Russian hackers on German government websites) (Korn Decl. Ex. 14); Malia Zimmerman, "Hack the vote: Cyber experts say ballot machines easy targets," *Fox News*, June 14, 2015 (detailing vulnerabilities in U.S. election systems) (Korn Decl. Ex. 15); Pam Fessler, "Vulnerable Voting Machine Raises Questions About Election Security," *NPR*, Apr. 16, 2015 (Korn Decl. Ex. 16) (same).

[9]   Associated Press, "Juan Manuel Santos campaign chief resigns amid bribery allegations," *The Guardian*, May 6, 2014 (Korn Decl. Ex. 17); *see also* William Neuman, "In Colombia, an Election May Turn on a Dirty War," *N.Y. Times*, May 15, 2014 ("[A] Colombian drug kingpin jailed in the United States had told investigators that in 2011 he and three other

5

The Article reports that Andrés Sepúlveda is "serving 10 years in prison [in Colombia] for charges including use of malicious software, conspiracy to commit crime, violation of personal data, and espionage, related to hacking during Colombia's 2014 presidential election." (Article at 61; *see also id.* at 62, 65.)  The Article reports Sepúlveda's admission that he hacked other elections in Latin America and his assertion that he did so while employed by Rendón.  (*Id.* at 62.)  Although the Amended Complaint repeatedly alleges that it was "the Bloomberg Reporters" who "claimed" that Rendón paid Sepúlveda to hack elections (Am. Compl. ¶¶ 84–90), the Article is clear that Bloomberg is merely reporting Sepúlveda's account.  This is evident from the cover of *Bloomberg Businessweek* itself, which contains a photo of Sepúlveda with the headline:  "Confessions of a Political Hacker:  One man's story of manipulating elections across Latin America."  (*Id.* ¶ 80.)  The statements the Amended Complaint alleges were defamatory make clear that they are statements by Sepúlveda about Rendón.  (*Id.* ¶ 122 ("Usually, he says, he [Sepúlveda] was on the payroll of Juan José Rendón . . . .") (emphasis added).)

As the Amended Complaint admits, Bloomberg's reporters also interviewed Rendón three times, starting a full month prior to publication, to seek his comments and responses to Sepúlveda's allegations.  (*Id.* ¶¶ 70–73.)  For example, immediately after reporting Sepúlveda's claim that "he was on the payroll of Juan José Rendón," the Article stated:

> Rendón denies using Sepúlveda for anything illegal, and categorically disputes the account Sepúlveda gave *Bloomberg Businessweek* of their relationship, but admits knowing him and using him to do web design.  "If I talked to him maybe once or twice, it was in a group session about that, about the Web, he [Rendón] says.  "I don't do illegal stuff at all.  There is negative campaigning.  They don't like it—OK.  But if it's legal, I'm gonna do it.  I'm not a saint, but I'm not a criminal."

(Article at 62; *see also id.* at 65 (quoting Rendón: "I never paid Andrés Sepúlveda a peso.").)  After reporting that "Sepúlveda provided *Bloomberg Businessweek* with what he says are e-mails showing conversations between him, Rendón, and Rendón's consulting firm concerning hacking and the progress of campaign-related cyber attacks," Bloomberg reported that "Rendón says the e-mails are fake."  (*Id.* at 62)  After reporting Sepúlveda's account of how he was initially hired by Rendón in 2005 after Rendón learned that Sepúlveda had hacked Rendón's computer during a

---

traffickers had paid a total of $12 million to a close political adviser of Mr. Santos. . . . The adviser, J. J. Rendón, a Venezuelan-born political consultant who lives in the United States, acknowledged serving as an intermediary but denied taking money.") (Korn Decl. Ex. 18).

visit to the campaign headquarters of former Colombian President Uribe, Bloomberg reported that "Rendón says this never happened." (*Id.*) And after reporting about a specific e-mail in which Rendón "seemed to congratulate Sepúlveda" for a successful hack, Bloomberg reported that "Rendón says he never sent such an e-mail." (*Id.* at 63.)

The Article and the Amended Complaint also make clear that Bloomberg extensively researched Sepúlveda's account to verify its accuracy prior to publication. Sepúlveda's account was supported by e-mails that he provided to Bloomberg "showing conversations between him, Rendón, and Rendón's consulting firm concerning hacking and the progress of campaign-related cyber attacks." (*Id.* at 62.) Bloomberg had those e-mails and samples of Sepúlveda's code reviewed by an independent security firm and was told they appeared authentic. (*Id.*) Bloomberg interviewed or attempted to interview numerous sources. (*Id.* at 62–64.) Bloomberg matched Sepúlveda's account of particular election incidents with objectively verifiable information. (*Id.* at 62–63.)

C.   Rendón Demands That Bloomberg Retract the Article
     But Does Not Identify Any Particular False Statements.

On August 16, 2016, Rendón's counsel sent Bloomberg L.P.—but not defendants Robertson and Riley—a letter regarding the Article. (Korn Decl. Ex. 19.) The letter states that the Article "falsely stated that Mr. Rendón hired Andrés Sepúlveda to 'rig elections throughout Latin America' and falsely stated, both directly and by implication, that Mr. Rendón initiated, directed, and condoned illegal and unethical cyberattacks in order to influence the outcome of high-profile political elections." (*Id.* at 1.) The letter further states that "[s]tatements in the Article that Mr. Rendón hired Andrés Sepúlveda to perform illegal or unethical work is [sic] demonstrably false and defamatory per se." (*Id.* at 2.) The letter also alludes to "[f]alse allegations in the Article that Mr. Rendón somehow procured, directed, engaged in, or condoned criminal and/or unethical conduct to 'hack' or 'rig' elections throughout Latin America[.]" (*Id.* at 3.) The letter does not quote any of the eighteen statements that Rendón now alleges are "false and defamatory." (*Compare* Korn Decl. Ex. 19 *with* Am. Compl. ¶¶ 122, 137, 152.)

The letter also repeats Rendón's denials of Sepúlveda's accusations, which Bloomberg had previously reported in the Article. The letter asserts, among other things, that Rendón's consulting company hired Sepúlveda for a single web design project, that this project was Rendón's only contact with Sepúlveda, that neither Rendón nor his agents hired Sepúlveda for "unlawful or unethical conduct," and that Sepúlveda is a "convicted felon with clear incentive to

make false allegations about others in order to benefit his own legal circumstances."  (*Id.* at 2.)
The letter demands the retraction of the Article and an apology to Rendón.  (*Id.* at 3.)

>      D.      Rendón Files His Original Complaint, in Which He Admits He is
>              *Countryless*, Then Scrambles to Manufacture Subject-Matter Jurisdiction.

Rendón filed his original Complaint on March 30, 2017.  The original Complaint
affirmatively pled that Rendón was <u>not</u> a citizen of the United States or any foreign state.  It
alleged Rendón was "an individual" living in Miami, Florida, who had "been disavowed by the
Venezuelan government, which has declared him to be '*countryless*.'"  (DE-1 (Compl.) ¶¶ 19,
50 ("This act of stripping Mr. Rendón of his fundamental right to citizenship and nationality
includes the revocation of his Venezuelan passport, which restricts his ability to travel
completely").)  Rendón further admitted he is not a U.S. citizen.  (Compl. ¶ 52.)

After Bloomberg filed a motion to dismiss for lack of subject-matter jurisdiction, Rendón
filed a series of motions in an attempt to salvage his case, including (1) a motion to amend the
Complaint (DE-28), (2) a motion to drop defendants Andrew Willis and Carlos Manuel
Rodríguez (DE-27), and (3) a response to Bloomberg's motion to dismiss for lack of subject-
matter jurisdiction (DE-33).[10]  In his motion to amend the Complaint, Rendón for the first time
asserted that he is in fact a Venezuelan citizen and claimed that, although the Venezuelan
government had "attempted" to strip him of his citizenship and nationality, the revocation of his
citizenship was without force under Venezuelan law.  (DE-28 at 3, 5; DE-33 at 1, 5–7.)  On
July 3, 2018, Rendón also filed a motion for leave to file supplemental briefing in support of his
motion to amend the Complaint.  (DE-38.)  Rendón sought to introduce purported "newly
discovered and previously unavailable evidence" including a "USCIS-issued travel permit" that
identifies his nationality as Venezuelan.  (DE-38 at 2.)  Rendón claimed he had received this
permit 13 days after the completion of briefing on Bloomberg's motion to dismiss for lack of
subject-matter jurisdiction but did not explain how he had come to obtain this document or attach
the document to his motion.  (*Id.*)

On September 13, 2018, Magistrate Judge Torres (i) permitted Rendón to amend his
Complaint and plead that—contrary to his original allegations—he is a citizen of Venezuela and

---

[10]   Bloomberg did not oppose Rendón's motion to dismiss Willis and Rodríguez.  On
June 4, 2018, the parties filed a joint stipulation to dismiss Willis and Rodríguez with prejudice.
(DE-34.)  On September 13, 2018, Judge Torres denied Rendón's motion as moot in light of his
order granting Rendón leave to amend his Complaint.  (DE-42.)

(ii) denied as moot Bloomberg's pending motions to dismiss.  (DE-41, DE-42.)  However, Judge Torres expressly recognized that "it is also possible that even with the clarifications in the amended complaint dismissal is still warranted."  (DE-41 at 9.)  Indeed, Judge Torres observed that "Defendants make a persuasive case" that the new "facts" on which Rendón purports to rely "have no bearing on the ultimate outcome."[11]  (*Id.* at 13.)

       E.      Rendón Files His Amended Complaint and
               Asserts Four New Claims Against Bloomberg L.P.

Rendón filed his Amended Complaint on September 14, 2018.  (DE-43.)  Counts I, II, and III assert claims for libel against Bloomberg.  Count I arises from statements that were published in the Article on Bloomberg's website on March 31, 2016.  (*Id.* ¶¶ 120–34.)  Count II arises from statements that were published in the Article in the U.S. print edition of *Bloomberg Businessweek* magazine on or about April 4, 2016.  (*Id.* ¶¶ 135–49.)  Count III arises from statements that were published in the Article in the international print edition of *Bloomberg Businessweek* magazine on or about April 4, 2016.  (*Id.* ¶¶ 150–64.)

For the first time, in Counts IV, V, and VI Rendón asserts claims for slander against Bloomberg L.P., by and through Rodríguez as Bloomberg L.P.'s employee and agent, but not against Rodríguez himself.  Count IV arises from statements that Rodríguez made during a CNN en Español news segment on April 1, 2016.  (*Id.* ¶¶ 165–79.)  Count V arises from statements that Rodríguez made during a notiguía.tv news segment on April 1, 2016.  (*Id.* ¶¶ 180–94.)  Count VI arises from statements that Rodríguez made during a Radio Fórmula news segment on April 1, 2016.  (*Id.* ¶¶ 195–209.)

Count VII asserts a claim for slander arising from statements Robertson made during a PRI Public International Radio segment on April 1, 2016.  (*Id.* ¶¶ 210–24.)

Count VIII asserts a new claim, styled as a negligent supervision claim against Bloomberg L.P.  (*Id.* ¶¶ 223–30.)  Count VIII is founded on the statements alleged to be defamatory in Counts I through VII.  (*Id.* ¶ 231.)

As explained below, the Amended Complaint should be dismissed in its entirety.

---

[11]  On September 27, 2018, Bloomberg filed an Objection to Judge Torres's decision on the grounds that Rendón should not have been permitted to file an amended complaint that contradicts his original allegations regarding his citizenship.  (DE-47.)  Bloomberg also appealed Judge Torres's order denying Bloomberg's motions to dismiss, on the grounds that Judge Torres did not have the authority to enter that order.  (*Id.*)

ARGUMENT

I.

The Court Does Not Have
Subject-Matter Jurisdiction Over Rendón's Claims

"Federal courts are courts of limited jurisdiction" and "possess only that power authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see also Hallett v. Ohio*, 711 F. App'x 949, 950 (11th Cir. 2017) (quoting *Kokkonen*). The federal courts' diversity and alienage jurisdiction is restricted by statute to civil actions between "(1) citizens of different States; (2) citizens of a State and citizens or subjects of a foreign state"; "(3) citizens of different States and in which citizens or subjects of a foreign state are additional parties; and (4) a foreign state . . . as plaintiff and citizens of a State or of different States." 28 U.S.C. § 1332(a). Assuming the amount-in-controversy threshold is met, there are two requirements for subject-matter jurisdiction based on diversity or alienage: "(1) adverse parties *cannot be* citizens of the same [S]tate and (2) each party must also affirmatively *be* a citizen of a [S]tate (or be a foreign state or citizen or subject thereof)." *Orchid Quay, LLC v. Suncor Bristol Bay, LLC*, 178 F. Supp. 3d 1300, 1306 (S.D. Fla. 2016) (citations omitted). "Diversity of the parties is determined at the time that the complaint is filed[.]" *Iraola & CIA, S.A. v. Kimberly-Clark Corp.*, 232 F.3d 854, 860 (11th Cir. 2000).

"It is to be presumed that a cause lies outside [the federal courts'] limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Kokkonen*, 511 U.S. at 377 (citations omitted). *See also Life of the S. Ins. Co. v. Carzell*, 851 F.3d 1341, 1344 (11th Cir. 2017) ("The party seeking to invoke a federal forum traditionally bears the burden of persuasion on jurisdictional issues such as establishing the citizenship of the parties.") (citations omitted). Indeed, this Court has dismissed complaints when the party asserting federal diversity jurisdiction has failed (despite multiple attempts) to sufficiently allege facts to meet the burden of establishing jurisdiction. *Chevaldina v. Katz*, No. 17-22225-CIV-WILLIAMS, 2018 BL 59889 (S.D. Fla. Feb. 19, 2018).

Under Federal Rule of Civil Procedure 12(b)(1), a party may challenge a federal court's jurisdiction by "facial attack" or "factual attack." *See, e.g.*, *McElmurray v. Consol. Gov't of Augusta-Richmond Cty.*, 501 F.3d 1244, 1251 (11th Cir. 2007). A factual attack—like Bloomberg's here—does not carry the "presumption of truthfulness afforded a plaintiff under

10

Federal Rule of Civil Procedure 12(b)(6) . . . and the court is free to weigh the evidence." *Scarfo v. Ginsberg*, 175 F.3d 957, 960 (11th Cir. 1999) (citation omitted).

A.   Rendón's Original Complaint Established His
     Statelessness and This Court's Lack of Subject-Matter Jurisdiction.

Rendón's allegations in his original Complaint conclusively established that he is stateless and that this Court lacks subject-matter jurisdiction.  First, Rendón alleged that he was not a citizen of a State.  In order to be a citizen of a State within the meaning of the diversity statute, a natural person must be a citizen of the United States.  *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 828 (1989).  Rendón was not a citizen of the United States—and therefore was not a citizen of any State—when he filed his Complaint.  (*See* Compl. ¶¶ 8, 52 (alleging Rendón was granted asylum and "path to United States citizenship" in 2016).  *See also* Am. Compl. ¶¶ 8, 52 (same).)

Second, Rendón clearly and unequivocally admitted that he was not a citizen of Venezuela when he filed suit.  (Compl. ¶ 50 (Rendón has been "stripp[ed] of his citizenship").)[12] Rendón also admitted that Venezuela has "disavowed" him and declared him "***countryless***." (Compl. ¶ 50.)  Because Rendón is not a citizen or subject of Venezuela or any other foreign state, he is stateless—"the proverbial man without a country—[who] cannot sue a United States citizen under alienage jurisdiction."[13]

---

[12]   The circumstances under which Venezuela revoked Rendón's citizenship and nationality are irrelevant to the question of whether Rendón is a citizen or subject of a foreign state.  *See, e.g., Medvedieff v. Cities Serv. Oil Co.*, 35 F. Supp. 999, 1001 (S.D.N.Y. 1940) (court had no alienage jurisdiction over claims brought by plaintiff stripped of his Italian citizenship by fascist government of Italy in 1938).

[13]   *Matimak Trading Co. v. Khalily*, 118 F.3d 76, 86 (2d Cir. 1997) (citations omitted), *abrogated on other grounds by JPMorgan Chase Bank v. Traffic Stream (BVI) Infrastructure Ltd.*, 536 U.S. 88 (2002) (holding citizen of British overseas territory is citizen of United Kingdom and, therefore, is not stateless, as *Khalily* had concluded); *see also Kantor v. Wellesley Galleries, Ltd.*, 704 F.2d 1088, 1090–92 (9th Cir. 1983) (no alienage jurisdiction where Soviet Union had revoked plaintiff's citizenship); *Shoemaker v. Malaxa*, 241 F.2d 129, 129 (2d Cir. 1957) (per curiam) (no alienage jurisdiction where Romania had revoked defendant's citizenship); *Abu-Zeineh v. Fed. Labs., Inc.*, 975 F. Supp. 774, 776–78 (W.D. Pa. 1994) (no alienage jurisdiction because Palestinian plaintiffs are not citizens or subjects of a foreign state); *Factor v. Pennington Press, Inc.*, 238 F. Supp. 630, 633 (N.D. Ill. 1964) (no alienage jurisdiction where plaintiff failed to substantiate claim of U.K. citizenship); *Blair Holdings Corp. v. Rubinstein*, 133 F. Supp. 496, 499 (S.D.N.Y. 1955) (no alienage jurisdiction where defendant had forfeited Soviet citizenship and had been stripped of Portuguese citizenship).

11

In a transparent attempt to save his case, Rendón has done an about-face and now alleges that "[h]e was born in Venezuela and has been at all times and currently is a Venezuelan citizen and national." (Am. Compl. ¶ 7.)  Because Bloomberg's challenge to this Court's subject-matter jurisdiction is factual, not facial, the Court is not required to accept Rendón's self-serving amended allegation as true.

Indeed, this Court is not required to consider Rendón's allegation of Venezuelan citizenship at all, because it plainly and irreconcilably contradicts his prior, unequivocal allegations that he "has been disavowed by the Venezuelan government, which has declared him to be '***countryless***,'" and that Venezuela had "stripp[ed] [him] of his fundamental right to citizenship[.]"  (*Compare* Compl. ¶ 50 *and* Am. Compl. ¶ 8.)  *See, e.g.*, *Gause v. Chase Home Fin. LLC*, No. 09-CV-4886 (JS), 2010 BL 416718, at *1–2 (E.D.N.Y. Mar. 9, 2010) (rejecting amended allegations that plaintiff was a citizen of the United States and defendants were citizens "of unknown jurisdiction," crediting original allegations that parties were citizens of New York, and dismissing amended complaint for lack of subject-matter jurisdiction); *Ageloff v. Kiley*, 318 F. Supp. 2d 1157, 1159 (S.D. Fla. 2004) (rejecting amended allegation that defendant threatened plaintiff in 2000 or 2001, crediting original allegation that threats were made between 1997 and 2000, and dismissing claim as barred by statute of limitations).[14]

Rendón claims that what he really meant to allege was that he is a Venezuelan citizen—that the Venezuelan government had merely "acted" to strip him of his citizenship, but, as a matter of Venezuelan law, this "attempt" was without legal effect.  (DE-33 at 5–7; DE-35 at 6.)  Rendón not only pleaded—clearly and unambiguously—that Venezuela had stripped him of his citizenship, disavowed him, and rendered him ***countryless***.  He also filed a civil cover sheet in which he identified one or more defendants—but not himself—as a citizen of a foreign state.

---

[14]   *See also Palm Beach Strategic Income LP v. Stanley P. Salzman, P.C.*, No. 10-CV-261 (JS)(AKT), 2011 BL 115910, at *6–7 (E.D.N.Y. May 2, 2011) (refusing to accept as true allegations in amended complaint contradicted by prior complaints and dismissing with prejudice); *Colliton v. Cravath, Swaine & Moore LLP*, No. 08 Civ 0400 (NRB), 2008 WL 4386764, at *6 (S.D.N.Y. Sept. 24, 2008), *aff'd*, 356 F. App'x 535 (2d Cir. 2009) (disregarding amended allegation that defendant had not employed plaintiff as attorney, crediting original allegation that defendant had employed plaintiff as attorney, and granting motion to dismiss); *Wallace v. N.Y. City Dep't of Corr.*, No. 95 CV 4404, 1996 WL 586797, at *2 (E.D.N.Y. 1996) (disregarding allegations in amended complaint, made in response to motion to dismiss, that "directly contradict[ed] the facts set forth in [plaintiff's] original complaint").

(DE-1-1.)   Only after learning that his statelessness deprived the Court of subject-matter jurisdiction and that his case would be dismissed—after the running of the statute of limitations—did Rendón reverse course and attempt to identify himself as a Venezuelan citizen.

Rendón's admission that the Venezuelan government stripped him of his citizenship is dispositive evidence of his statelessness.  *See, e.g.*, *Tucker v. Hous. Auth. of Birmingham Dist.*, 229 F. App'x 820, 826 (11th Cir. 2007) (pleadings that are "superseded by amendment, withdrawn or dismissed[] are admissible as admissions of the pleading party to the facts alleged therein").   Rendón may now claim he is a Venezuelan citizen, but his original denial of Venezuelan citizenship—made at a time when Rendón did not realize that such an admission would be fatal to his claims—is plainly more credible than Rendón's self-serving reversal in the face of a meritorious motion to dismiss for lack of subject-matter jurisdiction.  *See Scarfo*, 175 F.3d at 960 ("the court is free to weigh the evidence").   At worst, Rendón's contradictory claims regarding his citizenship cancel one another out, in which case Rendón cannot carry his burden of establishing that his case lies within the Court's limited jurisdiction.  *See Kokkonen*, 511 U.S. at 377 (citations omitted).

> B.      The Act of State Doctrine Bars the Court From Considering
>             or Accepting Rendón's Assertion of Venezuelan Citizenship.

Rendón has not recanted his factual allegation that Venezuela acted to deprive him of his citizenship in that country, but now claims that the Venezuelan government's stripping him of his citizenship was invalid under Venezuelan law and that he remains a citizen of that country. The act of state doctrine precludes the Court from accepting these assertions challenging the validity of the Venezuelan government's actions.  Indeed, the act of state doctrine "precludes any review whatever of the acts of the government of one sovereign State done within its own territory by the courts of another sovereign State."  *First Nat'l City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 763 (1972).  *See also Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 416 (1964) (quoting *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897)) ("'Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another, done within its own territory.").

"[W]hen it is made to appear that the foreign government has acted in a given way on the subject-matter of the litigation, the details of such action or the merit of the result cannot be questioned but must be accepted by our courts as a rule for their decision."  *Ricaud v. Am. Metal*

13

*Co.*, 246 U.S. 304, 309 (1918).  In other words, "the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid."  *W.S. Kirkpatrick & Co.*, 493 U.S. at 409.  *See also Glen v. Club Mediterranee S.A.*, 365 F. Supp. 2d 1263, 1271 (S.D. Fla. 2005) (citations omitted) (act of state doctrine "does not simply relieve the foreign government of liability for its acts, but operates as an issue preclusive device, foreclosing judicial inquiry into the validity or propriety of such acts in litigation between any set of parties."), *aff'd*, 450 F.3d 1251 (11th Cir. 2006).  Thus, the act of state doctrine precludes a challenge to another sovereign nation's conduct in stripping a party of his citizenship.  *Medvedieff*, 35 F. Supp. at 1001.[15]

It is undisputed that the Venezuelan government acted to strip Rendón of his citizenship and nationality.  (Am. Compl. ¶ 50; DE-33 at 5–7; DE-35 at 6.)  This act—taken by the Venezuelan government, a foreign sovereign, within its own jurisdiction—must "be deemed valid" and must be "accepted" by this Court "as a rule for [its] decision."  *See W.S. Kirkpatrick & Co.*, 493 U.S. at 409; *Ricaud*, 246 U.S. at 309.  It is not for this Court to adjudicate whether, as Rendón contends, "Venezuela cannot, under its own laws, revoke [his] citizenship or nationality."  (DE-33 at 9.)

Application of the act of state doctrine is particularly appropriate here because "the generally accepted test for determining whether a person is a foreign citizen for purposes of 28 U.S.C. § 1332(a)(2) is whether the country in which citizenship is claimed would so recognize him."[16]  Venezuela plainly <u>would not</u> recognize Rendón as a citizen or national (Compl. ¶ 50),

---

[15]   The act of state doctrine applies even when a foreign nation is accused of violating either its own law or international law.  *See, e.g.*, *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 304 (1918) ("It is not necessary to consider . . . the validity of the levy of the contribution made by the Mexican commanding general, under rules of international law applicable to the situation, since the subject is not open to re-examination by this or any other American court."); *Mezerhane v. Republica Bolivariana de Venezuela*, 785 F.3d 545, 547, 551–52 (11th Cir. 2015) (act of state doctrine barred claims that Venezuela had "engaged in a pattern of persecution against him that included numerous violations of human rights law, expropriation of his property in violation of international law, and other tortious acts").

[16]   *Sadat v. Mertes*, 615 F.2d 1176, 1183 (7th Cir. 1980); *see also United States v. Wong Kim Ark*, 169 U.S. 649, 668 (1898) ("[I]t is the inherent right of every independent nation to determine for itself, and according to its own constitution and laws, what classes of persons shall be entitled to its citizenship[.]"); *cf. Comparelli v. Republica Bolivariana de Venezuela*, 891 F.3d 1311, 1321 (11th Cir. 2018) ("International law recognizes that it is generally up to each state (i.e., country) to determine who are its nationals.").

14

and on this question this Court cannot substitute its judgment for that of the Venezuelan government.[17]

C.   The Venezuelan Government's Revocation of
Rendón's Citizenship is Effective Under Venezuelan Law.

Even if this Court were free to review the Venezuelan government's revocation of Rendón's citizenship, the result would be the same:  Rendón was not a citizen of Venezuela when he filed suit.  Under Venezuelan law, the executive branch of the Venezuelan government has the authority to issue "binding rules, interpretations, adjudications, orders, warrants or edicts" (each an "administrative act") that "constrain or interfere with the rights of Venezuelan citizens" or anyone else subject to Venezuelan law.  (*See* González Decl. ¶ 11.)  The executive branch may take an administrative act without "filing any lawsuit or petition" or "obtaining any judgment from [a] Venezuelan court[]."  (*Id.*)  Every administrative act is presumed to be lawful and is enforceable until it is revoked by the executive branch or nullified by a Venezuelan court.  (*Id.* ¶¶ 10, 12, 14.)

To overcome the "presumption of legality of an administrative act," an aggrieved person or entity "must either (i) file an administrative petition with the authority that issued the administrative act" or a superior authority "requesting the revocation of such act or (ii) file a lawsuit with a Venezuelan court requesting the annulment of the administrative act."  (*Id.* ¶ 15.)  Even then, the administrative act is presumptively legal and enforceable until the administrative authority or court either preliminarily enjoins the administrative act or issues a final decision revoking or nullifying the administrative act.  (*Id.* ¶ 16.)  To overcome this presumption of legality and enforceability, Rendón was required to seek relief from the Venezuelan executive branch or a Venezuelan court.  He does not allege that he did either of these things.  Therefore, under Venezuelan law, Rendón was not a citizen or national of Venezuela when he commenced this action and is not one today, despite his allegations.

---

[17]   Rendón's "USCIS-issued travel permit" is not relevant to this inquiry, no matter what it says.  The permit was not issued by the Venezuelan government and therefore is not evidence of actions taken by Venezuela in connection with Rendón's citizenship.

## II.

### Rendón Did Not Satisfy the Condition
<u>Precedent Created by Section 770.01, Florida Statutes</u>

In Florida, a plaintiff cannot sue a media defendant for libel or slander unless he first serves sufficient written notice of his allegations:

> <u>Before any civil action is brought</u> for publication or broadcast, in a newspaper, periodical, or other medium, of a libel or slander, the plaintiff shall, at least 5 days before instituting such action, serve notice in writing on the defendant, specifying the article or broadcast and the statements therein which he or she alleges to be false and defamatory.

Fla. Stat. § 770.01 (emphasis added); *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1112 (Fla. 2008) (statute applies to media defendants).[18]  Section 770.01 "'is designed to allow a defendant the opportunity to be put on notice so as to take necessary steps to mitigate potential damages *and perhaps avoid . . . litigation*.'" *Tobinick v. Novella*, No. 9:14-CV-80781, 2015 BL 70836, at *7 (S.D. Fla. Mar. 16, 2015).  Therefore, consistent with the plain meaning of Section 770.01, a plaintiff "cannot satisfy the statute by providing notice subsequent to filing the complaint." *Gifford v. Bruckner*, 565 So. 2d 887, 888 n.1 (Fla. 2d DCA 1990).  *See also Cummings v. Dawson*, 444 So. 2d 565, 566 (Fla. 1st DCA 1984) (affirming dismissal of libel and slander claim with prejudice where plaintiff did not establish that he complied with Section 770.01 "*before* instituting his action for libel or slander"); *Orlando Sports Stadium, Inc. v. Sentinel Star Co.*, 316 So. 2d 607, 610 (Fla. 4th DCA 1975) (plaintiff cannot "cure the defect of non-existence of a cause of action when suit was begun, by amendment of his pleadings to cover subsequently accruing rights.").

As demonstrated below, Rendón did not serve a satisfactory Section 770.01 notice on any of the defendants, and he concedes that any applicable statute of limitations has expired.  (DE-27 at 2, 3; DE-35 at 1–2.)  Therefore, the Court must dismiss this action with prejudice.

---

[18]  Rendón has represented that Florida law governs his claims.  (*See* DE-27 at 3.)  For purposes of this motion to dismiss, Bloomberg assumes Florida law applies.  Bloomberg reserves its right to argue that the law of another jurisdiction applies in the event that this case survives this motion to dismiss and once a factual record relevant to choice of law is developed.

A. Counts I, II, and III Should be Dismissed Because
Rendón's Notice Did Not Identify the Alleged False
and Defamatory Statements With the Requisite Specificity.

Section 770.01 "requires the best possible notice." *Nelson v. Associated Press, Inc.*, 667 F. Supp. 1468, 1474–75 (S.D. Fla. 1987). If the article is in print, the "best possible notice" means a verbatim quotation of the material alleged to be false and defamatory. *See id. See also Orlando Sports Stadium*, 316 So. 2d at 610 (Section 770.01 not satisfied where "appellants' notice specified the article" but not "the statements therein alleged to be false and defamatory") (citation omitted); *Gannett Fla. Corp. v. Montesano*, 308 So. 2d 599, 599–600 (Fla. 1st DCA 1975) (same). A summary or paraphrasing of the material alleged to be false and defamatory is insufficient. *See, e.g.*, *Hulander v. Sunbeam Television Corp.*, 364 So. 2d 845, 846 (Fla. 3d DCA 1978) (notice claiming that broadcast included "libelous statements *to the effect that* our clients had committed[] the felony of extortion and bribery with regard to their dealings with" certain firm and person did not satisfy Section 770.01), *receded from on other grounds by Edward L. Nezelek, Inc. v. Sunbeam Television Corp.*, 413 So. 2d 51 (Fla. 3d DCA 1982).[19]

Counts I, II, and III—which concern statements published online and in the U.S. and international print editions of *Bloomberg Businessweek*—fail because Rendón's notice to Bloomberg L.P. did not identify with specificity "the statements [in the Article] which [Rendón] alleges to be false and defamatory." *See* Fla. Stat. § 770.01; *Nelson*, 667 F. Supp. at 1474–75. None of the eighteen allegedly "false and defamatory statements and implications concerning Mr. Rendón" identified in the Amended Complaint was quoted verbatim in Rendón's notice. (*Compare* Korn Decl. Ex. 19 *with* Am. Compl. ¶¶ 122, 137, 152.)[20]

---

[19] *See also Nelson*, 667 F. Supp. at 1473 (letter claiming that plaintiff had been "subjected to innumerable defamatory statements accusing her of having conducted seances with 10 or 15 people in bed at one time with a three foot trumpet, having engaged in an act of lesbianism, having stood and watched sex acts and similar type malicious and unfounded statements" did not satisfy Section 770.01); *Montesano*, 308 So. 2d at 599 (notice claiming that article "imputed a crime" to plaintiff did not satisfy Section 770.01).

[20] The Court is entitled to consider Rendón's Section 770.01 notice in connection with this motion to dismiss. *Fin. Sec. Assur., Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1284 (11th Cir. 2007) (court may consider document outside four corners of complaint if plaintiff "refers to [the] document in [his] complaint, the document is central to [his] claim, its contents are not in dispute, and the defendant attaches the document to its motion to dismiss.").

Where, as here, the claims in question have become time-barred, dismissal under Section 770.01 must be with prejudice. *Gifford*, 565 So. 2d at 888 n.1; *Orlando Sports Stadium*, 316 So. 2d at 610 (dismissal required where plaintiff filed complaint two weeks before serving Section 770.01 notice). *See also Tobinick*, 2015 BL 70836, at *10 ("Summary judgment may be appropriate where the statute of limitations has expired and the plaintiff can no longer provide the defendant with pre-suit notice in compliance with the statute."); *Bayliss v. Cox Radio, Inc.*, No. 8:10-cv-1030-T-27MAP, 2010 BL 242294, at *4 (M.D. Fla. Oct. 13, 2010) (emphasis added) ("dismissal arguably would have been without prejudice <u>if the pertinent limitations period had not run</u>"); *City of Coconut Creek v. City of Deerfield Beach*, 840 So. 2d 389, 394 (Fla. 4th DCA 2003) ("If there remains sufficient time to comply with the statutory precondition, the action should be dismissed with leave to amend. If the time to comply with the precondition has expired, the action should be dismissed with prejudice."). Because Rendón's Section 770.01 notice was ineffective, and because his claims are now time-barred, Counts I, II, and III must be dismissed with prejudice.

B. Counts IV, V, VI, and VII Should be Dismissed Because Rendón's <u>Retraction Notice Did Not Identify the Interviews as False and Defamatory.</u>

Section 770.01 expressly requires a plaintiff to "specify[] <u>the article or broadcast</u> and the statements therein which he [] alleges to be false and defamatory." Fla. Stat. § 770.01 (emphasis added). Where a pre-suit notice identifies only one false and defamatory article or broadcast and the plaintiff subsequently asserts a libel or slander claim concerning a second article or broadcast, the claim concerning the second article or broadcast must be dismissed. *See, e.g.*, *Klayman v. City Pages*, Case No: 5:13-cv-143-Oc-22PRL, 2013 WL 12157865, at *3 (M.D. Fla. Nov. 15, 2013).

The retraction notice that Rendón served on Bloomberg L.P. did not mention the Interviews at all. (Korn Decl. Ex. 19.) Rendón does not claim he served another notice concerning the Interviews. (*See* Am. Compl.) Therefore, Counts IV, V, VI, and VII—which allege Bloomberg and Robertson defamed Rendón during the Interviews—must be dismissed with prejudice. *See Klayman*, 2013 WL 12157865, at *3.[21]

---

[21] Count VIII, Rendón's purported "negligent supervision" claim, is in fact a defamation claim. Therefore, Rendón's failure to serve a notice that satisfies Section 770.01 requires the dismissal of Count VIII, too. *See* Section II.D, *infra*.

C.     All Counts Should be Dismissed With Respect to Robertson and
       Riley Because Rendón Did Not Serve a Retraction Notice on Either of Them.

Under Section 770.01 a plaintiff must serve all media defendants—including individual journalists—with a written notice specifying the statements that the plaintiff alleges are false and defamatory before the plaintiff commences an action for libel or slander.  *Mancini v. Personalized Air Conditioning & Heating, Inc.*, 702 So. 2d 1376, 1380 (Fla. 4th DCA 1997) (Pariente, J.) (citation omitted).  Requiring service of written notice on corporate media entities but not individual journalists "would effectively circumvent the notice provisions of section 770.01 and eviscerate the intent of chapter 770 by allowing a plaintiff to sue newspaper reporters and columnists for libel and slander without naming the newspaper publisher."  *Id.*

Robertson and Riley are journalists (Am. Compl. ¶¶ 11, 12), but Rendón did not serve a retraction notice on either of them before commencing this action.  He served a retraction demand only on Bloomberg L.P. and *Bloomberg Businessweek*.  Korn Decl. Ex. 19.  Since Rendón has not satisfied Section 770.01 with respect to Robertson or Riley, his amended claims against them—Counts I, II, III, and VII (the last of which is asserted only against Robertson)— must be dismissed with prejudice.  *See Mancini*, 702 So. 2d at 1378–80.

D.     The Negligent Supervision Claim in Count VIII is a
       Defamation Claim That Fails for Noncompliance with Section 770.01.

Count VIII is a defamation claim masquerading as a negligent supervision claim.  It is barred by Florida's single publication rule and Section 770.01.

"'In Florida, a single publication gives rise to a single cause of action.'"  *Klayman v. Judicial Watch, Inc.*, 22 F. Supp. 3d 1240, 1256 (citation omitted).  "When claims are based on analogous underlying facts and the causes of action are intended to compensate for the same alleged harm, a plaintiff may not proceed on multiple counts for what is essentially the same defamatory publication or event."  *Id.* (citation omitted).  This rule "prevent[s] plaintiffs from circumventing a valid defense to defamation by recasting essentially the same facts into several causes of action all meant to compensate for the same harm.'"  *Id.* (citations omitted).  *See also Elof Hansson Paper & Board, Inc. v. Parodi Caldera*, Case No. 11-20495-CIV-UNGARO, 2011 BL 145894, at *3 (S.D. Fla. June 27, 2011) (dismissing tortious interference claim premised on same defamatory statement as untimely defamation claim).

As Rendón said in support of his motion for leave to amend, his "claim for Negligent Supervision arises out of the very same facts that Plaintiff's other seven claims do: that

19

Defendants published false and defamatory statements about him with prior knowledge or at least reckless disregard of the truth of those statements."  (DE-28 at 5; *see also* Am. Compl. ¶¶ 134, 149, 164, 179, 194, 209, 224, 231–32.)  Because the underlying facts are identical and the defamation and negligent supervision causes of action are intended to compensate for the same alleged harm, Rendón's negligent supervision claim should be dismissed.  *See Klayman*, 22 F. Supp. 3d at 1256.

Even if the facts were not identical, Rendón's action is "premised on the harm caused by [Bloomberg's allegedly] defamatory remarks" and its "gist" "is not the claim for negligent supervision, but the claim for defamation."  *See MYD Marine Distribs, Inc. v. Donovan Marine, Inc.*, No. 07-61624-CIV, 2009 BL 53369, at *4 (S.D. Fla. Mar. 16, 2009).  Under these circumstances, the label Rendón has given his claim is irrelevant; the Court must apply to Count VIII the law applicable to defamation claims.  *See, e.g.*, *id.* (two-year statute of limitations for defamation claims barred negligent supervision claim founded on defamatory remarks); *Elegele v. Harley Hotels, Inc.*, 689 So. 2d 1305, 1307 (Fla. 5th DCA 1997) (negligent supervision claim barred by two-year statute of limitations for libel or slander because "core cause of action remains an action for [libel] or slander").  As with the defamation claims, Count VIII must therefore be dismissed because Rendón failed to serve a notice that complies with Section 770.01.

### III.

Rendón Has Not Stated a Claim Upon Which Relief Can be Granted Because Bloomberg's Reporting is Privileged, Rendón Has Not Plausibly Alleged Actual Malice, Rendón Has Not Plausibly Alleged the Falsity of Numerous Statements Challenged in the Amended Complaint, and the Amended Counts Against Bloomberg L.P. are Time-Barred

The Amended Complaint fails to state a claim on which relief can be granted, in whole or in part, for four reasons.  First, Bloomberg's reporting is protected by Florida's neutral reporting privilege.  Second, the Amended Complaint does not plausibly allege actual malice.  Third, the Amended Complaint does not plausibly allege the falsity of a number of statements that Rendón claims are false and defamatory.  Fourth, Counts IV, V, and VI—which Rendón now asserts against Bloomberg L.P.—are time-barred.

A.   The Reporting is Protected by the Neutral Reporting Privilege.

For decades, Florida courts have recognized and applied the principle that neutral reporting (also referred to as "neutral reportage") of individuals' conflicting statements regarding

matters of public concern are absolutely protected.  A plaintiff cannot overcome this privilege by proving constitutional actual malice or common-law express malice.  The privilege ensures that journalists can impartially report each side of a newsworthy dispute without being held liable for republishing the competing versions of events.

The neutral reportage doctrine was first recognized by Florida courts in *Wade v. Stocks*, No. 81-26, 1981 BL 169 (Fla. 2d Cir. Ct. Oct. 9, 1981).  Stocks, a businessman in Franklin County, claimed that a city commissioner, Wade, possibly was involved "in acts of impropriety (pollution)."  *Id.* at *2.  The defendant accurately reported Stocks' remarks in its newspaper, *The Apalachicola Times*, and the trial court found that "a full report of both sides of the controversy was published in an effort to inform the public about a public issue involving a public official" and "factors of newsworthiness, involvement of a public figure, the reporter's attempt to elicit all sides of the story and the impartiality of the publication are apparent from the record."  *Id.*

Florida's neutral reportage doctrine was further defined by a series of Florida trial and appellate court decisions.  *See Hatjioannou v. Tribune Co.*, No. 82-5383, 1982 BL 421 (Fla. 13th Cir. Ct. Nov. 15, 1982); *Bair v. Palm Beach Newspapers, Inc.*, No. 76-4394 CA (2) 01 A, 1982 BL 60 (Fla. 15th Cir. Ct. June 1, 1982), *aff'd*, 444 So. 2d 1131 (Fla. 4th DCA 1984); and *Smith v. Taylor Cty. Publ'g Co.*, No. 81-2876, 1982 BL 93 (Fla. 2d Cir. Ct. Mar. 11, 1982), *aff'd in relevant part*, 443 So. 2d 1042, 1044 (Fla. 1st DCA 1983).[22]

Notably, in *Smith v. Taylor County*, the neutral reportage privilege barred the defamation claim even though the plaintiff was not a public official and the defendant was not a reliable source.  *Smith*, 1982 BL 93, at *2–3.  Smith's complaint alleged that the defendant journalists had published in the *Perry News-Herald* a news story reporting that Sadler had claimed that Smith had physically assaulted him.  The trial court dismissed the libel claim, noting it was clear from the complaint "that virtually the entire article is simply a reprint of statements made by a police officer and Sadler.  The article reports that Kenneth Smith had been contacted and refused to comment."  *Id.* at *3.  On appeal, Florida's First District Court of Appeal affirmed "because the article was a disinterested report of a newsworthy event"—even though (i) Smith, a principal

---

[22]   *See also Thomas v. Patton*, No. 16-20005-CA-00377-XXXX-MA, 2005 BL 88517, at *3 (Fla. 4th Cir. Ct. Oct. 21, 2005) (observing that Florida law protects media organizations that publish, broadcast, or republish "disinterested accounts of newsworthy information about matters of public concern"), *aff'd,* 939 So. 2d 139 (Fla. 1st DCA 2006); *El Amin v. Miami Herald Publ'g Co.*, No. 80-19892, 1983 BL 812 (Fla. 11th Cir. Ct. Jan. 17, 1983).

GUNSTER, YOAKLEY & STEWART, P.A. / WILLKIE, FARR & GALLAGHER LLP

of the *Taco Times*, was not a public official, (ii) Sadler's wife was an employee of the *News-Herald*, the rival of, and subject of criticism by, the *Taco Times*, and (iii) Sadler claimed Smith had assaulted him in response to his criticism of the *Taco Times*. *Smith*, 443 So. 2d at 1044-45.

The First District relied on the neutral reportage privilege again in *Huszar v. Gross*, 468 So. 2d 512 (Fla. 1st DCA 1985), when it rejected the argument that "the neutral reporting privilege cannot be properly asserted in a motion to dismiss because it requires factual determinations to be made" and held that the application of the privilege "is a question of law for the court to decide." *Id.* at 515–16. Similarly, the Fourth District Court of Appeal affirmed a trial court judgment on the basis of neutral reporting in *Bair*. *See* 444 So. 2d at 1131. The *Smith*, *Bair*, and *Huszar* decisions, as the highest appellate decisions from Florida courts interpreting Florida common law on this point, are controlling authority for this Court.[23]

Here, as the Amended Complaint itself recognizes, Sepúlveda's hacking activities (and election hacking generally) were the subject of significant media attention before Bloomberg published the Article. The fact that Sepúlveda—a notorious convicted election hacker—claimed that he was hired by Rendón—a famous political strategist who worked on the same campaigns for which Sepúlveda claims to have hacked—is undeniably newsworthy. Moreover, Bloomberg accurately and repeatedly included Rendón's responses, making clear that "Rendón denies using Sepúlveda for anything illegal, and categorically disputes the account Sepúlveda gave *Bloomberg Businessweek* of their relationship." (Article at 62; *see also id.* at 65.) In short, Bloomberg reported fairly and accurately both sides of the story in a disinterested manner. Bloomberg's accurate and neutral reporting of those accusations is protected by Florida law. Moreover, the First Amendment requires recognition of such a privilege. *Price v. Viking Penguin, Inc.*, 881 F.2d 1426, 1434 (8th Cir. 1989); *Edwards v. Nat'l Audubon Soc'y*, 556 F.2d 113, 120 (2d Cir. 1977); *but see Dickey v. CBS Inc.*, 583 F.2d 1221, 1226 (3d Cir. 1978).

---

[23]   "In determining the law of the state, federal courts must follow the decisions of the state's highest court, and in the absence of such decisions on an issue, must adhere to the decisions of the state's intermediate appellate courts unless there is some persuasive indication that the state's highest court would decide the issue otherwise." *Flintkote Co. v. Dravo Corp.*, 678 F.2d 942, 945 (11th Cir. 1982). *See also Pardo v. State*, 596 So. 2d 665, 666 (Fla. 1992) (citation omitted) ("In the absence of interdistrict conflict, district court decisions bind all Florida trial courts.").

B.   The Amended Complaint Does Not Plausibly
     <u>Allege That Bloomberg Acted With Actual Malice.</u>

Where a plaintiff is a public figure, he or she may recover for defamation only on clear and convincing proof that the defamatory falsehood was published with actual malice.  *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974) (establishing actual malice standard for public figures); *Smith v. Russell*, 456 So. 2d 462, 464 (Fla. 1984) (holding that U.S. Supreme Court precedent "allows public figures or public officials to recover for injury to reputation only upon clear and convincing proof of actual malice").  As the Eleventh Circuit recently held, applying the standards articulated in *Twombly* and *Iqbal*, "a defamation suit may be dismissed for failure to state a claim where the plaintiff has not pled facts sufficient to give rise to a reasonable inference of actual malice."  *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016). *See also Turner v. Wells*, 879 F.3d 1254, 1273 (11th Cir. 2018) ("conclusory" allegations that defendants "'knowingly and recklessly' ignored or deliberately avoided learning information when drafting their [r]eport" do not "support a claim of actual malice.").

To plead actual malice, Rendón must allege facts sufficient to give rise to a reasonable inference that a defamatory statement was made about him "with knowledge that it was false or with reckless disregard of whether it was false or not."  *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964).  "This is a subjective test," *Turner*, 879 F.3d at 1273, "and the beliefs or actions of a reasonable person are irrelevant."  *Michel*, 816 F.3d at 702–03.  "[A] failure to investigate, standing on its own, does not indicate the presence of actual malice."  *Id.* at 703.  Rather, Rendón must allege that Bloomberg, "instead of acting in good faith, actually entertained serious doubts as to the veracity of the published account, or was highly aware that the account was probably false."  *Id.* at 702.

Here, Rendón effectively admits in his Amended Complaint that he is a public figure. Rendón describes himself as a famous political consultant who has led high-profile political campaigns throughout Latin America and has received numerous awards and accolades recognizing his work.  (*See supra* at 3–4.)  He has achieved such notoriety that the President of Venezuela has labeled him "Public Enemy No. 1."  (Am. Compl. ¶ 49.)  Moreover, he has been profiled in the *Miami New Times* and has been the subject of several other media reports (for which he has filed several other lawsuits).  (*See supra* at 3–5 & n.3–4, 6–9.)  He is plainly a public figure.  *See, e.g., Michel*, 816 F.3d at 702 (holding that public-figure status is question of law and member of Grammy-winning music group was public figure based on how "[h]e

23

describes himself in his complaint"); *Rebozo v. Wash. Post Co.*, 637 F.2d 375, 379 (5th Cir. 1981) (close friend of President Nixon, although not a government official, was a public figure).

In any event, Rendón is at least a limited purpose public figure.[24]  Rendón is a well-known advocate for "democratic ideals and an advocate for free and open elections and governments throughout the world."  (Am. Compl. ¶ 8.)  He therefore has voluntarily injected himself into the public controversy regarding whether elections are, in fact, "free and open."  Bloomberg's reporting and the alleged defamatory statements—that Rendón hired Sepúlveda to employ computer hacking techniques to compromise the integrity of elections—are directly germane to that controversy.  Under well-settled Eleventh Circuit precedent, this makes him at least a limited purpose public figure, who therefore must prove actual malice.  *See Little v. Breland*, 93 F.3d 755, 757–58 (11th Cir. 1996); *Silvester*, 839 F.2d at 1494.

The Amended Complaint does not plausibly allege actual malice.  Bloomberg's reporting was the product of nine months of work by twenty journalists.  (Am. Compl. ¶ 64.)  Nowhere does Rendón allege any <u>facts</u> suggesting that Bloomberg knew its reporting was false or actually entertained serious doubts about its reporting.  Indeed, the Article itself shows that Bloomberg's reporters collected ample evidence that Sepúlveda's account was truthful.

*First*, the Article reports that Sepúlveda provided corroborative e-mails "showing conversations between him, Rendón, and Rendón's consulting firm concerning hacking . . . ."  (Article at 62.)  Although the Amended Complaint says that the existence of such e-mails is contradicted by Sepúlveda's statements that he destroyed evidence upon the conclusion of an operation (Am. Compl. ¶ 67), the Article expressly accounts for this by stating that, despite this practice, Sepúlveda "left some documents with members of his hacking teams and other trusted third parties as a secret 'insurance policy.'"  (Article at 62.)  And rather than accept Sepúlveda's account, Bloomberg sent these e-mails to be analyzed by "an independent computer security firm," which said that "a sample of the e-mails they examined appeared authentic."  (*Id.*)

*Second*, as Bloomberg told its readers, "[s]ome of Sepúlveda's descriptions of his actions match published accounts of events during various elections campaigns, but other details

---

[24]  To determine whether a plaintiff is a limited purpose public figure, the Court must "(1) isolate the public controversy, (2) examine the plaintiffs' involvement in the controversy, and (3) determine whether the alleged defamation [was] germane to the plaintiffs' participation in the controversy."  *Silvester v. Am. Broad. Cos.*, 839 F.2d 1491, 1494 (11th Cir. 1988) (citation and internal quotation marks omitted).

couldn't be independently verified." (*Id*. at 62.)  In that regard, Bloomberg's reporters contacted Gerardo Priego, whom Sepúlveda said was the victim of hacking in Tabasco, Mexico, and who told Bloomberg, "I always suspected something was off." (*Id*. at 64.)  Bloomberg also separately matched independently verifiable events with e-mails provided by Sepúlveda that he purportedly exchanged with Rendón about Luis Costa Bonino, a political adversary and hacking target.  (*Id*.)

*Third*, Bloomberg spoke with a security expert, David Maynor, who told Bloomberg that Sepúlveda's contentions about his election hacking operations were "plausible." (*Id*. at 65.)

*Fourth*, Bloomberg sought comments about its reporting from numerous additional sources, including Colombian presidential candidate Óscar Iván Zuluaga, his former campaign manager Luis Alfonso Hoyos, Mexican President Peña Nieto's press office, a spokesman for the PRI in Mexico, and Hope Hicks, a spokeswoman for then-candidate Donald J. Trump.  (*Id*. at 64–65.)

*Fifth*, Bloomberg showed an independent company samples of code that Sepúlveda claimed he had written, and the company "found [the samples] authentic and substantially original." (Am. Compl. ¶ 69; Article at 65.)

In addition, Bloomberg made clear to readers that its primary source had been imprisoned for numerous crimes and was "not an unimpeachable source of information." *See Silvester*, 839 F.2d at 1498.  As the Eleventh Circuit has explained, this undermines Rendón's claim that Bloomberg's reporting was published with actual malice.  *See id.*; *Turner*, 879 F.3d at 1274 (citation omitted) (inclusion of information that "cuts against the [d]efendants' general conclusions, allowing readers to decide for themselves what to conclude from the [r]eport, mak[es] any allegation of actual malice less plausible."); *Michel*, 816 F.3d at 703 ("[W]here the publisher includes information contrary to the general conclusions reached in an article, that showing tends to undermine the claims of malice.").  "The reasoning behind this rule is simple. Where a publisher gives readers sufficient information to weigh for themselves the likelihood of an article's veracity, it reduces the risk that readers will reach unfair (or simply incorrect) conclusions, even if the publisher itself has." *Michel*, 816 F.3d at 703.

In light of Bloomberg's numerous efforts to test the veracity of Sepúlveda's story, Rendón's allegations that Bloomberg's reporters did not try to contact Sepúlveda's "ex-girlfriend" and ignored his offers to provide flight passenger logs for his private jet because they

did not want to learn the truth are simply not plausible.  (Am. Compl. ¶¶ 77–78, 89.)[25]  It makes no sense that Bloomberg would go through a nine-month investigation and undertake such exhaustive efforts merely to publish a preconceived and false narrative to cast Rendón in a negative light.  (*Id*. ¶ 62.)  It is equally implausible that Bloomberg—a leading news organization whose most valuable asset is its reputation for accuracy—would risk publishing a story that Rendón could immediately refute with documentary evidence or eyewitness accounts.

In any event, at most, these allegations, if credited, would suggest only that Bloomberg "should have conducted more investigation," but the Eleventh Circuit has made clear that "failure to investigate does not give rise to a finding of actual malice."  *See Michel*, 816 F.3d at 693, 705 (rejecting allegation that reporter should have done <u>more</u> investigation to verify that plaintiff was the board member of a charitable foundation in response to conflicting information).

Equally unavailing is Rendón's claim that actual malice can be inferred from the supposed political bias of one of Bloomberg's reporters.  Alleged personal or political bias of a reporter does not give rise to actual malice.  *Suzuki Motor Corp. v. Consumers Union of U.S., Inc.*, 330 F.3d 1110, 1118 (9th Cir. 2003) (citation omitted) ("Actual malice is not bias.  '[I]ll will toward the plaintiff, or bad motives, are not elements of the *New York Times* standard.'").

At bottom, other than his own denials, Rendón does not and cannot point to any facts or evidence known to Bloomberg's reporters suggesting that they either knew their reporting was false or actually entertained serious doubts that it might be false.  The Supreme Court has made clear that "such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error."  *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 691 n.37 (1989) (quoting *Edwards*, 556 F.2d at 121).  Rendón has not alleged actual malice and his Amended Complaint should be dismissed.

---

[25]   Rendón also has no basis to allege that Bloomberg's reporters did not attempt to contact Sepúlveda's ex-girlfriend.  They did.  Nor is it plausible that Rendón would send his e-mails to Bloomberg, but not also send the jet logs he purportedly offered if they were exculpatory.

C.  Rendón Does Not Plausibly Allege the
    Falsity Of Numerous Statements That He Challenges.

"A false statement of fact is the *sine qua non* for recovery in a defamation action." *Hallmark Builders, Inc. v. Gaylord Broad. Co.*, 733 F.2d 1461, 1464 (11th Cir. 1984) (internal citation and quotation marks omitted).  Accordingly, to survive a motion to dismiss, a complaint must allege the false and defamatory statements with specificity.  *See Sarver v. Jackson*, 344 F. App'x 526, 529 (11th Cir. 2009).

Here, in Counts I, II, and III, Rendón identifies eighteen specific statements from the online, domestic print, and international print editions of the Article that he alleges are defamatory.  (*See* Am. Compl. ¶¶ 122, 137, 152.)  However, seven of those statements describe only Sepúlveda's hacking practices and Sepúlveda's conduct.  (*See* Ex. A, *infra*.)  They do not reference Rendón or defame him in any way.  And Rendón affirmatively disavows any knowledge about Sepúlveda's hacking activities and claims to have met him only once, briefly, in connection with a 2005 job that had nothing to do with computer hacking.  (*See* Am. Compl. ¶¶ 125a, 140a, 155a, 170a, 185a, 200a, 245a.)  Rendón cannot plausibly allege that Sepúlveda's account of Sepúlveda's own election hacking activities, as reported by Bloomberg, is false so long as Rendón also alleges that he had no knowledge of, and nothing to do with, Sepúlveda's operations.

In addition, in Counts IV, V, VI, and VII, Rendón alleges that, in the Interviews, Bloomberg, through its agents, "reiterated and republished the false and defamatory statements and implications made in the online and print editions of the Article, specifically that Mr. Rendón hired Sepúlveda to hack elections and conduct election fraud on his and his clients' behalf."  (*Id.* ¶¶ 167, 182, 197, 212.)  Rendón does not, however, identify or quote any specific statement that Bloomberg or any of its agents made during any of the Interviews, much less allege that it was false.  Counts IV through VII must therefore be dismissed.  *See, e.g.*, *Sarver*, 344 F. App'x at 529 (affirming partial dismissal of defamation claim because the "complaint failed to identify any specific written or verbal statements attributed to the defendants"); *Buckner v. Lower Fla. Keys Hosp. Dist.*, 403 So. 2d 1025, 1027–28 (Fla. 3d DCA 1981) (same).

27

> D.   Amended Counts IV, V, and VI Should be
> Dismissed Because They Do Not Relate Back to
> the Original Complaint and Are Therefore Time-Barred.

Amended Counts IV, V, and VI do not relate back to the date of the original Complaint and are time-barred.  An amendment to a complaint that "changes the party or the naming of the party against whom a claim is asserted" relates back to the date of the original complaint only when, among other things, the party the amended claim is to be asserted against "knew or should have known," within the time limit for service prescribed by Federal Rule of Civil Procedure 4(m), "that the action would have been brought against it, but for a mistake concerning a proper party's identity."   Fed. R. Civ. P. 15(c)(1)(C)(ii).   "When the original complaint and the plaintiff's conduct compel the conclusion that the failure to name the prospective defendant in the original complaint was the result of a fully informed decision as opposed to a mistake concerning the proper defendant's identity, the requirements of Rule 15(c)(1)(C)(ii) are not met." *Krupski v. Costa Crociere S.p.A.*, 560 U.S. 538, 552 (2010).

Here, Rendón admits that the amendments to Counts IV, V, and VI "result from dropping two parties to the lawsuit."  (DE-35 at 3.)  In other words, Rendón deliberately asserted Counts IV, V, and VI against Rodríguez—just as he deliberately asserted Counts I, II, and III against all defendants and Count VII against Robertson—but now that he has dismissed Rodríguez in a (futile) effort to manufacture subject-matter jurisdiction, he is trying to salvage Counts IV, V, and VI by asserting them against another defendant instead of dismissing them.  This explains why Rendón is amending Counts IV, V, and VI, but not Count VII—Robertson, unlike Rodríguez, is not being dismissed as a defendant because he does not defeat diversity jurisdiction, so Rendón does not need to assert Count VII against Bloomberg L.P., in place of Robertson.

In short, Rendón plainly did not make a mistake concerning the identity of the defendant against whom he originally asserted Counts IV, V, and VI.  He deliberately chose to name Rodríguez alone.  Therefore, "the requirements of Rule 15(c)(1)(C)(ii) are not met" and Counts IV, V, and VI, as amended and asserted against Bloomberg L.P., do not relate back to the date of the original Complaint.  *See Krupski*, 560 U.S. at 552.  As Rendón has conceded any applicable statute of limitations expired before he sought leave to amend his Complaint (*see, e.g.*, DE-27 at 2), Counts IV, V, and VI are also time-barred.

<u>CONCLUSION</u>

Bloomberg respectfully submits that the Court should dismiss this action for lack of subject-matter jurisdiction.  In the alternative, the Court should dismiss this action with prejudice on the grounds that Rendón has not complied with Section 770.01, Florida Statutes, and the applicable statute of limitations has now run, and on the grounds that the Amended Complaint fails to state a claim.

Respectfully submitted,

Gunster, Yoakley & Stewart, P.A.

By____s/ *Thomas R. Julin*_____
      Thomas R. Julin & Timothy J. McGinn
      Florida Bar No. 325376 & 1000377
      600 Brickell Avenue, Suite 3500
      Miami, FL 33131
      305.376.6007 Fax 6010
      tjulin@gunster.com

Willkie Farr & Gallagher LLP

By____s/ *Jeffrey B. Korn*_____
      Jeffrey B. Korn & Jonathan D. Waisnor
      *Admitted Pro Hac Vice*
      787 Seventh Avenue
      New York, NY 10019
      212.728.8000
      jkorn@willkie.com

Attorneys for the Defendants

<u>EXHIBIT A</u>

(Alleged Defamatory Statements Solely About Sepúlveda's Conduct)

- "Sepúlveda's first hacking job, he says, was breaking into an Uribe rival's website, stealing a database of e-mail addresses, and spamming the accounts with disinformation.  He was paid $15,000 in cash for a month's work, five times as much as he made in his previous job designing websites."

- "Each job ended with a specific, color-coded destruct sequence.  On election day, Sepúlveda would purge all data classified as 'red.'  Those were the files that could send him and his handlers to prison: intercepted phone calls and e-mails, lists of hacking victims, and confidential briefings he prepared for the campaigns.  All phones, hard drives, flash drives, and computer servers were physically destroyed.  Less-sensitive 'yellow' data—travel schedules, salary spreadsheets, fundraising plans—were saved to an encrypted thumb drive and given to the campaigns for one final review.  A week later it, too, would be destroyed."

- "In Honduras, Sepúlveda defended the communications and computer systems of presidential candidate Porfirio Lobo Sosa from hackers employed by his competitors."

- "Sepúlveda's team installed malware in routers in the headquarters of the PRD candidate, which let him tap the phones and computers of anyone using the network, including the candidate.  He took similar steps against PAN's Vázquez Mota.  When the candidates' teams prepared policy speeches, Sepúlveda had the details as soon as a speechwriter's fingers hit the keyboard.  Sepúlveda saw the opponents' upcoming meetings and campaign schedules before their own teams did."

- "Sepúlveda managed thousands of such fake profiles and used the accounts to shape discussion around topics such as Peña Nieto's plan to end drug violence, priming the social media pump with views that real users would mimic.  For less nuanced work, he had a larger army of 30,000 Twitter bots, automatic posters that could create trends.  One conversation he started stoked fear that the more López Obrador rose in the polls, the lower the peso would sink."

- "Just about anything the digital dark arts could offer to Peña Nieto's campaign or important local allies, Sepúlveda and his team provided.  On election night, he had computers call tens of thousands of voters with prerecorded phone messages at 3 a.m. in the critical swing state of Jalisco.  The calls appeared to come from the campaign of popular left-wing gubernatorial candidate Enrique Alfaro Ramirez.  That angered voters— that was the point—and Alfaro lost by a slim margin.  In another

x

GUNSTER, YOAKLEY & STEWART, P.A. / WILLKIE, FARR & GALLAGHER LLP

governor's race, in Tabasco, Sepúlveda set up fake Facebook accounts of gay men claiming to back a conservative Catholic candidate representing the PAN, a stunt designed to alienate his base."

- "Sepúlveda's team disabled the consultant's personal website and directed journalists to a clone site.  There they posted what looked like a long defense written by Costa Bonino, which casually raised questions about whether his Uruguayan roots violated Mexican restrictions on foreigners in elections.  Costa Bonino left the campaign a few days later."

(*See* Am. Compl. ¶¶ 122, 137, 152.)

GUNSTER, YOAKLEY & STEWART, P.A. / WILLKIE, FARR & GALLAGHER LLP

CERTIFICATE OF SERVICE

I hereby certify that on October 15, 2018, I electronically filed the foregoing document and the attachments thereto with the Clerk of the Court using CM/ECF and through that filing served:

IL Young Choi
Choi & Menezes, LLP
1925 Brickell Avenue, Suite D-206
Miami, FL  33129
IYC@choilawfirm.com

Thomas A. Clare, Elizabeth M. Locke & Dustin A. Pusch
Clare & Locke
902 Prince Street
Alexandria, VA  22314
tom@clarelocke.com, libby@clarelocke.com &
dustin@clarelocke.com

s/ *Timothy J. McGinn*
Timothy J. McGinn