**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 1:17-CV-21192-KMW**

JUAN JOSÉ RENDÓN DELGADO

                Plaintiff,

   v.

BLOOMBERG L.P.;
JORDAN ROBERTSON; and
MICHAEL RILEY

                Defendants.

<u>**SECOND AMENDED COMPLAINT**</u>

Plaintiff Juan José Rendón Delgado ("Mr. Rendón" or "JJ Rendón"), by and through his undersigned counsel, hereby files the following Complaint against Defendants Bloomberg L.P., ("Bloomberg"), Jordan Robertson ("Robertson"), and Michael Riley ("Riley"), and in support of his Complaint, avers as follows:

<u>**NATURE OF THE ACTION**</u>

1.    This defamation action arises out of a false and defamatory article titled "How to Hack an Election" published by Bloomberg online on March 31, 2016 and in the April 4-10, 2016 print edition of the *Bloomberg Businessweek* magazine (herein "Bloomberg Article" or "Article").[1]

---

[1] Jordan Robertson, Michael Riley, & Andrew Willis, "How to Hack an Election," *Bloomberg Businesweek* (March 31, 2016) (attached hereto as Exhibit A), available at http://www.bloomberg.com/features/2016-how-to-hack-an-election/.

The Article, which was authored by Robertson, Riley, Bloomberg Reporter Andrew Willis, and Bloomberg Bureau Chief Carlos Manuel Rodríguez (collectively the "Bloomberg Reporters"), was published by Bloomberg to a global audience in both English and Spanish both on Bloomberg Businessweek's website and in both the U.S. domestic and international versions of the print magazine.[2]   The Article was the ***cover story*** for the international version of *Bloomberg Businessweek*.  The Article was the first article posted online in both English and Spanish in Bloomberg's history and was the most viewed article on any of Bloomberg's websites.

2.     The goal of the Article was not to present an accurate or fair depiction of Mr. Rendón as a Latin American political consultant and his work on numerous high-profile Latin American political campaigns.  Instead, the Article weaves a sordid tale of Mr. Rendón hiring convicted felon and professional hacker Andrés Sepúlveda ("Sepúlveda") to influence the outcome of several hotly contested political elections in South America and Mexico through hacking and cyber attacks.  The preconceived goal of the Article was to manufacture an outrageous and false story that Mr. Rendón, ***who has no record of criminal behavior***, had fixed many of the Latin American campaigns he worked on by engaging Sepúlveda in criminal and unlawful conduct to hack and otherwise undermine the campaigns of Mr. Rendón's clients' political opponents.

3.     The Article accomplished that goal.  The Article casted Mr. Rendón as an immoral and unethical villain roaming around Latin American to rig high-profile elections for his and his clients' benefits.  The Bloomberg Reporters claimed – both in the Article and in numerous media and publicity appearances and interviews designed to increase publicity for the Article – that Mr. Rendón employed and urged Sepúlveda to operate under the table and behind closed doors to

---

[2] Jordan Robertson, Michael Riley, & Andrew Willis, "How to Hack an Election," *Bloomberg Businesweek* Print edition (April 4-10, 2016) (attached hereto as Exhibit B).

subvert the opponents of Mr. Rendón's high-profile political clients.  This included hacking into the social media and email accounts of these opponents and creating fake social media and other public accounts to falsely drum-up debates about issues damaging to these opponents.   The Bloomberg Article accused Mr. Rendón of crimes including tax evasion, human trafficking, espionage, international cyber terrorism, racketeering, and conspiracy.  These alleged tactics undermined the free and open elections in nations throughout Latin America and were, according to the Bloomberg Reporters, the main reason Mr. Rendón's clients were successful and victorious.

4.      These statements – and the portrayal of Mr. Rendón – in "How to Hack an Election" and the Bloomberg Defendants' subsequent public statements are categorically *false*.  In fact, Mr. Rendón *never* engaged in any criminal, illegal, nefarious, or otherwise immoral conduct during his political campaigns, nor has he ever been convicted of any criminal behavior whatsoever.  He *never* worked with Sepúlveda in any capacity on these campaigns other than for a short-lived, two-week interval in 2005 during which Sepúlveda conducted minimal web design work.  Additionally, upon speaking with the Bloomberg Reporters, Mr. Rendón offered to provide documentation that directly refuted their and Sepúlveda's alleged claims, as well as contact information for individuals who would corroborate Mr. Rendón's correct version of the story.  The Bloomberg Reporters ignored these offers, and the information and documentation Mr. Rendón offered in order to maintain their false and preconceived storyline.

5.      The Bloomberg Reporters' allegations against Mr. Rendón are not only clearly false, but defamatory *per se*.  By claiming that Mr. Rendón hired, employed, directed, and condoned Sepúlveda's hacking and cyber attacks, the Bloomberg Defendants attributed to Mr. Rendón illegal conduct – election fraud, tax evasion, human trafficking, espionage, international cyber terrorism, racketeering, and conspiracy – and conduct unfit for a political strategist,

consultant, and advisor.  Bloomberg knew that its Reporters were publishing false and defamatory statements about Mr. Rendón, or at the very least, failed to supervise the conduct of its employees, and in doing so allowed the false and defamatory statements to be published in *Bloomberg Businessweek* and for the statements to be repeated on the publicity tour for the Article.  These false and defamatory statements have irreparably harmed Mr. Rendón's reputation as both a savvy and ethical political strategist and as an advocate for free and open elections and democracies, and his business interests and ability to operate as a political consultant.

6.      The Bloomberg Defendants' highly defamatory and false statements about Mr. Rendón were not the result of an innocent mistake; they were the result of wanton journalism and reporters, acting at the direction of Bloomberg, who were more concerned with writing an article that fulfilled their preconceived narrative about rigged elections in Latin America, about carrying out the next series of attacks against an enemy of the totalitarian Venezuelan regime, and about selling magazines to boost the economic bottom line than they were about discovering and publishing the truth.  The Bloomberg Article amounts to fake news.

7.      Mr. Rendón brings this action to vindicate his rights under civil law, to restore his reputation as a highly-regarded, successful, and ethical political consultant and human rights advocate, and to establish the Bloomberg Defendants' liability for the irreparable harm they have caused to his reputation and business interests by the false and defamatory statements published by Bloomberg.  Mr. Rendón seeks an award of compensatory damages for the reputational and economic harm caused by the Bloomberg Defendants' defamatory statements and, given the willful and malicious nature of Defendants' conduct in knowingly publishing defamatory falsehoods about him, he also seeks an award of punitive damages.

## PARTIES AND RELEVANT NON-PARTIES

8.      Plaintiff Juan José Rendón Delgado ("Mr. Rendón") is an individual and a

Venezuelan citiezen who lives and is domiciled in the State of Florida, city of Miami and has lived and been domiciled in the State of Florida at all times since the commencement of this case.  Mr. Rendón was born in Venezuela, is therefore a Venezuelan citizen by birth, and is—and has always been—a Venezuelan citizen and national.  Mr. Rendón has never resigned or renounced his Venezuelan citizenship and is not and has never been a citizen of any country other than Venezuela.  Because, under Venezuelan law, a Venezuelan's nationality and citizenship can only be lost by a Venezuelan citizen's affirmative act to formally resign his citizenship—and it cannot be revoked or rescinded by an act of the Venezuelan government—Mr. Rendón has always been since birth and remains today a Venezuelan citizen and national.  Mr. Rendón is a successful campaign and election advisor and consultant and has managed campaigns throughout Latin American at the presidential, state, and local levels.  He is a staunch activist for democratic ideals and an advocate for free and open elections and governments throughout the world.  He is a fierce opponent of the current totalitarian and dictatorial regimes of Venezuela and of former and current Venezuelan presidents Hugo Chávez and Nicolás Maduro.  He is the subject of *Bloomberg Businessweek*'s article, "How to Hack an Election."  He has no criminal record and has been granted asylum by the United States government.

9.      Defendant Bloomberg L.P. is the publisher of numerous business, financial, political, and technology publications for customers worldwide.  Bloomberg L.P. is the publisher of *Bloomberg Businessweek*'s online and print publications.  Bloomberg L.P. is a Delaware limited partnership with headquarters and its principal place of business in New York City, New York.  Bloomberg, L.P.'s goal is to "engage an influential global audience" and claims that it is "***media***

*for leaders*."[3]  Bloomberg L.P. is, and since the commencement of this case on March 30, 2017 has been, a citizen of Delaware, New York, New Jersey, and New Mexico, but ***not*** a citizen or domiciliary of Florida or any foreign state because none of its partners are citizens of or domiciled in the Florida or any foreign state.  Specifically, Bloomberg L.P. has two partners, and has since the commencement of this case had the same two partners, as follows:[4]

    (i)    The general partner and a limited partner of Bloomberg L.P. is **Bloomberg Inc.**, which owns 99.5% of Bloomberg L.P.  Bloomberg Inc. is a Delaware corporation with headquarters and its principal place of business in New York.

    (ii)    The other limited partner of Bloomberg L.P. is **BLP Acquisition L.P.**, which owns 0.5% of Bloomberg L.P.  BLP Acquisition L.P. is a Delaware limited partnership with headquarters and its principal place of business in New York.  BLP Acquisition L.P. has two partners as follows:

        (a)    The general partner of BLP Acquisition L.P. is **Bloomberg Inc.**, which owns 1% of BLP Acquisition L.P.  Bloomberg Inc. is a Delaware corporation with its headquarters and principal place of business in New York.

        (b)    The limited partner of BLP Acquisition L.P. is **BLP Acquisition Holding LLC**, which owns 99% of BLP Acquisition L.P.  BLP Acquisition Holding

---

3 *See* "Bloomberg Media" available at https://www.bloombergmedia.com/about (last accessed 3/13/2017).

4 *See* Rule 7.1 Amended Disclosure Statement of Defendant Bloomberg L.P., *Van Deeen v. Bloomberg L.P.*, No. 20-cv-239 (S.D. Ala. Dec. 2, 2020); *see also Gary Kompothecras & Physicians Grp., LLC v. Bloomberg, L.P.*, No. 13-cv-3122, 2014 WL 793349 (M.D. Fla. Feb. 27, 2014) (Defendant Bloomberg L.P. did not oppose co-defendant's removal of case to federal court; case was only remanded because a different, non-diverse defendant—not Bloomberg L.P.—was not fraudulently joined).

LLC is a Delaware limited liability company with its principal place of business in New York.  The owners/members of BLP Acquisition Holding LLC are as follows:

(1)      Michael Bloomberg, a U.S. citizen domiciled in New York;

(2)      Duncan Macmillan, a U.S. citizen domiciled in New Jersey;

(3)      Thomas Secunda, a U.S. citizen domiciled in New York;

(4)      Thomas Neff, a U.S. citizen domiciled in New Mexico;

(5)      Robert Ostrow, a U.S. citizen domiciled in New York;

(6)      Ross Macdonald Barnes, Jr., a U.S. citizen domiciled in New Jersey; and

(7)      Mark Purdy, a U.S. citizen domiciled in New York.

10.    *Bloomberg Businessweek* is a weekly business magazine published by Bloomberg L.P.  The magazine purports to provide information and interpretation about what is happening in the business world.  It constitutes an online publication as well as both a U.S. and International edition of its print magazine.  *Bloomberg Businessweek* is the publication in which the article, "How to Hack an Election" was published.

11.    Defendant Jordan Robertson is a U.S. citizen and cybersecurity reporter for Bloomberg News and who lives and is domiciled in Washington, DC—and has lived and been domiciled in Washington, DC since the commencement of this case.  Defendant Robertson has been with Bloomberg News for over 5 years.  Defendant Robertson was the co-author of the *Bloomberg Businessweek* article, "How to Hack an Election."

12.    Defendant Michael Riley is U.S. citizen and a cybersecurity reporter for Bloomberg News and who lives and is domiciled in Washington, DC—and has lived and been domiciled in

Washington, DC since the commencement of this case. Defendant Riley has been with Bloomberg News for over 6 years. Defendant Riley was the co-author of the *Bloomberg Businessweek* article, "How to Hack an Election."

13.    Non-party Andrew Willis ("Willis") is a Bloomberg, L.P. reporter based in Bogota, Colombia covering news on commodities and Colombia's internal conflict. Willis was with Bloomberg for over four years and acting as an agent for Bloomberg at the time the Article was published. He is well known to have close ties to Venezuelan interests and to Venezuelan oil magnate, Alejandro Betancourt López. Willis was the co-author of and acting within the scope of his employment when he co-authored the *Bloomberg Businessweek* article, "How to Hack an Election."

14.    Non-party Carlos Manuel Rodríguez ("Rodríguez") is the Mexico Bureau Chief at Bloomberg News located in Mexico City, Mexico. Rodríguez has been with and acting as an agent for Bloomberg for over eleven years and in his current role for over four years. Rodríguez was a contributor and advisor and acting within the scope of his employment when he contributed to and advised on the *Bloomberg Businessweek* article, "How to Hack an Election."

15.    Non-party Andrés Sepúlveda is a Colombian national currently serving a 10-year sentence in a Colombian prison for espionage, hacking, and other crimes. Sepúlveda is the subject of and primary source for the *Bloomberg Businessweek* article, "How to Hack an Election."

## JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. § 1332 because there exists (and at all times since the commencement of this case has existed) complete diversity of citizenship the Plaintiff and the Defendants and the amount in controversy exceeds $75,000.00, exclusive of interest and costs. Specifically, as pleaded above, Plaintiff Rendón is a Venezuelan citizen domiciled in Florida; Defendant Bloomberg L.P. is a citizen of

Delaware, New York, New Jersey, and New Mexico (and is ***not*** a citizen or domiciliary of Florida or any foreign state); and Defendants Robertson and Riley are citizens and domiciliaries of Washington, DC (and ***not*** citizens or domiciliaries of Florida or any foreign state).

17.     This Court has personal jurisdiction over the Defendants because the Defendants repeatedly and deliberately reached into Florida during the reporting process, knowingly published a false and defamatory exchange of and concerning a Florida resident who was harmed by the Defendants in Florida, and published the false and defamatory exchange in Florida and to residents of Florida.  Defendants contacted Florida residents by telephone and email on several occasions prior to publication for comment and to supposedly investigate facts for their story.  Defendants knew that the Plaintiff was a resident of Florida prior to publication.  Defendants intentionally collected, manipulated, and published select facts from and about the Plaintiff and then published that that information in its national and international print and online editions to a worldwide audience, including in Florida to residents of Florida, damaging the Plaintiff in Florida.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391, because a substantial part of the events giving rise to Plaintiff's claims occurred in the Southern District of Florida and because all Defendants are subject to personal jurisdiction in this District.

## **FACTUAL ALLEGATIONS**

### **Mr. Rendón Builds a Successful Career as a Proponent of Democratic Ideals and in Political Campaign Advising and Consulting**

19.     Born in Venezuela to Venezuelan democratic activists, Mr. Rendón was instilled with strong democratic ideals and a desire to resist autocratic and totalitarian governments and regimes.  His parents were involved in the political party Acción Democrática, which was integral in ending the reign of Venezuelan dictator Marcos Pérez Jiménez in 1958 and taught him at an early age to adhere to his convictions and to place ethics and principles above all else.  After

studying psychology, communication, strategic planning, public relations, and marketing management at universities in Venezuela and Italy, he embarked on his own political advocacy career.

20.     At the age of 24, Mr. Rendón volunteered for Carlos Andrés Pérez's successful presidential campaign in 1988.  Initially hired as the driver for President Pérez's chief campaign strategist and famed American political consultant, Joseph Napolitan, Mr. Rendón's drive and political intuition were recognized immediately and he was promoted to the position of assistant to Mr. Napolitan.   Mr. Rendón's role on the campaign was to spearhead initiatives to encourage young Venezuelans to vote in the presidential election.

21.     Shortly after Pérez was elected president of Venezuela, Mr. Rendón founded his own advertising company, Chiripa Publicidad in Caracas, Venezuela.  His company gained an immediate reputation as an ethical and forward-thinking political media consulting firm and was hired by Venezuelan politician and presidential candidate Rafael Caldera.  Mr. Rendón and Chiripa Publicidad were integral in President Caldera's election victory in 1993.   Through Chiripa Publicidad, he continued to work with and advise other high profile political figures including Major General Augusto Italo del Valle Alliegro of the Venezuelan Army and Venezuelan political reformist Enrique Ochoa Antich.

22.     By the early-to-mid 2000's Mr. Rendón was advising political organizations and parties as well as governments and governmental agencies throughout Latin America.  He advised and worked with numerous successful democratic and governmental organizations, including the Institutional Revolutionary Party in Mexico, Colombia's largest political party – the Party of the U, and the Colombian Ministry of National Defense.  In each case, Mr. Rendón advised and consulted ***successful and upstanding campaigns***.

23.     Mr. Rendón has also worked on and managed numerous high-profile presidential campaigns throughout Latin America.  He has been a close advisor and lead strategist for the successful presidential campaigns of Hipólito Mejía in the Dominican Republic, for Juan Manuel Santos in Colombia, for Porfirio Lobo Sosa and Juan Orlando Hernández in Honduras, and for Enrique Peña Nieto in Mexico.  He was also the main strategist for Venezuelan opposition candidate Henrique Capriles Radonski in 2013, who was narrowly defeated by current Venezuelan president Nicolás Maduro in a highly contested election.

24.     In recognition of his campaign consulting prowess and ethical standards, Mr. Rendón has been honored with numerous awards from several leading international political associations.  These awards and honors include:

- The 2003 Special Annual Prize for New Techniques in Political Communication from the Latin American Association of Political Consultants;

- 2012 induction into the Hall of Fame of Political Consulting by Victory Awards;

- 2012 ranking as one of the top five most prominent Latin American consultants by *Campaigns & Elections* magazine;

- 2014 nomination as Political Consultant of the Year by Victory Awards; and

- 2015 award for Crisis Management of the Year by Victory Awards.

25.     Mr. Rendón continues to promote democratic ideals throughout Latin America and particularly in his native Venezuela.  Most recently, he was featured in a promotional video for a free and democratic Venezuela titled, "Venezuela Eres Tú" along with other prominent Venezuelan celebrities and activists.[5]

26.     Mr. Rendón currently operates his consulting practice in Miami, FL through his

---

5 "Venezuela Eres Tú," available at https://www.youtube.com/watch?v=AzlKQX9yahU (last accessed Mar. 29, 2017).

consulting firms JJ Rendon & Associates and Strategic Creativity, LLC.

### Mr. Rendón Receives Recognition and Numerous International and American Awards and Honors for his Devotion to Democracy and Humanitarianism

27.    In addition to advising and managing Latin American democratic organizations, governments, and political candidates for over twenty-five years, Mr. Rendón has also devoted himself to selfless political and social activism and democratic causes.  He has worked tirelessly to reduce the influence of neo-totalitarian regimes in Latin America and beyond, including in Bolivia, Cuba, and his native Venezuela.  Not only did he help elect over 100 members of the Democratic Unity Roundtable – a coalition of Venezuelan politicians that oppose Hugo Chávez's and Nicolás Maduro's dictatorial regime – to Venezuela's National Assembly, but he has also spoken out publicly against Venezuela's anti-democratic government throughout his political life.

28.    In 2013, JJ Rendón started and organized The Power of One seminar and conference series.  The Power of One is a series of talks and seminars that focuses on strategic opposition to neo-totalitarian regimes, including Venezuela's regime.  It provides political activists with tools and strategies to ***peacefully and democratically*** oppose and dismantle oppressive regimes all over the world, including in Latin America.  Mr. Rendón presents the seminar throughout Latin America and the United States free of charge and has presented for audiences in Washington, DC and for the United Nations.

29.    For his tireless work to promote democratic ideals, perform community outreach, and engage in and lead various philanthropic and humanitarian causes locally and globally, Mr. Rendón has received numerous civic awards and has been honored by several governments and respected organizations and institutions throughout his career.  These awards and honors include:

- The 2015 Humanitarian Award for Innovation from the Humanitarian Innovation Forum of the United Nations for work in Democracy and Human Rights;

- The Order of Merit award from Honduran President Porfirio Lobo Sosa in 2011;

- The Truth and Freedom Medal from VI Cumbre Mundial de Comunicación Política in 2015;

- The Key to the city of Miami, FL in 2015; and

- Honorary doctorates from universities all over the world including the International University of Panamá, Ricardo Palma de Lima University, and Cambridge University.

30. Mr. Rendón was also specifically honored and recognized by the United States Congress for his twenty-five years of devotion to and defense of liberty, democracy, and civil rights for his work in Latin America. *The United States Congress raised the American flag in his honor* and presented the flag to him in recognition of his work.

### Andrés Sepúlveda is Hired to Conduct Legitimate Website Work for Colombian President Álvaro Uribe's Campaign

31. In 2005, Mr. Rendón's consulting firm was working for the Party of the U in Colombia, which supported the re-election campaign of Colombian President Álvaro Uribe. In 2005, a call for bids from professional web designers to perform a single web design project for the campaign.

32. An agency where Sepúlveda worked as a subcontractor submitted a bid for the web design project. The agency won the bid and assigned Sepúlveda to the project.

33. Two weeks into the project, and after being paid a down payment for the project contract, Sepúlveda had not produced any substantial work. His work on the project was terminated without any substantive work product.

34. During the two weeks of web design work, Mr. Rendón had little contact with Sepúlveda. This contact was limited to some emails, brief conversations that solely related to the web design project, and large staff meetings at which both Mr. Rendón and Sepúlveda may have been present. These emails only referenced the web design project and possibly one or two instances where they met briefly.

35.     During his brief work on this single web design project **Sepúlveda never performed any illegal or otherwise dubious or unethical work on behalf of Mr. Rendón**, any of his consulting firms, nor any of Mr. Rendón's clients.

36.     Upon the termination of his contract for this single web design project, Sepúlveda **never again** worked on any campaigns associated with Mr. Rendón, any of his consulting firms, nor any of his clients.

**Sepúlveda is Arrested for and Convicted of Hacking Accounts in Opposition to the Colombian Government's Peace Talks with the FARC**

37.     In 2014, in pursuit of his own political agenda to oppose peace and reconciliation talks between the Colombian government of President Juan Manuel Santos and the Revolutionary Armed Forces of Colombia (FARC), Sepúlveda hacked the social media and email accounts of certain FARC members and other negotiators.[6]  In order to gain access to information on and undermine the peace negotiations between the FARC and the Colombian government, Sepúlveda created false identities on Facebook and fake email accounts posing as FARC sympathizers, sent emails and communications from those fake accounts, purchased emails of attendees at the FARC-Colombian peace talks in Havana, Cuba in order to procure IP addresses for those attendees, and accessed and used previously closed email accounts.  Sepúlveda then publicized classified information and military intelligence he had obtained through his hacking activities in order to turn public opinion against the peace process and support the presidency of Oscar Iván Zuluaga, who also opposed the peace process.

38.     During Sepúlveda's illegal acts to undermine the peace talks and Colombian

---

6 *See* Jim Wyss, "Detained Colombia Hacker Outlines Alleged Political Plot Against Peace Process," The Miami Herald (Aug. 25, 2014), available at http://www.miamiherald.com/news/nation-world/world/americas/article1981482.html.

President Juan Manuel Santos's efforts, he showed a propensity for hacking personal email accounts, doctoring emails, and even creating entirely fake emails and other communications.

39.     In May of 2014, Sepúlveda was apprehended by Colombian authorities in suspicion of the hack.  Sepúlveda was convicted of his crimes and sentenced to ten years in prison in Colombia.  Sepúlveda's arrest and illegal activities, including details of his propensity for creating fake email and social media accounts and for fabricating emails and other communications, became international news and were widely reported on in Colombia and in international media outlets.

40.     Sepúlveda claimed that he had worked and conducted his illegal activities on behalf of Oscar Iván Zuluaga's presidential campaign.  Sepúlveda claimed that his activities were ordered and directed by Zuluaga, Zuluaga's son, and the campaign manager and were officially condoned by the campaign itself.

41.     Sepúlveda's claim that his illegal activities were done at the behest of Zuluaga and his campaign were investigated by Colombia's Prosecutor General's Office.  After a thorough investigation, the ***Prosecutor General dropped all criminal charges against Zuluaga***.  The Prosecutor General determined that there was no "factual evidence" to support a "reasonable infer[ence]" to support Sepúlveda's allegations or any illegal activities by Zuluaga or his campaign.[7]

42.     Likewise, ***Sepúlveda's own brother*** broadcasted a disjointed defense of his brother on YouTube that contradicted his own brother's story, claiming that his brother did not work at the behest of Zuluaga.

---

[7] *See* Stephen Gill, "Former Colombia Presidential Candidate Off The Hook In Electoral Spying Scandal," Colombia Reports (January 13, 2017), available at http://colombiareports.com/former-colombia-presidential-candidate-off-hook-political-spying-scandal/.

43.     In 2015, Sepúlveda was found guilty of the charges of illegal interception, abusing access to classified information, espionage, and use of illegal software.  He was sentenced to 10 years in prison, the maximum sentence for his crimes.[8]

44.     At no point during his arrest or his trial for these crimes did Sepúlveda ever refer to or claim he performed any illegal work for Mr. Rendón.

### Mr. Rendón has been Targeted by the Venezuelan Government

45.     Because of his unwavering commitment to democratic ideals throughout Latin America and specifically in Venezuela in opposition to the totalitarian regimes of Hugo Chávez and Nicolás Maduro, Mr. Rendón has been the target of numerous false attacks and campaigns by the totalitarian Venezuelan regimes.

46.     In 2004, Mr. Rendón first accused the Chavez regime of committing election fraud and of suppressing democratic processes in Venezuela.  Upon doing so, he left Venezuela for fear of retribution.  He has not returned to Venezuela since.   Since then, the Venezuelan governments have engaged in a personal campaign to undermine Mr. Rendón's credibility, ***falsely accuse*** and imprison him, and generally threaten his livelihood.

47.     For example, Venezuelan prosecutors falsely accused Mr. Rendón, while in Panama on business, of assault and engaged INTERPOL to arrest him and extradite him to Venezuela.  The Venezuelan government took the drastic and inappropriate step of requesting a Red Notice from INTERPOL, a code typically reserved a nation's most wanted and dangerous individuals.  After denying the claims and charges, Mr. Rendón demanded that the Venezuelan

---

[8] *See* Natalie Roterman, "Opposition Hacker Andrés Sepúlveda Sentenced To 10 Years In Prison For Spying On Colombia Peace Process," Latin Times (April 12, 2015), available at http://www.latintimes.com/opposition-hacker-andres-sepulveda-sentenced-10-years-prison-spying-colombia-peace-309023.

government produce a warrant for his arrest.  Knowing the charges to be false and unsubstantiated, the Venezuelan government refused to produce a warrant.  Based on this refusal, INTERPOL's understanding that the Red Notice was improper, and INTERPOL's determination that the extradition request was done for political rather than legal purposes, INTERPOL declined to pursue Mr. Rendón and all of the claims were dismissed.

48.     Other instances of the Venezuelan seeking to attack, trap, and persecute Mr. Rendón include, but are not limited to:

- Bribing individuals to jump in front of Mr. Rendón's vehicle in order to then arrest and sue him;

- Numerous attempts to attack and kidnap Mr. Rendón, causing him to travel in armored vehicles;

- Attempting to block his immigration applications in various countries, including Mexico; and

- Conducting a negative and false media campaign against Mr. Rendón in Colombia and Venezuela, including falsely tying him to international conspiracies conducted by the United States to overthrow the Venezuelan government.

49.     In June 2013, Maduro began a direct and calculated ***public smear campaign*** of Mr. Rendón.  Maduro declared Mr. Rendón to be "Public Enemy No. 1 in Venezuela" and referred to him as "human scum" for daring to oppose Maduro's totalitarian regime.[9]  President Maduro vowed to fight any opposition to his regime, including Mr. Rendón's, "with force."

---

9   See   http://www.psuv.org.ve/temas/noticias/nicolas-maduro-j-j-rendon-es-enemigo-publico-n%C2%B01-venezuela/#.V8eAL5MrL67 (last accessed Mar. 29, 2017).



*Venezuelan president Nicolás Maduro declares JJ Rendón to be "Public Enemy No. 1 in Venezuela"*

50.    Although the Venezuelan government has attempted to disavow itself of Mr. Rendón, including by revoking his Venezuelan passport, which restricts his ability to travel completely, it has not in fact revoked Mr. Rendón's Venezuelan citizenship and it could not actually or legally do so.   The Venezuelan government has not taken—nor legally could it take— any actions or administrative acts that would in fact strip Mr. Rendón of his Venezuelan citizenship or nationality.   Therefore, although Mr. Rendón has lost his *passport* and Nicolas Maduro has spoken hatefully and violently about Mr. Rendón, Mr. Rendón remains a Venezuelan citizen and

national today.[10]

51.     It is for these reasons and others, as well as in recognition of the danger and threat to his livelihood and the persecution he has faced and continues to face at the hands of the Venezuelan government, that *Mr. Rendón sought asylum in the United States*.

52.     The United States government conducted a rigorous application and vetting process, which included a thorough investigation of all allegations against him including the false allegations contained in the Bloomberg Article. This process was significantly delayed by the publication of the Bloomberg Article because an allegation of cyber terrorism, as was described in the Bloomberg Article, would be clear grounds for a denial of asylum.[11] This significant delay was, upon information and belief, caused by the false and criminal allegations made in the Bloomberg Article by the Bloomberg Defendants about Mr. Rendón. However, after a thorough review of his application and a clear understanding of the falsity of the Bloomberg Defendant's criminal allegations, the United States government officially *granted* Mr. Rendón political asylum and *a path* to United States citizenship in 2016. However, Mr. Rendón has *not* yet obtained U.S. citizenship and remains solely a Venezuelan citizen today.

53.     The granting of asylum to Mr. Rendón is a recognition by the United States government that he is someone who has "suffered persecution or [has] fear that [he] will suffer persecution due to [his] race, religion, nationality, membership in a particular social group,

---

[10]   The United States does not recognize Nicolás Maduro as Venezuela's President; rather, it "recognize[s] the authority of the democratically elected 2015 [Venezuelan] National Assembly as the last remaining democratic institution and Juan Guaidó as Venezuela's interim president." U.S. Department of State, *U.S. Recognition of Venezuela's 2015 National Assembly and Interim President Guaidó*, (Jan. 4, 2022), https://www.state.gov/u-s-recognition-of-venezuelas-2015-national-assembly-and-interim-president-guaido,

[11] *See* Asylum and Withholding or Removal, 8 C.F.R. 208.4 (2009) (summary available at https://www.uscis.gov/humanitarian/refugees-asylum/asylum/asylum-bars.).

[and/or] political opinion."[12]   It was also a recognition that the United States government itself found that the Bloomberg Article was fake news and the criminal allegations in the article were false and to be ignored for the purposes of its review of Mr. Rendón's asylum application.

54.     While it was of significant relief for Mr. Rendón to receive asylum status, it also meant that he had to permanently relocate and bring his entire life to the United States. Additionally, despite this approval, Mr. Rendón's travel documents were still withheld by the United States government for an additional seven months and were not provided to him until early February 2017.  This withholding further hindered Mr. Rendón's ability to travel for both personal and business reasons and, upon information and belief, was caused in part by the United States government's continued analysis of the criminal allegations made in the Bloomberg Article. However, just as with the general granting of asylum, the United States government found no merit in the false allegations made by the Bloomberg Defendants and did eventually provide Mr. Rendón with the proper travel documents.

55.     Upon information and belief, the Venezuelan government continues to seek methods and means to undermine Mr. Rendón's credibility and his ability to oppose the Venezuelan totalitarian regime.

**Bloomberg Reporter Andrew Willis Develops Strong Ties to the Venezuelan Government and Venezuelan Oil Interests**

56.     Bloomberg Reporter and agent Andrew Willis joined Bloomberg's Bogota, Colombia bureau in April 2013 in order to cover commodities and Colombia's internal conflict. Upon doing so, he quickly discovered that his reporting success depended on oil sector connections

---

12 See "Asylum" available at https://www.uscis.gov/humanitarian/refugees-asylum/asylum (last accessed on Mar. 29, 2017).

in the region, specifically in Venezuela.

57.     Willis quickly gained access to and a rapport with Alejandro Betancourt López, the Venezuelan billionaire whose family owned a 20% stake in Colombian-based Pacific Rubiales Energy Corp., Latin America's largest independent oil producer.  Alejandro Betancourt López and his family have deep ties to the totalitarian Venezuelan regimes of Chavez and Maduro and depend on those ties to maintain their vast fortune and economic stature in Venezuela.

58.     Since May 2014, Willis has written at least **_forty articles_** for Bloomberg featuring López and Pacific Rubiales that portray López and the company in a positive light and promote Pacific Rubiales's business interests.[13]

### The Bloomberg Reporters Work With Convicted Felon Sepúlveda to Craft a False and Defamatory Story About Mr. Rendón

59.     Prompted by Willis and acting within the scope of their employment, the Bloomberg Reporters searched for connections between Mr. Rendón – Venezuela's "Public Enemy No. 1" – and any activities that would undermine his credibility.  Having been in Colombia during Sepúlveda's highly publicized arrest and conviction, Willis was familiar with both Sepúlveda's case, his unsubstantiated claims that he hacked accounts on behalf of Oscar Iván Zuluaga's presidential campaign, the fact that Oscar Iván Zuluaga was supported and endorsed by former Colombian president Álvaro Uribe, and that Mr. Rendón had once worked for Uribe's party and campaign.

60.     After making contact with Sepúlveda, Willis and Bloomberg took advantage of Sepúlveda's fragile psyche in prison and his willingness to say anything in order to improve his conditions in prison.  Additionally, Sepúlveda was up front about his **_motives_** for publicizing his

---

[13]  See http://www.bloomberg.com/authors/ARLm6Hq3MFg/andrew-willis (last accessed Aug. 28, 2016).

alleged story with any reporters: to gain publicity and notoriety for his own proprietary software *Social Media Predator*, which he hoped to market, sell, and use as leverage for a reduced or suspended prison sentence.

61.     With these motives and a lack of awareness of the consequences of his fabricated story, Sepúlveda began telling the Bloomberg Reporters his concocted history that placed him at the center of the most high-profile Latin American political campaigns of the previous ten years.

62.     The *invented* story that Sepúlveda spun – that he engaged in illegal and unethical cyber-hacking campaigns on behalf of JJ Rendón and his high-profile and successful clients to win presidential elections throughout Latin America – fit Bloomberg's pre-conceived narrative that Venezuela's "Public Enemy No. 1" was a criminal himself.

63.     From these interviews in a Colombian prison with Sepúlveda, the Bloomberg Reporters began crafting an entire article that falsely implicated not only Mr. Rendón in illegal activity, but also numerous former and current Latin American presidents, including current Mexican president Enrique Peña Nieto.  Despite these outrageous and far-reaching allegations, the Bloomberg Reporters were content in relying solely on the word of a convicted felon and a handful of dubious emails.

64.     The Bloomberg Defendants spent nine-months and assigned twenty journalists to interview and gather information from Sepúlveda.  However, after this nine month "investigation," the Bloomberg Reporters had little more than Sepúlveda's own words to support their claims.  In the end, they only cited *five* sources total in the Article:  Sepúlveda, Mr. Rendón, Donald Trump's spokeswoman Hope Hicks, David Maynor of Errata Security, and one anonymous former campaign staffer for the Peña Nieto campaign in Mexico.  Notably, the anonymous former campaign staffer, who is not quoted in the article, is the only source other than Sepúlveda and Mr.

Rendón to comment on Sepúlveda's actual claims about Mr. Rendón. In stark contrast, the Bloomberg Reporters only devoted a handful of emails and just three short telephone conversations to the real story.

**The Bloomberg Defendants Rely On and Purposefully Distort Harmless and Generic Communications Between Mr. Rendón And Sepúlveda to Support Their False Story**

65.     In their reporting, the Bloomberg Reporters claimed to have collected and rely heavily on allegedly-produced emails from Sepúlveda that purportedly substantiate his false claims.

66.     The emails Sepúlveda allegedly provided – which were not published, linked to, or provided to readers of the Article in any way – purport to show conversations between Sepúlveda, Mr. Rendón, and other employees of Mr. Rendón's consulting firm about hacking and campaign-related cyber attacks. Sepúlveda allegedly provided emails in different formats, some of which were just "screen shots" of the emails.

67.     While the Bloomberg Reporters claimed that Sepúlveda provided them with a dozen or so emails between him and Mr. Rendón, the Bloomberg Reporters also realized that Sepúlveda had claimed that he had in fact ***destroyed*** all other evidence of any hacking he had conducted for Mr. Rendón or otherwise.

> Each job ended with a specific, color-coded destruct sequence. On election day, Sepúlveda would purge all data classified as "red." Those were files that could send him and his handlers to prison: intercepted phone calls and e-mails, lists of hacking victims, and confidential briefings he prepared for the campaigns. All phones, hard drives, flash drives, and computer servers were physically destroyed. Less-sensitive "yellow" data–travel schedules, salary spreadsheets, fundraising plans–were saved to an encrypted thumb drive and given to the campaigns for one final review. A week later it, too, would be destroyed.

*Excerpt from the Article, pg. 63*

68.     Therefore, the only documentation the Bloomberg Reporters had from this convicted felon to support his story was a handful of emails – from an individual who claimed that he could invent any type of social media or email account – some of which were not originals but rather screen shots of emails.

69.     In addition, in subsequent interviews and publicity appearances, the Bloomberg Reporters' claimed to have verified Sepúlveda's source code he used for the significant amount of programming necessary to complete the subversive work he claimed to have done.  However, while gathering and reviewing this source code, the Bloomberg Reporters became aware that a large portion of the computer programming and even "hacker" community who knew Sepúlveda and were aware of his coding ability claimed that he could barely code at all.

**The Bloomberg Defendants Intentionally Ignore Information – Both Publicly Available and Provided by Mr. Rendón Before Their Article Was Published – That Contradicts Their Preconceived Story About Mr. Rendón**

70.     Despite allegedly spending nine months on investigating and gathering information on the story and interviewing twenty witnesses prior to publication of the Article, the Bloomberg Reporters **only reached out** to Mr. Rendón for comment **a mere month** prior to publication once the reporting had been finalized and publication was imminent.  However, even given an unreasonably tight deadline to comment and refute the false allegations leveled against him, Mr. Rendón provided the Bloomberg Reporters with statements and offers of evidence that contradicted Sepúlveda's story and the Bloomberg Reporters' false and preconceived narrative.

71.     When Willis first reached out to Mr. Rendón via email, he did so under the guise that he was writing a piece on Latin American political campaigns.  Willis did not disclose his intent to write an article that told a false narrative that Mr. Rendón had engaged in illegal, unethical, and nefarious conduct while consulting on such campaigns.  In fact, during the first conversation

between Willis and Mr. Rendón, ***neither cyber attacks, nor hacking, nor Sepúlveda*** were even mentioned.

72.     It was only during a subsequent conversation that Willis raised the topic of Sepúlveda working for Mr. Rendón and hacking Rendón's clients' political opponents for him. Mr. Rendón immediately denied such allegations and told Willis directly that he had no recollection of ever having worked with Sepúlveda in any capacity. In an act of good faith, Mr. Rendón stated that he would look into whether he had ever had any forgotten contact with Sepúlveda and any other information that would assist with the reporting. However, Mr. Rendón was emphatic that the Bloomberg narrative was false and could not possibly be substantiated.

73.     In a final conversation and after investigating the matter further, Mr. Rendón told Willis that he had found that Sepúlveda had indeed briefly worked with him on a single web design project during Uribe's presidential campaign in 2005, that he emailed with Sepúlveda on a limited basis, that he may have had a conversation or two with Sepúlveda, and that Sepúlveda's tenure had been short and terminated after little-to-no work had been conducted.

74.     Mr. Rendón was clear with Willis that the high-profile campaigns he worked on were massive and complex and that a strict chain of command was necessary for the campaign to function properly. Mr. Rendón told Willis that Sepúlveda was a low-level staffer on the campaign for just two weeks, whereas Mr. Rendón was an important, high-level campaign consultant who would not have had any meaningful or substantive interactions with a web designer such as Sepúlveda. Mr. Rendón also told Willis that Sepúlveda had been an employee of the campaign – not Mr. Rendón's – and that Sepúlveda had most assuredly never performed any illegal or otherwise dubious or unethical work on behalf of Mr. Rendón, any of his consulting firms, or any of Mr. Rendón's clients.

75.     To verify his claims about Sepúlveda's very brief and limited work, Mr. Rendón offered to and did provide Bloomberg with his *only communications* with Sepúlveda – *about the web design project.*  Mr. Rendón also offered to provide other information and documents that would debunk other aspects of Sepúlveda's story, including the passenger logs of his private jet which would show that Sepúlveda never flew on it at all, let alone to Mexico during Peña Nieto's campaign.  Mr. Rendón maintained detailed and meticulous passenger logs and manifests, which show who flew where and when, as well as the verified identifies of those passengers to ensure that no one traveled under a fake name or alias.  These jet logs and passenger manifests are required by law to be accurate and account for all passengers.  The fact that they *did not include Sepúlveda* on them would have *shown definitively* that Sepúlveda was not with Mr. Rendón in any of the countries they claimed, nor was he in the countries where the elections that he alleged to have been a part of took place.  The Bloomberg Reporters ignored this information and failed to actually verify whether Sepúlveda was in fact in any of the countries on the dates he claimed to be.

> Sepúlveda didn't like the idea of working in Mexico, a dangerous country for involvement in public life. But Rendón persuaded him to travel there for short trips, starting in 2008, often flying him in on his private jet. Working at one point in Tabasco, on the sweltering Caribbean coast, Sepúlveda hacked a political boss who turned out to have connections to a drug cartel. After Rendón's security team learned of a plan to kill Sepúlveda, he spent a night in an armored Chevy Suburban before returning to Mexico City.

*Excerpt from the Article, pg. 64*

76.     Mr. Rendón clearly and emphatically explained to Willis that the records he was offering to Bloomberg were all of the emails that ever existed between Mr. Rendón and Sepúlveda. Mr. Rendón told Willis that because he is subject to numerous different compliance and regulatory standards inherent in national and international election law, he keeps meticulous records of all of

his communications, including emails. Therefore, the emails Mr. Rendón referenced in his conversation with Willis and provided to Bloomberg were the complete record of his interactions with Sepúlveda, and these emails did not include any references to any subversive, illegal, or otherwise unethical "hacking" whatsoever.

77.    Mr. Rendón also directed Willis to numerous publicly available documents and pieces of information that also directly contradicted Sepúlveda's story. Mr. Rendón strongly suggested that Willis call Sepúlveda's ex-girlfriend and mother of his child to verify his whereabouts at different times over the prior ten years (for which he provided her telephone number), watch Sepúlveda's own brother's YouTube video that contradicted his own brother's story regarding Zuluaga, and review numerous online articles that contradicted Sepúlveda. He also suggested that he speak with any of his current or former employees.

78.    Specifically, ***Sepúlveda's ex-girlfriend***, who was a former assistant for Mr. Rendón during President Pena Nieto's campaign in Mexico and managed his travel arrangements, would have told Willis that Sepúlveda did not know Mr. Rendón, did not travel with Mr. Rendón, and did not work on the Pena Nieto campaign.

79.    ***The Bloomberg Reporters did not follow-up on any of these offers*** to provide documentation or with any of the sources Mr. Rendón referenced and suggested. Instead, the Bloomberg Reporters contacted several of Mr. Rendón's competitors for comment. When even his competitors would not verify that Bloomberg Reporters' preconceived narrative, they offered to make one witness's identity anonymous if she were willing to lie and change her statement to verify Sepúlveda's story.

**The Bloomberg Defendants Publish "How to Hack an Election" and False and Defamatory Statements About Mr. Rendón**

80.    On March 31, 2016, Bloomberg published "How to Hack an Election." The Article

was published online on *Bloomberg Businessweek*'s website.  The Article was republished in the hardcopy edition of both *Bloomberg Businessweek*'s U.S. and International magazines on or about April 4, 2016.  It was the first *Bloomberg Businessweek* article posted online in both English and Spanish in Bloomberg's history.  The Article was also published as the "cover story" for the International print edition, with the headline: "CONFESSIONS OF A POLITICAL HACKER: One Man's Story of Manipulating Elections Across Latin America."



*Bloomberg Businessweek International Edition Cover, April 4-10, 2016 Edition*

81.     The Article's main focus was Sepúlveda's alleged hacking on behalf of and at the direction of Mr. Rendón in order to win high-profile political elections across Latin America, including those of Colombian president Álvaro Uribe, Honduran president Porfirio Lobo Sosa, and Mexican president Enrique Peña Nieto.  The general theme of the Article was that Sepúlveda engaged in election fraud and other patterns of unlawful conduct at the request and direction of Mr. Rendón.

82.     The story begins with Sepúlveda reacting to Peña Nieto's victory in the Mexican presidential election in 2012 and promptly "destroying evidence" of his alleged illegal hacking activities in support of Peña Nieto's victory.  The Bloomberg Reporters wrote that Sepúlveda "drilled holes in flash drives, hard drives, and cell phones, fried their circuits in a microwave, then broke them to shards with a hammer. He shredded documents and flushed them down the toilet and erased servers in Russia and Ukraine rented anonymously with Bitcoins."

83.     The Bloomberg Reporters then tell Sepúlveda's sordid tale of how he allegedly met and began working for Mr. Rendón in 2005.  According to the Bloomberg Reporters, Sepúlveda visited Colombian president Álvaro Uribe's party headquarters and decided on his own to hack Mr. Rendón's personal laptop.  According to the Article, Mr. Rendón was initially "furious – then hired him on the spot."  From this point through 2012, the Article alleged that Sepúlveda hacked numerous political opponents of Mr. Rendón's clients.

84.     The Bloomberg Reporters claimed that Mr. Rendón and Sepúlveda had an immediate connection and Mr. Rendón believed that "hackers could be completely integrated into a modern political operation, running attack ads, researching the opposition, and finding ways to suppress a foe's turnout."  This belief, combined with Sepúlveda's "insight" into social media and his ability to fake social media trends and accounts, could be utilized to "manipulate the public

debate" and directly help Mr. Rendón's clients achieve victory.

85.     The Bloomberg Reporters claimed that Mr. Rendón paid Sepúlveda in cash only, half-upfront and half when the job was completed.  According to the Article, to initiate a job, Mr. Rendón would give Sepúlveda "a piece of paper with target names, e-mail addresses, and phone numbers.  Sepúlveda would take the note to his hotel, enter the data into an encrypted file, then burn the page or flush it down the toilet.  If Rendón needed to send an e-mail, he used coded language.  To "caress" meant to attack; to "listen to music" meant to intercept a target's phone calls."  And the Bloomberg Reporters claimed that Mr. Rendón and Sepúlveda "took pains not to be seen together" and only communicated "over encrypted phones."

> According to Sepúlveda, his payments were made in cash, half upfront. When he traveled, he used a fake passport and stayed alone in a hotel, far from campaign staff. No one could bring a smartphone or camera into his room.

*Excerpt from the Article, pg. 62*

86.     The Bloomberg Reporters claimed that upon completion of a job for Mr. Rendón, Sepúlveda would purge the incriminating data and destroy "All phones, hard drives, flash drives, and computer servers."  Within a week, all data would be destroyed.

87.     The Bloomberg Reporters claimed that Sepúlveda conducted this subversive and illegal process repeatedly on behalf of Mr. Rendón and his clients up to the 2012 Mexican elections.

88.     The Article returns to and culminates with the 2012 Mexican presidential election. The Bloomberg Reporters claimed that "In Mexico, Sepúlveda's technical mastery and Rendón's grand vision for a ruthless political machine fully came together" and were integral in Peña Nieto's victory.  The Bloomberg Reporters claimed that Sepúlveda, on behalf of Mr. Rendón:

- "installed malware in routers in the headquarters" of Peña Nieto's opponents and tapped their phones and computers, which enabled him to access their prepared speeches, meetings, and schedules;

- created and managed thousands of fake Twitter profiles in order to control public debate on issues favorable to Peña Nieto;

- sent automated phone calls on election night at 3:00am to "tens of thousands of voters" with "prerecorded messages" from a gubernatorial candidate in order to anger the recipients so they would not vote for him;

- created fake Facebook accounts of gay men claiming to back a conservative candidate; and

- disabled an opponent's consultant's website and replaced it with a controlled, cloned website.

89.    Of particular note is the Bloomberg Reporters' claim that Sepúlveda would often fly on Mr. Rendón's private jet to and from Mexico to work for Mr. Rendón on behalf of Peña Nieto.  This fact is demonstrably false, as none of Mr. Rendón's flight records, logs, or manifests – which he offered to provide to Bloomberg, but was rebuffed – show Sepúlveda as having ever been a passenger on Mr. Rendón's flights and that all passengers were accounted for at all times on such flights.  Therefore, unless Sepúlveda arrived in these countries on the dates he suggested by other means – which could have been verified by the Bloomberg Reporters, but was not – he was not in the countries on the dates he claimed.

90.    The Bloomberg Reporters claimed that Mr. Rendón had asked Sepúlveda to once again work for him in Colombia, but that Sepúlveda refused because of Mr. Rendón's work with candidates who supported peace talks and reconciliation with the FARC.

91.    The Article concludes with, in a transparent attempt to appeal to an American audience, the idea that Mr. Rendón had been asked to work with candidates in the American presidential election, namely Donald Trump.  While denied by both Mr. Rendón and the Trump campaign, the Bloomberg Reporters included the rumors that he "was working for Donald

Trump's presidential campaign" and rumors that he was considering working with other candidates as well.

92.     Notably, the Bloomberg Reporters do not mention the severe persecution Mr. Rendón has suffered at the hands of the Venezuelan government, nor do they criticize or even reference the totalitarian regimes of Hugo Chávez nor Nicolás Maduro.   The Article only references in passing that "after accusing then-President Chavez of vote rigging in 2004, [Mr. Rendón] left and never went back."

93.     The Bloomberg Reporters targeted Mr. Rendón as the clear and preconceived villain in their story.  While Sepúlveda is portrayed as a principled idealist who only hacked "to end dictatorship and socialist governments in Latin America," Mr. Rendón is portrayed as an immoral political operative whose focus was winning at any cost.  The Bloomberg Reporters falsely accuse Mr. Rendón of numerous despicable crimes beyond in the Article, including international cyber terrorism, tax evasion, falsification of documents, human trafficking, espionage, conspiracy, and racketeering, in addition to the despicable and criminal behavior of rigging elections throughout Latin America.  In reality, however, Mr. Rendón has no criminal record whatsoever and has led a principled career devoted to the same causes for which the Bloomberg Reporters praised Sepúlveda.  The Bloomberg Article's purpose was clear:   to transform Mr. Rendón into a criminal mastermind and social pariah thereby destroying his political career and putting an end to his philanthropic and human rights activism throughout Latin America and the world.

**The Bloomberg Defendants Publicize and Magnify the Impact of their Defamatory Article Through a Series of Social Media Posts and Other News and Video Appearances**

94.     Following publication of the Article, Bloomberg went to great lengths to further publicize and draw attention to the fake news it created.  The Bloomberg Defendants made

numerous posts and Tweets with links to and comments about the Article to both the Reporters'
own individual Twitter and Facebook accounts as well as Bloomberg's various account pages.

95.     In addition to publicizing the Article on social media, Bloomberg sent the
Bloomberg Reporters on a ***press tour*** designed to further publicize the Article and to capitalize on
all the attention it was receiving.  During a series of appearances on radio shows and television
news shows, the Bloomberg Reporters doubled down and reiterated their false claims concerning
Mr. Rendón.  The Bloomberg Reporters appeared on both U.S. and international television and
radio programming to publicize the Article, including on NPR, Univision, CNN en Español, PRI's
"The World,", Radio Fórmula, La Nacion in Costa Rica, notiguía.tv in Mexico, and of course
Bloomberg's own TV programs.

96.     Bloomberg created its own ***Media Distribution page*** online on which it boasted
about the numerous public appearances the Bloomberg Reporters had made to promote the Article,
the extensive news coverage the Article had received from other national and international news
outlets, and the large traffic and audience the Article had garnered.[14]  The Bloomberg Defendants
boasted that "The English version became the most read story on Bloomberg.com" and the Article
had prompted "Bloomberg and Andrés Sepúlveda [to become] Twitter trending topics in Mexico."

---

14 *See* Bloomberg Media Distribution, How to Hack an Election, available at
http://www.bloomberg.com/distribution/blog/2016-04-08/hack-election-como-hackear-una-
eleccion/ (last accessed Mar. 29, 2017).



**Within 36 hours:**

- Mexican President Enrique Peña Nieto publicly denied Sepulveda's claim of having worked on behalf of his campaign.

- NPR's "Here and Now," Univision, CNN en Espanol, PRI's "The World,", Radio Fórmula, El Financiero Bloomberg TV and La Nacion (Costa Rica) interviewed the Bloomberg team.

- The English version became the most read story on Bloomberg.com.

- International news coverage of the piece included: The Drudge Report, Longform, The Guardian, The Atlantic, FT, Boing Boing, Fusion, Reforma (Mexico's largest newspaper), El Economista, El Financiero, Expansion, BuzzFeed Mexico, Forbes Mexico, Univision, Le Figaro (France), DW (Germany), Il Post (Italy), El Pais (Brazil & Spain), el Periodico (Spain), El Nacional (Venezuela), El Univeral (Mexico), La Estrella (Panama), PanAm Post (Panama), Prensa Libre (Guatemala), Confidencial (Nicaragua) Su Noticiero (Venezuela), Tal Cual (Venezuela), La Jornada, Las2Orillas, Proseco, SDPNoticias, Aristegui Noticias, Sin Embargo, Olmeca Diario, Diario de Yucatan, Vanguardia, La Prensea (San Antonio, TX) and many, many more.

*Bloomberg's Media Distribution Page Article Popularity Metrics*

**The Bloomberg Defendants Repeat and Republish Their False and Defamatory Statements About Mr. Rendón on April 1, 2016 on CNN en Español, Radio Fórmula, notiguía.tv in Mexico, and PRI Public International Radio**

97.     Because the Article's most detailed and chilling focus besides the accusations against Mr. Rendón were the false allegations and fake news that the most recent Mexican presidential election had been deeply influenced by Sepúlveda's hacking, the Mexican allegations gained notoriety.  For this reason, Bloomberg dispatched its agent and Director of News for Mexico, Rodríguez, to publicize the Article in Mexico.  Immediately after publication, Rodríguez discussed and republished the false and defamatory statements about Mr. Rendón to various news outlets.

98.     On April 1, 2016, one day after the online publication of the Article, Rodríguez appeared on news programs in Mexico on CNN en Español,[15] Radio Fórmula,[16] and notiguía.tv in Mexico on behalf of Bloomberg.[17] On these programs, Rodríguez reiterated Sepúlveda's alleged hacking on behalf of and at the direction of Mr. Rendón in order to win high-profile political elections across Latin America.  While Rodríguez doubled-down on Bloomberg's false allegations against Mr. Rendón, he notably admitted that the only direct connection the Bloomberg Reporters relied upon between Sepúlveda and Mr. Rendón was Sepúlveda's word and that Mr. Rendón had worked for Peña Nieto's political party in support of his presidential election campaign.  He specifically did not have a response to the CNN en Español reporter's questions about the

---

[15] See Bloomberg defiende Reportaje de Hacker que Manipuló Elecciones en 2012, CNN en Español, available at https://www.youtube.com/watch?v=8l91gOL0oyw (last accessed Mar. 29, 2017).

[16] See Bloomberg News hacker maintains posture and documents that support it, Radio Fórmula, http://www.radioformula.com.mx/notas.asp?Idn=582677&idFC=2016 (last accessed Mar. 29, 2017).

[17] See Bloomberg ratifica: Enrique Peña sí contrató a hacker en 2012, notiguía.tv, available at https://www.youtube.com/watch?v=6xnvInXN1lg (last accessed Mar. 29, 2017).

divergence between Sepúlveda's story and Mr. Rendón's statements to the Bloomberg Reporters, nor did he divulge any evidence supporting the accusation that the 2012 Mexican election had been rigged in any way.  Rodríguez also claimed that one fact that caused them to doubt Mr. Rendón's version was that his story had changed about ever meeting Sepúlveda, which was a complete distortion of the record.  In fact, Mr. Rendón was completely transparent with the Bloomberg Reporters in that he wasn't sure if he had ever met Sepúlveda, checked his records, and then stated that he may have met him at some point during his brief work with the Party of U.

99.    In addition to Rodríguez's appearances, Defendant Robertson appeared on PRI Public International Radio on April 1, 2016.[18]  Robertson also reiterated Sepúlveda's alleged hacking on behalf of and at the direction of Mr. Rendón in order to win high-profile political elections across Latin America.  Robertson doubled down on the false statement that there was a "deep relationship there between JJ Rendón and Andrés Sepúlveda" and that between them they "know there was a lot of hacking going on and it's much more than just like espionage."   In this interview, Robertson however admitted that there were many facts that they could not validate – which was not mentioned in the Article – and that once again they only got a dozen or so emails from Sepúlveda.   Despite this, Robertson unabashedly publicized Bloomberg's flawed reporting as fact and maintained the false and criminal allegations against Mr. Rendón.

100.    To date, despite the Bloomberg Defendants' fake news and false allegations that Mr. Rendón directed and perpetuated countless instances of illegal and criminal political hacking and electioneering, no alleged "victim" of such hacking or electioneering has filed suit against Mr.

---

[18] *See* The Bloomberg team that uncovered the Latin American election hacker had no idea what it would find, PRI Public International Radio, available at http://www.pri.org/stories/2016-04-01/bloomberg-team-uncovered-latin-american-election-hacker-had-no-idea-what-it-would   (last accessed Mar. 29, 2017).

Rendón, nor have they filed any other claims or complaints regarding those elections.

### Mr. Rendón has Suffered Significant Reputational, Emotional, and Economic Harm as a Result of the Bloomberg Defendants' Statements

101.    The publication of the Article and subsequent statements by Defendant Robertson and Rodríguez caused irreparable harm to Mr. Rendón's business interests and to his personal reputation as a civic leader, humanitarian, and ethical political strategist and consultant.

102.    Before the publication of the Article, Mr. Rendón was a well-known throughout Latin America, but was still relatively unknown in the United States.  Mr. Rendón had invested significant time, money, and resources into setting up his political consulting business in the United States, specifically in Miami, FL.  From there, Mr. Rendón planned to translate his campaign consulting and advising success in Latin America to the United States and build his practice from Miami.  However, the Bloomberg Article's false allegations created a negative first impression that immediately halted this expansion.

103.    In addition to branching out into the United States political market, Mr. Rendón had engaged with and agreed to work for numerous Latin American and international political campaigns.  These campaigns included the Guatemalan presidential campaign, two Mexican gubernatorial campaigns, and other campaigns in Paraguay, Argentina, and Honduras.  He had also had initial discussions about being involved in the American presidential and other national campaigns in a variety of different capacities.  In addition, because of his limited capacity to work with only a certain number of campaigns at one time, he turned down numerous other jobs and campaign advising and consulting opportunities to work on these specific campaigns.

104.    After the publication of the Article, Mr. Rendón lost these specific jobs and campaign opportunities because of the fear these potential clients had of working with an accused political hacker, even if untrue.  These included, at minimum, a $5 million contract to be the lead

strategist and advisor for the Guatemalan presidential campaign, as well as lost funds for at least the two Mexican gubernatorial campaigns and the campaigns in Paraguay, Argentina, and Honduras.  A conservative estimate of these lost contracts is $23 million.

105.    The Article was also Mr. Rendón's unintended introduction to the American political consultancy market and directly impacted and stalled his plans to grow his consultancy practice in the United States.  This is in addition to the countless potential clients across Latin America who did not seek Mr. Rendón's services because of the firestorm created by the Article. And, as a successful political and campaign consultant for presidential and other very high profile elections, Mr. Rendón has benefited in the past from subsequent and continued contractual relationships with his clients.  In other words, when Mr. Rendón provides consulting services for his clients and they win – which they do at a significant rate – he is typically hired for the future political races of those candidates.  A conservative estimate of Mr. Rendón's lost future revenues from the Article is $93 million.

106.    And as a result of the Article's publication and the false accusations made by Bloomberg, Mr. Rendón was forced to postpone planned investments as well as the devaluation of his current investments, including the valuation of his own company.

107.    Mr. Rendón also found that his ability to secure bank loans and other financing for both professional and personal endeavors was significantly more difficult and in certain cases impossible following the publication of the Article and the false accusations that he was a criminal. Mr. Rendón has had great difficulties securing lines of credit after publication of the Article, and to the extent he has been able to secure them, he has had to pay significantly increased rates to do so.

108.    Due to the publication of the Article, Mr. Rendón's asylum application was also

delayed for more than three additional months and his travel documents were delayed an additional ten months, during which Mr. Rendón was absolutely restricted from travel.  This over ten-month travel restriction affected his business and personal interests, and it limited his ability to gain additional and new business and mitigate the harmful effects of the Article.

109.    It also greatly impacted his physical and mental well-being, living with the fear that he would be deported from the United States at any moment and potentially forced to return to Venezuela and suffer immediate threats to his life and livelihood.  The effects of the Bloomberg Article were also very traumatic to Mr. Rendón because of the great pains and work he had made to finally get to the United States and apply for political asylum.  He had finally arrived to a nation he considered free of such nefarious tactics, character assassination, and threats to livelihood. However, when he arrived, he was met by the Bloomberg Defendants' false allegations of criminal behavior that made him question the fact that if he was not safe in the United States from these threats, would he be safe anywhere?  Additionally, his parents, who had previously fled Venezuela to the United States, were traumatized by the false allegations made against their son, which likewise caused significant harm to Mr. Rendón. This renewed trauma was as harmful to Mr. Rendón as any other effect from the Bloomberg Defendants' false allegations.

110.    Mr. Rendón suffered the deep indignity of being the subject of an immediate and international attempt on his reputation while a new asylum-seeker in this country.  At a time when Mr. Rendón should have felt secure and welcome, he instead felt the stain of the Article's accusations haunt him and poison the opinions others had of him.

111.    And lastly, the publication of the Article deeply harmed Mr. Rendón's reputation in the international, Latin American, and South Floridian communities as an upstanding and ethical resident and citizen, and as a staunch defender of civil and humanitarian rights, especially as it

pertains to free and democratic elections and government.  Mr. Rendón has worked tirelessly his entire life to promote open and democratic societies and relies greatly on his own reputation to continue to influence international governments and communities for the better.  Specifically, the Article has reignited the Venezuelan government's smear campaign and false attacks against him, and damaged his standing in the anti-Venezuelan totalitarian regime community.  The publication of the Article drastically and irreparably harmed his own reputation, and as a consequence his vast humanitarian and philanthropic efforts, particularly with regards to promoting human rights, free elections, and a viable democracy in his native Venezuela.

112.    Because of the harm to his reputation caused by the false allegations in the Bloomberg Article, Mr. Rendón has been forced to spend significant time and money on legal and consulting fees in order to repair his image, including online.  He has had to spend significant resources fixing errors on his Wikipedia page and other online information outlets, releasing statements that contradicted Bloomberg's false allegations, and meeting with influential individuals.

**The Bloomberg Defendants Refuse to Retract or Correct Their False and Defamatory Statements**

113.    On August 16, 2016, counsel for Mr. Rendón wrote to the Bloomberg Defendants on behalf of Mr. Rendón to notify them that the statements about Mr. Rendón they published in the Article – including their statements that "Mr. Rendón hired Andrés Sepúlveda to "rig elections throughout Latin America" and falsely stated, both directly and by implication, that Mr. Rendón initiated, directed, and condoned illegal and unethical cyber attacks in order to influence the outcome of high-profile political elections" – are false and defamatory.[19]  That letter identified the

_____

[19] Letter from Thomas A. Clare to Bloomberg, L.P., John Micklethwait, & Ellen Pollock (Aug. 16, 2016) (attached hereto as Exhibit C).

specific statements in the Article that are false and defamatory and/or give rise to false and defamatory implications about Mr. Rendón.  The letter requested the retraction of the statements and that Bloomberg issue an apology to Mr. Rendón.

114.    Through that letter, Mr. Rendón complied with Florida Statute § 770.01 et seq. by specifying the Bloomberg Defendants' defamatory statements and requesting their retraction or correction.

115.    The Bloomberg Defendants, by an August 23, 2016 letter from their attorney, **refused to retract or correct** their defamatory statements about Mr. Rendón and instead sought to justify their publication of such fake news.  The Bloomberg Defendants continue to refer to and reaffirm their false allegations about Mr. Rendón.

### Mr. Rendón Files a Criminal Complaint Against Sepúlveda in Colombia for Aggravated Slander/Defamation

116.    In April 2016, Mr. Rendón filed a criminal complaint against Sepúlveda in Colombia for aggravated slander/defamation for his statements to Bloomberg and other media outlets that republished the Bloomberg Article.  The Criminal Complaint asserted that  Sepúlveda falsely accused Mr. Rendón of the crimes of espionage, illicit use of communications, cyber manipulation and terrorism, and the theft of private information.

117.    On May 12, 2016, Bloomberg published a follow-up to the Bloomberg Article titled "Colombian Election Hacker Moved From Protective Custody."[20]   In this article, Bloomberg reported that Sepúlveda had been moved from protective custody back to a general population prison, however it refused to report that the **move was due** in large part to the criminal complaint

---

[20] *See* "Colombian Election Hacker Moved From Protective Custody," *Bloomberg Businessweek*, May 12, 2016, available at https://www.bloomberg.com/news/articles/2016-05-12/colombian-election-hacker-moved-from-protective-custody (last accessed Mar. 29, 2017).

filed by Mr. Rendón, and the article did not even mention the criminal complaint in its reporting.

**Mexico's Electoral Authority Dismisses a Complaint About Sepúlveda's Alleged Hacking in the 2012 Mexican Election as "Frivolous"**

118.     In September 2016, the National Electoral Institute – Mexico's autonomous organization responsible for organizing and managing Mexico's federal elections – dismissed a complaint filed with its Complaints Commission regarding the 2012 Mexican presidential election.[21]  The complaint was filed by a representative from the National Action Party – one of the opposition parties to President Peña Nieto's party – and was based entirely on Sepúlveda's story and Bloomberg's false and defamatory Article.  ***The National Electoral Institute's Complaints Commission declared that the complaint was "frivolous"*** and refused to investigate the claim further.

119.     Additionally, none of the opponents of the political candidates of the elections and campaigns cited by the Bloomberg Reporters in the Article have complained of the use of any illegal campaign tactics by their opponents or those campaigns.  To-date, the only allegations of such election hacking or manipulation has been in the false and defamatory Bloomberg Article.

<u>**COUNT I – DEFAMATION FOR STATEMENTS IN THE MARCH 31, 2016 ONLINE EDITION OF THE BLOOMBERG ARTICLE, "HOW TO HACK AN ELECTION"**</u>

120.     Plaintiff repeats and alleges paragraphs 1- 119 as if set forth fully herein.

121.     The Bloomberg Defendants published "How to Hack an Election" on March 31, 2016.  The Article was published to a worldwide audience on *Bloomberg Businessweek*'s website. A true and correct copy of the online edition of the article is attached hereto as Exhibit A.

122.     The Article contains the following false and defamatory statements and

---

21 *See* "Mexico Refuses to Probe Hacker's Claims of Electoral Fraud," teleSUR, Sept. 3, 2016, available at http://www.telesurtv.net/english/news/Mexico-Refuses-to-Probe-Hackers-Claims-of-Electoral-Fraud-20160903-0004.html (last accessed Mar. 29, 2017).

implications concerning Mr. Rendón:

- "Usually, he says, he was on the payroll of Juan José Rendón, a Miami-based political consultant who's been called the Karl Rove of Latin America."

- "Sepúlveda provided Bloomberg Businessweek with what he says are e-mails showing conversations between him, Rendón, and Rendón's consulting firm concerning hacking and the progress of campaign-related cyber attacks."

- "During a visit to party headquarters, Sepúlveda took out his laptop and began scanning the office's wireless network. He easily tapped into the computer of Rendón, the party's strategist, and downloaded Uribe's work schedule and upcoming speeches. Sepúlveda says Rendón was furious—then hired him on the spot."

- "Sepúlveda's first hacking job, he says, was breaking into an Uribe rival's website, stealing a database of e-mail addresses, and spamming the accounts with disinformation. He was paid $15,000 in cash for a month's work, five times as much as he made in his previous job designing websites."

- "Rendón, says Sepúlveda, saw that hackers could be completely integrated into a modern political operation, running attack ads, researching the opposition, and finding ways to suppress a foe's turnout."

- "According to Sepúlveda, his payments were made in cash, half upfront."

- "Most jobs were initiated in person. Sepúlveda says Rendón would give him a piece of paper with target names, e-mail addresses, and phone numbers. Sepúlveda would take the note to his hotel, enter the data into an encrypted file, then burn the page or flush it down the toilet. If Rendón needed to send an e-mail, he used coded language. To "caress" meant to attack; to "listen to music" meant to intercept a target's phone calls."

- "Rendón and Sepúlveda took pains not to be seen together. They communicated over encrypted phones, which they replaced every two months. Sepúlveda says he sent daily progress reports and intelligence briefings from throwaway e-mail accounts to a go between in Rendón's consulting firm."

- "Each job ended with a specific, color-coded destruct sequence. On election day, Sepúlveda would purge all data classified as "red." Those were files that could send him and his handlers to prison: intercepted phone calls and e-mails, lists of hacking victims, and confidential briefings he prepared for the campaigns. All phones, hard drives, flash drives, and computer servers were physically destroyed. Less-sensitive "yellow" data—travel schedules, salary spreadsheets, fundraising plans—were saved to an encrypted thumb drive and given to the campaigns for one final review. A week later it, too, would be destroyed."

- "In Honduras, Sepúlveda defended the communications and computer systems of presidential candidate Porfirio Lobo Sosa from hackers employed by his competitors. In Guatemala, he digitally eavesdropped on six political and business figures, and says he delivered the data to Rendón on encrypted flash drives at dead drops."

- "After Sepúlveda hacked Cabello's Twitter account, Rendón seemed to congratulate him. "Eres noticia :)"—you're news—he wrote in a Sept. 9, 2012, e-mail, linking to a story about the breach."

- "In Mexico, Sepúlveda's technical mastery and Rendón's grand vision for a ruthless political machine fully came together, fueled by the huge resources of the PRI."

- "Sepúlveda didn't like the idea of working in Mexico, a dangerous country for involvement in public life. But Rendón persuaded him to travel there for short trips, starting in 2008, often flying him in on his private jet. Working at one point in Tabasco, on the sweltering Gulf of Mexico, Sepúlveda hacked a political boss who turned out to have connections to a drug cartel. After Rendón's security team learned of a plan to kill Sepúlveda, he spent a night in an armored Chevy Suburban before returning to Mexico City."

- "Sepúlveda's team installed malware in routers in the headquarters of the PRD candidate, which let him tap the phones and computers of anyone using the network, including the candidate. He took similar steps against PAN's Vázquez Mota. When the candidates' teams prepared policy speeches, Sepúlveda had the details as soon as a speechwriter's fingers hit the keyboard. Sepúlveda saw the opponents' upcoming meetings and campaign schedules before their own teams did."

- "Sepúlveda managed thousands of such fake profiles and used the accounts to shape discussion around topics such as Peña Nieto's plan to end drug violence, priming the social media pump with views that real users would mimic. For less nuanced work, he had a larger army of 30,000 Twitter bots, automatic posters that could create trends. One conversation he started stoked fear that the more López Obrador rose in the polls, the lower the peso would sink."

- "Just about anything the digital dark arts could offer to Peña Nieto's campaign or important local allies, Sepúlveda and his team provided. On election night, he had computers call tens of thousands of voters with prerecorded phone messages at 3 a.m. in the critical swing state of Jalisco. The calls appeared to come from the campaign of popular left-wing gubernatorial candidate Enrique Alfaro Ramírez. That angered voters—and that was the point—and Alfaro lost by a slim margin. In another governor's race, in Tabasco, Sepúlveda set up fake Facebook accounts of gay men claiming to back a conservative Catholic candidate representing the PAN, a stunt designed to alienate his base."

- "Sepúlveda's team disabled the consultant's personal website and directed journalists to a clone site. There they posted what looked like a long defense written by Costa Bonino, which casually raised questions about whether his Uruguayan roots violated Mexican restrictions on foreigners in elections. Costa Bonino left the campaign a few days later."

- "Rendón, who was working for Santos, wanted Sepúlveda to join his team, but Sepúlveda turned him down."

123.    These statements are reasonably understood to be statements of and concerning Mr. Rendón and were in fact understood by persons reading them to be statements of and concerning Mr. Rendón.

124.    These statements are reasonably understood to be statements of fact regarding Mr. Rendón and were reasonably understood by persons reading them to be statements of fact regarding Mr. Rendón.

125.    These statements are false for the following reasons:

a.    Mr. Rendón never hired Sepúlveda to hack elections or conduct any unethical, illegal, or otherwise inappropriate work on behalf of Mr. Rendón, any of his consulting firms, nor any of Mr. Rendón's clients.  Mr. Rendón, nor any of his consulting firms nor clients, has ever hired, employed, engaged, or otherwise worked with Sepúlveda in any capacity during any election in which Mr. Rendón has been involved, except for a single web design project in 2005.

b.    Mr. Rendón's only interactions with Sepúlveda were limited to a single web design project that Sepúlveda worked on for two weeks in 2005 on behalf of the Party of the U.  Sepúlveda did little to no work on that web design project and his contract was terminated prior to completion.

c.    Mr. Rendón has never nor does he now initiate, condone, or otherwise

employ illegal tactics in the elections and campaigns in which he is involved, nor does he certainly condone or use cyber attacks or hacking in any elections in which he is involved.

126.    The substantial danger of injury to Mr. Rendón's reputation from such statements is readily apparent.  Such statements would tend to so harm the reputations of another as to lower his in the estimation of the community or to deter third persons from associating or dealing with him.

127.    By such publication, the Bloomberg Defendants did cause harm to Mr. Rendón's reputation.

128.    At a minimum, the Bloomberg Defendants had serious doubts as to the truth of these statements and a high degree of awareness that they were probably false, and therefore were required to investigate their veracity before publishing them.  The Bloomberg Defendants failure to adequately do so amounts to actual malice.

129.    The Bloomberg Defendants purposefully avoided the truth, and purposefully avoided interviewing sources, pursuing and receiving documents, and following fundamental reporting practices intentionally in order to avoid the truth.

130.    The Bloomberg Defendants published these statements with actual malice in that they published them even though they were specifically informed of their falsity numerous times, including in each conversation with Mr. Rendón and other hackers familiar with Sepúlveda's career and abilities.

131.    At the time of publication, the Bloomberg Defendants knew these statements were false, or recklessly disregarded the truth or falsity of the statements.

132.    The Bloomberg Defendants actions were malicious, willful, and wanton, and

evidence a conscious disregard for Mr. Rendón's rights.   Accordingly, punitive damages are appropriate.

133.   The Bloomberg Defendants' statements about Mr. Rendón are defamatory per se and by implication.  By stating and implying that Mr. Rendón perpetrated election fraud by hiring and initiating the political hacking of numerous high-profile elections, the Bloomberg Defendants stated that Mr. Rendón committed illegal, criminal, and unethical acts, including international cyber terrorism, tax evasion, falsification of documents, human trafficking, espionage, conspiracy, and racketeering.   Moreover, the Bloomberg Defendants' statements about Mr. Rendón are defamatory per se because they attribute to Mr. Rendón unfitness to perform the duties of his profession, and foreseeably would hurt Mr. Rendón in his profession.  These statements prejudice Mr. Rendón in his profession as a political election and campaign consultant and advisor who is responsible for managing high-profile elections in a legal and ethical manner.  The Bloomberg Defendants' statements about Mr. Rendón are defamatory per se because they because they tend to subject, and have indeed subjected, Mr. Rendón to hatred, distrust, ridicule, contempt, or disgrace, and because they tend to injure, and indeed have injured, Mr. Rendón in his trade or profession.  Mr. Rendón is therefore entitled to presumed damages.

134.   As a direct and proximate result of these false statements by the Bloomberg Defendants, Mr. Rendón has suffered damages, including inter alia, injury to his reputation, embarrassment, humiliation, emotional distress, injury to his business interests, and economic harm to be determined at trial.

**COUNT II – DEFAMATION FOR STATEMENTS IN THE APRIL 4-10, 2016 U.S. PRINT EDITION OF THE BLOOMBERG ARTICLE, "HOW TO HACK AN ELECTION"**

135.   Plaintiff repeats and alleges paragraphs 1- 134 as if set forth fully herein.

136.   The Bloomberg Defendants published "How to Hack an Election" on or about April

4, 2016.  The Article was published to a U.S. national audience in *Bloomberg Businessweek*'s April 4-10, 2016 U.S. print edition.  A true and correct copy of the online edition of the article is attached hereto as Exhibit B.

137.    The Article contains the following false and defamatory statements and implications concerning Mr. Rendón:

- "Usually, he says, he was on the payroll of Juan José Rendón, a Miami-based political consultant who's been called the Karl Rove of Latin America."

- "Sepúlveda provided Bloomberg Businessweek with what he says are e-mails showing conversations between him, Rendón, and Rendón's consulting firm concerning hacking and the progress of campaign-related cyber attacks."

- "During a visit to party headquarters, Sepúlveda took out his laptop and began scanning the office's wireless network. He easily tapped into the computer of Rendón, the party's strategist, and downloaded Uribe's work schedule and upcoming speeches. Sepúlveda says Rendón was furious—then hired him on the spot."

- "Sepúlveda's first hacking job, he says, was breaking into an Uribe rival's website, stealing a database of e-mail addresses, and spamming the accounts with disinformation. He was paid $15,000 in cash for a month's work, five times as much as he made in his previous job designing websites."

- "Rendón, says Sepúlveda, saw that hackers could be completely integrated into a modern political operation, running attack ads, researching the opposition, and finding ways to suppress a foe's turnout."

- "According to Sepúlveda, his payments were made in cash, half upfront."

- "Most jobs were initiated in person. Sepúlveda says Rendón would give him a piece of paper with target names, e-mail addresses, and phone numbers. Sepúlveda would take the note to his hotel, enter the data into an encrypted file, then burn the page or flush it down the toilet. If Rendón needed to send an e-mail, he used coded language. To "caress" meant to attack; to "listen to music" meant to intercept a target's phone calls."

- "Rendón and Sepúlveda took pains not to be seen together. They communicated over encrypted phones, which they replaced every two months. Sepúlveda says he sent daily progress reports and intelligence briefings from throwaway e-mail accounts to a go between in Rendón's consulting firm."

- "Each job ended with a specific, color-coded destruct sequence. On election day, Sepúlveda would purge all data classified as "red." Those were files that could send him and his handlers to prison: intercepted phone calls and e-mails, lists of hacking victims, and confidential briefings he prepared for the campaigns. All phones, hard drives, flash drives, and computer servers were physically destroyed. Less-sensitive "yellow" data—travel schedules, salary spreadsheets, fundraising plans—were saved to an encrypted thumb drive and given to the campaigns for one final review. A week later it, too, would be destroyed."

- "In Honduras, Sepúlveda defended the communications and computer systems of presidential candidate Porfirio Lobo Sosa from hackers employed by his competitors. In Guatemala, he digitally eavesdropped on six political and business figures, and says he delivered the data to Rendón on encrypted flash drives at dead drops."

- "After Sepúlveda hacked Cabello's Twitter account, Rendón seemed to congratulate him. "Eres noticia :)"—you're news—he wrote in a Sept. 9, 2012, e-mail, linking to a story about the breach."

- "In Mexico, Sepúlveda's technical mastery and Rendón's grand vision for a ruthless political machine fully came together, fueled by the huge resources of the PRI."

- "Sepúlveda didn't like the idea of working in Mexico, a dangerous country for involvement in public life. But Rendón persuaded him to travel there for short trips, starting in 2008, often flying him in on his private jet. Working at one point in Tabasco, on the sweltering Gulf of Mexico, Sepúlveda hacked a political boss who turned out to have connections to a drug cartel. After Rendón's security team learned of a plan to kill Sepúlveda, he spent a night in an armored Chevy Suburban before returning to Mexico City."

- "Sepúlveda's team installed malware in routers in the headquarters of the PRD candidate, which let him tap the phones and computers of anyone using the network, including the candidate. He took similar steps against PAN's Vázquez Mota. When the candidates' teams prepared policy speeches, Sepúlveda had the details as soon as a speechwriter's fingers hit the keyboard. Sepúlveda saw the opponents' upcoming meetings and campaign schedules before their own teams did."

- "Sepúlveda managed thousands of such fake profiles and used the accounts to shape discussion around topics such as Peña Nieto's plan to end drug violence, priming the social media pump with views that real users would mimic. For less nuanced work, he had a larger army of 30,000 Twitter bots, automatic posters that could create trends. One conversation he started stoked fear that the more López Obrador rose in the polls, the lower the peso would sink."

- "Just about anything the digital dark arts could offer to Peña Nieto's campaign or important local allies, Sepúlveda and his team provided. On election night, he had computers call tens of thousands of voters with prerecorded phone messages at 3 a.m. in the critical swing state of Jalisco. The calls appeared to come from the campaign of popular left-wing gubernatorial candidate Enrique Alfaro Ramírez. That angered voters—that was the point—and Alfaro lost by a slim margin. In another governor's race, in Tabasco, Sepúlveda set up fake Facebook accounts of gay men claiming to back a conservative Catholic candidate representing the PAN, a stunt designed to alienate his base."

- "Sepúlveda's team disabled the consultant's personal website and directed journalists to a clone site. There they posted what looked like a long defense written by Costa Bonino, which casually raised questions about whether his Uruguayan roots violated Mexican restrictions on foreigners in elections. Costa Bonino left the campaign a few days later."

- "Rendón, who was working for Santos, wanted Sepúlveda to join his team, but Sepúlveda turned him down."

138.    These statements are reasonably understood to be statements of and concerning Mr. Rendón and were in fact understood by persons reading them to be statements of and concerning Mr. Rendón.

139.    These statements are reasonably understood to be statements of fact regarding Mr. Rendón and were reasonably understood by persons reading them to be statements of fact regarding Mr. Rendón.

140.    These statements are false for the following reasons:

a.    Mr. Rendón never hired Sepúlveda to hack elections or conduct any unethical, illegal, or otherwise inappropriate work on behalf of Mr. Rendón, any of his consulting firms, nor any of Mr. Rendón's clients.  Mr. Rendón, nor any of his consulting firms nor clients, has ever hired, employed, engaged, or otherwise worked with Sepúlveda in any capacity during any election in which Mr. Rendón has been involved, except for a single web design project in 2005.

b.      Mr. Rendón's only interactions with Sepúlveda were limited to a single web design project that Sepúlveda worked on for two weeks in 2005 on behalf of the Party of the U.  Sepúlveda did little to no work on that web design project and his contract was terminated prior to completion.

c.      Mr. Rendón has never nor does he now initiate, condone, or otherwise employ illegal tactics in the elections and campaigns in which he is involved, nor does he certainly condone or use cyber attacks or hacking in any elections in which he is involved.

141.    The substantial danger of injury to Mr. Rendón's reputation from such statements is readily apparent.  Such statements would tend to so harm the reputations of another as to lower his in the estimation of the community or to deter third persons from associating or dealing with him.

142.    By such publication, the Bloomberg Defendants did cause harm to Mr. Rendón's reputation.

143.    At a minimum, the Bloomberg Defendants had serious doubts as to the truth of these statements and a high degree of awareness that they were probably false, and therefore were required to investigate their veracity before publishing them.  The Bloomberg Defendants failure to adequately do so amounts to actual malice.

144.    The Bloomberg Defendants purposefully avoided the truth, and purposefully avoided interviewing sources, pursuing and receiving documents, and following fundamental reporting practices intentionally in order to avoid the truth.

145.    The Bloomberg Defendants published these statements with actual malice in that they published them even though they were specifically informed of their falsity numerous times,

including in each conversation with Mr. Rendón and other hackers familiar with Sepúlveda's career and abilities.

146.    At the time of publication, the Bloomberg Defendants knew these statements were false, or recklessly disregarded the truth or falsity of the statements.

147.    The Bloomberg Defendants actions were malicious, willful, and wanton, and evidence a conscious disregard for Mr. Rendón's rights.   Accordingly, punitive damages are appropriate.

148.    The Bloomberg Defendants' statements about Mr. Rendón are defamatory per se and by implication.  By stating and implying that Mr. Rendón perpetrated election fraud by hiring and initiating the political hacking of numerous high-profile elections, the Bloomberg Defendants stated that Mr. Rendón committed illegal, criminal, and unethical acts, including international cyber terrorism, tax evasion, falsification of documents, human trafficking, espionage, conspiracy, and racketeering.   Moreover, the Bloomberg Defendants' statements about Mr. Rendón are defamatory per se because they attribute to Mr. Rendón unfitness to perform the duties of his profession, and foreseeably would hurt Mr. Rendón in his profession.  These statements prejudice Mr. Rendón in his profession as a political election and campaign consultant and advisor who is responsible for managing high-profile elections in a legal and ethical manner.   The Bloomberg Defendants' statements about Mr. Rendón are defamatory per se because they because they tend to subject, and have indeed subjected, Mr. Rendón to hatred, distrust, ridicule, contempt, or disgrace, and because they tend to injure, and indeed have injured, Mr. Rendón in his trade or profession.  Mr. Rendón is therefore entitled to presumed damages.

149.    As a direct and proximate result of these false statements by the Bloomberg Defendants, Mr. Rendón has suffered damages, including inter alia, injury to his reputation,

embarrassment, humiliation, emotional distress, injury to his business interests, and economic harm to be determined at trial.

### COUNT III – DEFAMATION FOR STATEMENTS IN THE APRIL 4-10, 2016 INTERNATIONAL PRINT EDITION OF THE BLOOMBERG ARTICLE, "HOW TO HACK AN ELECTION"

150.    Plaintiff repeats and alleges paragraphs 1- 149 as if set forth fully herein.

151.    The Bloomberg Defendants published "How to Hack an Election" on or about April 4, 2016.  The Article was published to a worldwide audience *Bloomberg Businessweek*'s April 4-10, 2016 International print edition and was the cover story of this edition.

152.    The Article contains the following false and defamatory statements and implications concerning Mr. Rendón:

- "Usually, he says, he was on the payroll of Juan José Rendón, a Miami-based political consultant who's been called the Karl Rove of Latin America."

- "Sepúlveda provided Bloomberg Businessweek with what he says are e-mails showing conversations between him, Rendón, and Rendón's consulting firm concerning hacking and the progress of campaign-related cyber attacks."

- "During a visit to party headquarters, Sepúlveda took out his laptop and began scanning the office's wireless network. He easily tapped into the computer of Rendón, the party's strategist, and downloaded Uribe's work schedule and upcoming speeches. Sepúlveda says Rendón was furious—then hired him on the spot."

- "Sepúlveda's first hacking job, he says, was breaking into an Uribe rival's website, stealing a database of e-mail addresses, and spamming the accounts with disinformation. He was paid $15,000 in cash for a month's work, five times as much as he made in his previous job designing websites."

- "Rendón, says Sepúlveda, saw that hackers could be completely integrated into a modern political operation, running attack ads, researching the opposition, and finding ways to suppress a foe's turnout."

- "According to Sepúlveda, his payments were made in cash, half upfront."

- "Most jobs were initiated in person. Sepúlveda says Rendón would give him a piece of paper with target names, e-mail addresses, and phone numbers. Sepúlveda would take the note to his hotel, enter the data into an encrypted file, then burn the page

or flush it down the toilet. If Rendón needed to send an e-mail, he used coded language. To "caress" meant to attack; to "listen to music" meant to intercept a target's phone calls."

- "Rendón and Sepúlveda took pains not to be seen together. They communicated over encrypted phones, which they replaced every two months. Sepúlveda says he sent daily progress reports and intelligence briefings from throwaway e-mail accounts to a go between in Rendón's consulting firm."

- "Each job ended with a specific, color-coded destruct sequence. On election day, Sepúlveda would purge all data classified as "red." Those were files that could send him and his handlers to prison: intercepted phone calls and e-mails, lists of hacking victims, and confidential briefings he prepared for the campaigns. All phones, hard drives, flash drives, and computer servers were physically destroyed. Less-sensitive "yellow" data—travel schedules, salary spreadsheets, fundraising plans—were saved to an encrypted thumb drive and given to the campaigns for one final review. A week later it, too, would be destroyed."

- "In Honduras, Sepúlveda defended the communications and computer systems of presidential candidate Porfirio Lobo Sosa from hackers employed by his competitors. In Guatemala, he digitally eavesdropped on six political and business figures, and says he delivered the data to Rendón on encrypted flash drives at dead drops."

- "After Sepúlveda hacked Cabello's Twitter account, Rendón seemed to congratulate him. "Eres noticia :)"—you're news—he wrote in a Sept. 9, 2012, e-mail, linking to a story about the breach."

- "In Mexico, Sepúlveda's technical mastery and Rendón's grand vision for a ruthless political machine fully came together, fueled by the huge resources of the PRI."

- "Sepúlveda didn't like the idea of working in Mexico, a dangerous country for involvement in public life. But Rendón persuaded him to travel there for short trips, starting in 2008, often flying him in on his private jet. Working at one point in Tabasco, on the sweltering Gulf of Mexico, Sepúlveda hacked a political boss who turned out to have connections to a drug cartel. After Rendón's security team learned of a plan to kill Sepúlveda, he spent a night in an armored Chevy Suburban before returning to Mexico City."

- "Sepúlveda's team installed malware in routers in the headquarters of the PRD candidate, which let him tap the phones and computers of anyone using the network, including the candidate. He took similar steps against PAN's Vázquez Mota. When the candidates' teams prepared policy speeches, Sepúlveda had the details as soon as a speechwriter's fingers hit the keyboard. Sepúlveda saw the opponents' upcoming meetings and campaign schedules before their own teams did."

- "Sepúlveda managed thousands of such fake profiles and used the accounts to shape discussion around topics such as Peña Nieto's plan to end drug violence, priming the social media pump with views that real users would mimic. For less nuanced work, he had a larger army of 30,000 Twitter bots, automatic posters that could create trends. One conversation he started stoked fear that the more López Obrador rose in the polls, the lower the peso would sink."

- "Just about anything the digital dark arts could offer to Peña Nieto's campaign or important local allies, Sepúlveda and his team provided. On election night, he had computers call tens of thousands of voters with prerecorded phone messages at 3 a.m. in the critical swing state of Jalisco. The calls appeared to come from the campaign of popular left-wing gubernatorial candidate Enrique Alfaro Ramírez. That angered voters—that was the point—and Alfaro lost by a slim margin. In another governor's race, in Tabasco, Sepúlveda set up fake Facebook accounts of gay men claiming to back a conservative Catholic candidate representing the PAN, a stunt designed to alienate his base."

- "Sepúlveda's team disabled the consultant's personal website and directed journalists to a clone site. There they posted what looked like a long defense written by Costa Bonino, which casually raised questions about whether his Uruguayan roots violated Mexican restrictions on foreigners in elections. Costa Bonino left the campaign a few days later."

- "Rendón, who was working for Santos, wanted Sepúlveda to join his team, but Sepúlveda turned him down."

153.    These statements are reasonably understood to be statements of and concerning Mr. Rendón and were in fact understood by persons reading them to be statements of and concerning Mr. Rendón.

154.    These statements are reasonably understood to be statements of fact regarding Mr. Rendón and were reasonably understood by persons reading them to be statements of fact regarding Mr. Rendón.

155.    These statements are false for the following reasons:

   a.    Mr. Rendón never hired Sepúlveda to hack elections or conduct any unethical, illegal, or otherwise inappropriate work on behalf of Mr. Rendón, any of his consulting firms, nor any of Mr. Rendón's clients.  Mr. Rendón, nor any of his consulting firms nor clients, has ever hired, employed,

engaged, or otherwise worked with Sepúlveda in any capacity during any election in which Mr. Rendón has been involved, except for a single web design project in 2005.

b.    Mr. Rendón's only interactions with Sepúlveda were limited to a single web design project that Sepúlveda worked on for two weeks in 2005 on behalf of the Party of the U.  Sepúlveda did little to no work on that web design project and his contract was terminated prior to completion.

c.    Mr. Rendón has never nor does he now initiate, condone, or otherwise employ illegal tactics in the elections and campaigns in which he is involved, nor does he certainly condone or use cyber attacks or hacking in any elections in which he is involved.

156.    The substantial danger of injury to Mr. Rendón's reputation from such statements is readily apparent.  Such statements would tend to so harm the reputations of another as to lower his in the estimation of the community or to deter third persons from associating or dealing with him.

157.    By such publication, the Bloomberg Defendants did cause harm to Mr. Rendón's reputation.

158.    At a minimum, the Bloomberg Defendants had serious doubts as to the truth of these statements and a high degree of awareness that they were probably false, and therefore were required to investigate their veracity before publishing them.  The Bloomberg Defendants failure to adequately do so amounts to actual malice.

159.    The Bloomberg Defendants purposefully avoided the truth, and purposefully avoided interviewing sources, pursuing and receiving documents, and following fundamental

reporting practices intentionally in order to avoid the truth.

160.    The Bloomberg Defendants published these statements with actual malice in that they published them even though they were specifically informed of their falsity numerous times, including in each conversation with Mr. Rendón and other hackers familiar with Sepúlveda's career and abilities.

161.    At the time of publication, the Bloomberg Defendants knew these statements were false, or recklessly disregarded the truth or falsity of the statements.

162.    The Bloomberg Defendants' actions were malicious, willful, and wanton, and evidence a conscious disregard for Mr. Rendón's rights.   Accordingly, punitive damages are appropriate.

163.    The Bloomberg Defendants' statements about Mr. Rendón are defamatory per se and by implication.  By stating and implying that Mr. Rendón perpetrated election fraud by hiring and initiating the political hacking of numerous high-profile elections, the Bloomberg Defendants stated that Mr. Rendón committed illegal, criminal, and unethical acts, including international cyber terrorism, tax evasion, falsification of documents, human trafficking, espionage, conspiracy, and racketeering.   Moreover, the Bloomberg Defendants' statements about Mr. Rendón are defamatory per se because they attribute to Mr. Rendón unfitness to perform the duties of his profession, and foreseeably would hurt Mr. Rendón in his profession.  These statements prejudice Mr. Rendón in his profession as a political election and campaign consultant and advisor who is responsible for managing high-profile elections in a legal and ethical manner.  The Bloomberg Defendants' statements about Mr. Rendón are defamatory per se because they because they tend to subject, and have indeed subjected, Mr. Rendón to hatred, distrust, ridicule, contempt, or disgrace, and because they tend to injure, and indeed have injured, Mr. Rendón in his trade or

profession. Mr. Rendón is therefore entitled to presumed damages.

164. As a direct and proximate result of these false statements by the Bloomberg Defendants, Mr. Rendón has suffered damages, including inter alia, injury to his reputation, embarrassment, humiliation, emotional distress, injury to his business interests, and economic harm to be determined at trial.

### COUNT IV – DEFAMATION FOR STATEMENTS ON THE APRIL 1, 2016 CNN EN ESPAÑOL TELEVISION SHOW

165. Plaintiff repeats and alleges paragraphs 1- 164 as if set forth fully herein.

166. Defendant Bloomberg, by and through Bloomberg employee and agent Rodríguez acting on Bloomberg's behalf and within the scope of his employment, published defamatory statements on an April 1, 2016 CNN en Español news segment.

167. Defendant Bloomberg reiterated and republished the false and defamatory statements and implications made in the online and print editions of the Article, specifically that Mr. Rendón hired Sepúlveda to hack elections and conduct election fraud on his and his clients' behalf.

168. These statements are reasonably understood to be statements of and concerning Mr. Rendón and were in fact understood by persons reading them to be statements of and concerning Mr. Rendón.

169. These statements are reasonably understood to be statements of fact regarding Mr. Rendón and were reasonably understood by persons reading them to be statements of fact regarding Mr. Rendón.

170. These statements are false for the following reasons:

      a.     Mr. Rendón never hired Sepúlveda to hack elections or conduct any unethical, illegal, or otherwise inappropriate work on behalf of Mr. Rendón,

any of his consulting firms, nor any of Mr. Rendón's clients.  Mr. Rendón, nor any of his consulting firms nor clients, has ever hired, employed, engaged, or otherwise worked with Sepúlveda in any capacity during any election in which Mr. Rendón has been involved, except for a single web design project in 2005.

b.   Mr. Rendón's only interactions with Sepúlveda were limited to a single web design project that Sepúlveda worked on for two weeks in 2005 on behalf of the Party of the U.  Sepúlveda did little to no work on that web design project and his contract was terminated prior to completion.

c.   Mr. Rendón has never nor does he now initiate, condone, or otherwise employ illegal tactics in the elections and campaigns in which he is involved, nor does he certainly condone or use cyber attacks or hacking in any elections in which he is involved.

171.   The substantial danger of injury to Mr. Rendón's reputation from such statements is readily apparent.  Such statements would tend to so harm the reputations of another as to lower his in the estimation of the community or to deter third persons from associating or dealing with him.

172.   By such publication, the Defendant Bloomberg did cause harm to Mr. Rendón's reputation.

173.   At a minimum, Defendant Bloomberg had serious doubts as to the truth of these statements and a high degree of awareness that they were probably false, and therefore were required to investigate their veracity before publishing them.  Defendant Bloomberg's failure to adequately do so amounts to actual malice.

174.    Defendant Bloomberg purposefully avoided the truth, and purposefully avoided interviewing sources, pursuing and receiving documents, and following fundamental reporting practices intentionally in order to avoid the truth.

175.    Defendant Bloomberg published these statements with actual malice in that they published them even though they were specifically informed of their falsity numerous times, including in each conversation with Mr. Rendón and other hackers familiar with Sepúlveda's career and abilities.

176.    At the time of publication, Defendant Bloomberg knew these statements were false, or recklessly disregarded the truth or falsity of the statements.

177.    Defendant Bloomberg's actions were malicious, willful, and wanton, and evidence a conscious disregard for Mr. Rendón's rights.  Accordingly, punitive damages are appropriate.

178.    Defendant Bloomberg's statements about Mr. Rendón are defamatory per se and by implication.  By stating and implying that Mr. Rendón perpetrated election fraud by hiring and initiating the political hacking of numerous high-profile elections, Defendant Bloomberg stated that Mr. Rendón committed illegal, criminal, and unethical acts, including international cyber terrorism, tax evasion, falsification of documents, human trafficking, espionage, conspiracy, and racketeering.  Moreover, Defendant Bloomberg's statements about Mr. Rendón are defamatory per se because they attribute to Mr. Rendón unfitness to perform the duties of his profession, and foreseeably would hurt Mr. Rendón in his profession.  These statements prejudice Mr. Rendón in his profession as a political election and campaign consultant and advisor who is responsible for managing high-profile elections in a legal and ethical manner.  Defendant Bloomberg's statements about Mr. Rendón are defamatory per se because they because they tend to subject, and have indeed subjected, Mr. Rendón to hatred, distrust, ridicule, contempt, or disgrace, and because they

tend to injure, and indeed have injured, Mr. Rendón in his trade or profession.  Mr. Rendón is therefore entitled to presumed damages.

179.    As a direct and proximate result of these false statements by Defendant Bloomberg, Mr. Rendón has suffered damages, including inter alia, injury to his reputation, embarrassment, humiliation, emotional distress, injury to his business interests, and economic harm to be determined at trial.

## <u>COUNT V – DEFAMATION FOR STATEMENTS ON THE APRIL 1, 2016 NOTIGUÍA.TV ONLINE SHOW</u>

180.    Plaintiff repeats and alleges paragraphs 1- 179 as if set forth fully herein.

181.    Defendant Bloomberg, by and through Bloomberg employee and agent Rodríguez acting on Bloomberg's behalf and within the scope of his employment, published defamatory statements on an April 1, 2016 notiguía.tv news segment.

182.    Defendant Bloomberg reiterated and republished the false and defamatory statements and implications made in the online and print editions of the Article, specifically that Mr. Rendón hired Sepúlveda to hack elections and conduct election fraud on his and his clients' behalf.

183.    These statements are reasonably understood to be statements of and concerning Mr. Rendón and were in fact understood by persons reading them to be statements of and concerning Mr. Rendón.

184.    These statements are reasonably understood to be statements of fact regarding Mr. Rendón and were reasonably understood by persons reading them to be statements of fact regarding Mr. Rendón.

185.    These statements are false for the following reasons:

a.    Mr. Rendón never hired Sepúlveda to hack elections or conduct any

unethical, illegal, or otherwise inappropriate work on behalf of Mr. Rendón, any of his consulting firms, nor any of Mr. Rendón's clients. Mr. Rendón, nor any of his consulting firms nor clients, has ever hired, employed, engaged, or otherwise worked with Sepúlveda in any capacity during any election in which Mr. Rendón has been involved, except for a single web design project in 2005.

b.  Mr. Rendón's only interactions with Sepúlveda were limited to a single web design project that Sepúlveda worked on for two weeks in 2005 on behalf of the Party of the U.  Sepúlveda did little to no work on that web design project and his contract was terminated prior to completion.

c.  Mr. Rendón has never nor does he now initiate, condone, or otherwise employ illegal tactics in the elections and campaigns in which he is involved, nor does he certainly condone or use cyber attacks or hacking in any elections in which he is involved.

186.  The substantial danger of injury to Mr. Rendón's reputation from such statements is readily apparent.  Such statements would tend to so harm the reputations of another as to lower his in the estimation of the community or to deter third persons from associating or dealing with him.

187.  By such publication, Defendant Bloomberg did cause harm to Mr. Rendón's reputation.

188.  At a minimum, Defendant Bloomberg had serious doubts as to the truth of these statements and a high degree of awareness that they were probably false, and therefore were required to investigate their veracity before publishing them.  Defendant Bloomberg's failure to

adequately do so amounts to actual malice.

189.    Defendant Bloomberg purposefully avoided the truth, and purposefully avoided interviewing sources, pursuing and receiving documents, and following fundamental reporting practices intentionally in order to avoid the truth.

190.    Defendant Bloomberg published these statements with actual malice in that they published them even though they were specifically informed of their falsity numerous times, including in each conversation with Mr. Rendón and other hackers familiar with Sepúlveda's career and abilities.

191.    At the time of publication, Defendant Bloomberg knew these statements were false, or recklessly disregarded the truth or falsity of the statements.

192.    Defendant Bloomberg's actions were malicious, willful, and wanton, and evidence a conscious disregard for Mr. Rendón's rights.  Accordingly, punitive damages are appropriate.

193.    Defendant Bloomberg's statements about Mr. Rendón are defamatory per se and by implication.  By stating and implying that Mr. Rendón perpetrated election fraud by hiring and initiating the political hacking of numerous high-profile elections, Defendant Bloomberg  stated that Mr. Rendón committed illegal, criminal, and unethical acts, including international cyber terrorism, tax evasion, falsification of documents, human trafficking, espionage, conspiracy, and racketeering.  Moreover, Defendant Bloomberg's statements about Mr. Rendón are defamatory per se because they attribute to Mr. Rendón unfitness to perform the duties of his profession, and foreseeably would hurt Mr. Rendón in his profession.  These statements prejudice Mr. Rendón in his profession as a political election and campaign consultant and advisor who is responsible for managing high-profile elections in a legal and ethical manner.  Defendant Bloomberg's statements about Mr. Rendón are defamatory per se because they because they tend to subject, and have

indeed subjected, Mr. Rendón to hatred, distrust, ridicule, contempt, or disgrace, and because they tend to injure, and indeed have injured, Mr. Rendón in his trade or profession.  Mr. Rendón is therefore entitled to presumed damages.

194.    As a direct and proximate result of these false statements by Defendant Bloomberg, Mr. Rendón has suffered damages, including inter alia, injury to his reputation, embarrassment, humiliation, emotional distress, injury to his business interests, and economic harm to be determined at trial.

## COUNT VI – DEFAMATION FOR STATEMENTS ON THE APRIL 1, 2016 RADIO FÓRMULA SHOW

195.    Plaintiff repeats and alleges paragraphs 1- 194 as if set forth fully herein.

196.    Defendant Bloomberg, by and through Bloomberg employee and agent Rodríguez acting on Bloomberg's behalf and within the scope of his employment, published defamatory statements on an April 1, 2016 Radio Fórmula segment.

197.    Defendant Bloomberg reiterated and republished the false and defamatory statements and implications made in the online and print editions of the Article, specifically that Mr. Rendón hired Sepúlveda to hack elections and conduct election fraud on his and his clients' behalf.

198.    These statements are reasonably understood to be statements of and concerning Mr. Rendón and were in fact understood by persons reading them to be statements of and concerning Mr. Rendón.

199.    These statements are reasonably understood to be statements of fact regarding Mr. Rendón and were reasonably understood by persons reading them to be statements of fact regarding Mr. Rendón.

200.    These statements are false for the following reasons:

a.   Mr. Rendón never hired Sepúlveda to hack elections or conduct any unethical, illegal, or otherwise inappropriate work on behalf of Mr. Rendón, any of his consulting firms, nor any of Mr. Rendón's clients.  Mr. Rendón, nor any of his consulting firms nor clients, has ever hired, employed, engaged, or otherwise worked with Sepúlveda in any capacity during any election in which Mr. Rendón has been involved, except for a single web design project in 2005.

b.   Mr. Rendón's only interactions with Sepúlveda were limited to a single web design project that Sepúlveda worked on for two weeks in 2005 on behalf of the Party of the U.  Sepúlveda did little to no work on that web design project and his contract was terminated prior to completion.

c.   Mr. Rendón has never nor does he now initiate, condone, or otherwise employ illegal tactics in the elections and campaigns in which he is involved, nor does he certainly condone or use cyber attacks or hacking in any elections in which he is involved.

201.   The substantial danger of injury to Mr. Rendón's reputation from such statements is readily apparent.  Such statements would tend to so harm the reputations of another as to lower his in the estimation of the community or to deter third persons from associating or dealing with him.

202.   By such publication, Defendant Bloomberg did cause harm to Mr. Rendón's reputation.

203.   At a minimum, Defendant Bloomberg had serious doubts as to the truth of these statements and a high degree of awareness that they were probably false, and therefore were

required to investigate their veracity before publishing them.  Defendant Bloomberg's failure to adequately do so amounts to actual malice.

204.    Defendant Bloomberg's purposefully avoided the truth, and purposefully avoided interviewing sources, pursuing and receiving documents, and following fundamental reporting practices intentionally in order to avoid the truth.

205.    Defendant Bloomberg's published these statements with actual malice in that they published them even though they were specifically informed of their falsity numerous times, including in each conversation with Mr. Rendón and other hackers familiar with Sepúlveda's career and abilities.

206.    At the time of publication, Defendant Bloomberg knew these statements were false, or recklessly disregarded the truth or falsity of the statements.

207.    Defendant Bloomberg's actions were malicious, willful, and wanton, and evidence a conscious disregard for Mr. Rendón's rights.  Accordingly, punitive damages are appropriate.

208.    Defendant Bloomberg's statements about Mr. Rendón are defamatory per se and by implication.  By stating and implying that Mr. Rendón perpetrated election fraud by hiring and initiating the political hacking of numerous high-profile elections, Defendant Bloomberg stated that Mr. Rendón committed illegal, criminal, and unethical acts, including international cyber terrorism, tax evasion, falsification of documents, human trafficking, espionage, conspiracy, and racketeering.  Moreover, Defendant Bloomberg's statements about Mr. Rendón are defamatory per se because they attribute to Mr. Rendón unfitness to perform the duties of his profession, and foreseeably would hurt Mr. Rendón in his profession.  These statements prejudice Mr. Rendón in his profession as a political election and campaign consultant and advisor who is responsible for managing high-profile elections in a legal and ethical manner.  Defendant Bloomberg's statements

about Mr. Rendón are defamatory per se because they because they tend to subject, and have indeed subjected, Mr. Rendón to hatred, distrust, ridicule, contempt, or disgrace, and because they tend to injure, and indeed have injured, Mr. Rendón in his trade or profession.  Mr. Rendón is therefore entitled to presumed damages.

209.     As a direct and proximate result of these false statements by Defendant Bloomberg, Mr. Rendón has suffered damages, including inter alia, injury to his reputation, embarrassment, humiliation, emotional distress, injury to his business interests, and economic harm to be determined at trial.

## COUNT VII – DEFAMATION FOR STATEMENTS ON THE APRIL 1, 2016 PRI PUBLIC INTERNATIONAL RADIO SHOW

210.     Plaintiff repeats and alleges paragraphs 1- 209 as if set forth fully herein.

211.     Bloomberg Defendant Robertson published defamatory statements on an April 1, 2016 PRI Public International Radio segment.

212.     Bloomberg Defendant Robertson reiterated and republished the false and defamatory statements and implications made in the online and print editions of the Article, specifically that Mr. Rendón hired Sepúlveda to hack elections and conduct election fraud on his and his clients' behalf.

213.     These statements are reasonably understood to be statements of and concerning Mr. Rendón and were in fact understood by persons reading them to be statements of and concerning Mr. Rendón.

214.     These statements are reasonably understood to be statements of fact regarding Mr. Rendón and were reasonably understood by persons reading them to be statements of fact regarding Mr. Rendón.

215.     These statements are false for the following reasons:

a.   Mr. Rendón never hired Sepúlveda to hack elections or conduct any unethical, illegal, or otherwise inappropriate work on behalf of Mr. Rendón, any of his consulting firms, nor any of Mr. Rendón's clients. Mr. Rendón, nor any of his consulting firms nor clients, has ever hired, employed, engaged, or otherwise worked with Sepúlveda in any capacity during any election in which Mr. Rendón has been involved, except for a single web design project in 2005.

b.   Mr. Rendón's only interactions with Sepúlveda were limited to a single web design project that Sepúlveda worked on for two weeks in 2005 on behalf of the Party of the U. Sepúlveda did little to no work on that web design project and his contract was terminated prior to completion.

c.   Mr. Rendón has never nor does he now initiate, condone, or otherwise employ illegal tactics in the elections and campaigns in which he is involved, nor does he certainly condone or use cyber attacks or hacking in any elections in which he is involved.

216.   The substantial danger of injury to Mr. Rendón's reputation from such statements is readily apparent. Such statements would tend to so harm the reputations of another as to lower his in the estimation of the community or to deter third persons from associating or dealing with him.

217.   By such publication, Bloomberg Defendant Robertson did cause harm to Mr. Rendón's reputation.

218.   At a minimum, Bloomberg Defendant Robertson had serious doubts as to the truth of these statements and a high degree of awareness that they were probably false, and therefore

were required to investigate their veracity before publishing them.   Bloomberg Defendant Robertson's failure to adequately do so amounts to actual malice.

219.    The Bloomberg Defendant Robertson purposefully avoided the truth, and purposefully avoided interviewing sources, pursuing and receiving documents, and following fundamental reporting practices intentionally in order to avoid the truth.

220.    Bloomberg Defendant Robertson published these statements with actual malice in that they published them even though they were specifically informed of their falsity numerous times, including in each conversation with Mr. Rendón and other hackers familiar with Sepúlveda's career and abilities.

221.    At the time of publication, Bloomberg Defendant Robertson knew these statements were false, or recklessly disregarded the truth.

222.    Bloomberg Defendant Robertson's actions were malicious, willful, and wanton, and evidence a conscious disregard for Mr. Rendón's rights.   Accordingly, punitive damages are appropriate.

223.    Bloomberg Defendant Robertson's statements about Mr. Rendón are defamatory per se and by implication.   By stating and implying that Mr. Rendón perpetrated election fraud by hiring and initiating the political hacking of numerous high-profile elections, the Bloomberg Defendant Robertson stated that Mr. Rendón committed illegal, criminal, and unethical acts, including international cyber terrorism, tax evasion, falsification of documents, human trafficking, espionage, conspiracy, and racketeering.    Moreover, Bloomberg Defendant Robertson's statements about Mr. Rendón are defamatory per se because they attribute to Mr. Rendón unfitness to perform the duties of his profession, and foreseeably would hurt Mr. Rendón in his profession. These statements prejudice Mr. Rendón in his profession as a political election and campaign

consultant and advisor who is responsible for managing high-profile elections in a legal and ethical manner.  Bloomberg Defendant Robertson's statements about Mr. Rendón are defamatory per se because they because they tend to subject, and have indeed subjected, Mr. Rendón to hatred, distrust, ridicule, contempt, or disgrace, and because they tend to injure, and indeed have injured, Mr. Rendón in his trade or profession.  Mr. Rendón is therefore entitled to presumed damages.

224.    As a direct and proximate result of these false statements by Bloomberg Defendant Robertson, Mr. Rendón has suffered damages, including inter alia, injury to his reputation, embarrassment, humiliation, emotional distress, injury to his business interests, and economic harm to be determined at trial.

## COUNT VIII – BLOOMBERG'S NEGLIGENT SUPERVISION OF ITS EMPLOYEES

225.    Plaintiff repeats and alleges paragraphs 1- 224 as if set forth fully herein.

226.    Defendants Bloomberg L.P. and Bloomberg Businessweek became aware, or should have become aware, of problems that indicated the unfitness of its employees, specifically Robertson, Riley, Willis, and Rodríguez, and/or was on notice of the Bloomberg Reporters' potentially harmful and reckless reporting about Mr. Rendón.

227.    As a subject of an over nine-month investigation sanctioned by Bloomberg, the Bloomberg Reporters were within the foreseeable risks created by Bloomberg's employment of the Bloomberg Reporters.

228.    Bloomberg had a duty to supervise and not retain the Bloomberg Reporters so that they would not falsely defame Mr. Rendón.

229.    Bloomberg breached the standard of care required of employers by retaining and failing to supervise the Bloomberg Reporters and failing to ensure that they would not be in a position to defame Mr. Rendón.

230.    Had the Bloomberg Reporters been terminated previously or had been supervised,

Mr. Rendón would not have been damaged.

231.    Bloomberg's failure to supervise and to not retain the Bloomberg Reporters was the proximate and direct cause of injury to Mr. Rendón because the Bloomberg Reporters, acting as employees and agents of Bloomberg, published defamatory statements about Mr. Rendón in:

      a.      the online edition of the Article, "How to Hack an Election" on *Bloomberg Businessweek*'s website (Count I, paragraphs 120-134);

      b.      the U.S. print edition of the Article, "How to Hack an Election" on *Bloomberg Businessweek*'s website (Count II, paragraphs 135-149);

      c.      the international print edition of the Article, "How to Hack an Election" on *Bloomberg Businessweek*'s website (Count III, paragraphs 150-164);

      d.      on the April 1, 2016 CNN En Español Television show (Count IV, paragraphs 165-179);

      e.      on the April 1, 2016 Notíguia.tv online show (Count V, paragraphs 180-194);

      f.      on the April 1, 2016 Radio Fórmula Show (Count VI, paragraphs 195-209); and

      g.      on the April 1, 2016 PRI Public International Radio Show (Count VII, paragraphs 210-224).

232.    Mr. Rendón has suffered damages, including inter alia, injury to his reputation, embarrassment, humiliation, emotional distress, injury to his business interests, and economic harm to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in Plaintiff's favor, and against Defendants, as follows:

(8)     awarding Mr. Rendón actual and presumed damages to be specifically determined at trial; and

(9)     awarding Mr. Rendón punitive damages in an amount to be specifically determined at trial; and

(10)    awarding Mr. Rendón all costs, disbursements, fees, and interest as authorized by Florida Law and Rules; and

(11)    such other and additional remedies as the Court may deem just and proper.

## A DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury of all issues so triable.

Dated:  February 14, 2022                Respectfully Submitted,

  _/s/ IL Young Choi_
IL Young Choi (FL Bar No. 10375)
CHOI & MENEZES, LLP
1925 Brickell Avenue, Suite D-206
Miami, FL 33129
Telephone: (305) 854-6333
Facsimile:  (305) 675-0967
Email:  IYC@choilawfirm.com
Email:  legalassistant@choilawfirm.com
Email:  choilaw@aol.com

Thomas A. Clare, P.C. (*pro hac vice*)
Elizabeth M. Locke, P.C. (*pro hac vice*)
Dustin A. Pusch (*pro hac vice*)
CLARE LOCKE LLP
10 Prince Street
Alexandria, VA 22314
Telephone: (202) 628-7400
Email: tom@clarelocke.com
Email: libby@clarelocke.com
Email: dustin@clarelocke.com

***Attorneys for Plaintiff Juan José Rendón Delgado***

# EXHIBIT A

April 4—April 10, 2016 | bloomberg.com



# Bloomberg Businessweek

## Spawn of Clippy

Microsoft is building
an army of artificial
intelligence bots.
Can they be controlled?
p50



# HOW TO

## AN EL

60

Andrés Sepúlveda
claims he spent eight
years disrupting
campaigns across
Latin America

By Jordan Robertson,
Michael Riley,
and Andrew Willis

Photographs by
Juan Arredondo

It was just before midnight when Enrique Peña Nieto declared victory as the newly elected president of Mexico. Peña Nieto was a lawyer and a millionaire, from a family of mayors and governors. His wife was a telenovela star. He beamed as he was showered with red, green, and white confetti at the Mexico City headquarters of the Institutional Revolutionary Party, or PRI, which had ruled for more than 70 years before being forced out in 2000. Returning the party to power on that night in July 2012, Peña Nieto vowed to tame drug violence, fight corruption, and open a more transparent era in Mexican politics.

Two thousand miles away, in an apartment in Bogotá's upscale Chicó Navarra neighborhood, Andrés Sepúlveda sat before six computer screens. Sepúlveda is Colombian, bricklike, with a shaved head, goatee, and a tattoo of a QR code containing an encryption key on the back of his head. On his nape are the words "</head>" and "<body>" stacked atop each other, dark riffs on coding. He was watching a live feed of Peña Nieto's victory party, waiting for an official declaration of the results.

When Peña Nieto won, Sepúlveda began destroying evidence. He drilled holes in flash drives, hard drives, and cell phones, fried their circuits in a microwave, then broke them to shards with a hammer. He shredded documents and flushed them down the toilet and erased servers in Russia and Ukraine rented anonymously with Bitcoins. He was dismantling what he says was a secret history of one of the dirtiest Latin American campaigns in recent memory.

For eight years, Sepúlveda, now 31, says he traveled the continent rigging major political campaigns. With a budget of $600,000, the Peña Nieto job was by far his most complex. He led a team of hackers that stole campaign strategies, manipulated social media to create false waves of enthusiasm and derision, and installed spyware in opposition offices, all to help Peña Nieto, a right-of-center candidate, eke out a victory. On that July night, he cracked bottle after bottle of Colón Negra beer in celebration. As usual on election night, he was alone.

Sepúlveda's career began in 2005, and his first jobs were small—mostly defacing campaign websites and breaking into opponents' donor databases. Within a few years he was assembling teams that spied, stole, and smeared on behalf of presidential campaigns across Latin America. He wasn't cheap, but his services

were extensive. For $12,000 a month, a customer hired a crew that could hack smartphones, spoof and clone Web pages, and send mass e-mails and texts. The premium package, at $20,000 a month, also included a full range of digital interception, attack, decryption, and defense. The jobs were carefully laundered through layers of middlemen and consultants. Sepúlveda says many of the candidates he helped might not even have known about his role; he says he met only a few.

His teams worked on presidential elections in Nicaragua, Panama, Honduras, El Salvador, Colombia, Mexico, Costa Rica, Guatemala, and Venezuela. Campaigns mentioned in this story were contacted through former and current spokespeople; none but Mexico's PRI and the campaign of Guatemala's National Advancement Party would comment.

As a child, he witnessed the violence of Colombia's Marxist guerrillas. As an adult, he allied with a right wing emerging across Latin America. He believed his hacking was no more diabolical than the tactics of those he opposed, such as Hugo Chávez and Daniel Ortega.

Many of Sepúlveda's efforts were unsuccessful, but he has enough wins that he might be able to claim as much influence over the political direction of modern Latin America as anyone in the 21st century. "My job was to do actions of dirty war and psychological operations, black propaganda, rumors—the whole dark side of politics that nobody knows exists but everyone can see," he says in Spanish, while sitting at a small plastic table in an outdoor courtyard deep within the heavily fortified offices of Colombia's attorney general's office. He's serving 10 years in prison for charges including use of malicious software, conspiracy to commit crime, violation of personal data, and espionage, related to hacking during Colombia's 2014 presidential election. He has agreed ➡

61



to tell his full story for the first time, hoping to convince the public that he's rehabilitated–and gather support for a reduced sentence.

Usually, he says, he was on the payroll of Juan José Rendón, a Miami-based political consultant who's been called the Karl Rove of Latin America. Rendón denies using Sepúlveda for anything illegal, and categorically disputes the account Sepúlveda gave *Bloomberg Businessweek* of their relationship, but admits knowing him and using him to do website design. "If I talked to him maybe once or twice, it was in a group session about that, about the Web," he says. "I don't do illegal stuff at all. There is negative campaigning. They don't like it–OK. But if it's legal, I'm gonna do it. I'm not a saint, but I'm not a criminal." While Sepúlveda's policy was to destroy all data at the completion of a job, he left some documents with members of his hacking teams and other trusted third parties as a secret "insurance policy."

Sepúlveda provided *Bloomberg Businessweek* with what he says are e-mails showing conversations between him, Rendón, and Rendón's consulting firm concerning hacking and the progress of campaign-related cyber attacks. Rendón says the e-mails are fake. An analysis by an independent computer security firm said a sample of the e-mails they examined appeared authentic. Some of Sepúlveda's descriptions of his actions match published accounts of events during various election campaigns, but other details couldn't be independently verified. One person working on the campaign in Mexico, who asked not to be identified out of fear for his safety, substantially confirmed Sepúlveda's accounts of his and Rendón's roles in that election.

Sepúlveda says he was offered several political jobs in Spain, which he says he turned down because he was too busy. On the question of whether the U.S. presidential campaign is being tampered with, he is unequivocal. "I'm 100 percent sure it is," he says.

Sepúlveda grew up poor in Bucaramanga, eight hours north of Bogotá by car. His mother was a secretary. His father was an activist, helping farmers find better crops to grow than coca plants, and the family moved constantly because of death threats from drug traffickers. His parents divorced, and by the age of 15, after failing school, he went to live with his father in Bogotá and used a computer for the first time. He later enrolled in a local technology school and, through a friend there, learned to code.

In 2005, Sepúlveda's older brother, a publicist, was helping with the congressional campaigns of a party aligned with then-Colombian President Alvaro Uribe. Uribe was a hero of the brothers, a U.S. ally who strengthened the military to fight the Revolutionary Armed Forces of Colombia (FARC). During a visit to party headquarters, Sepúlveda took out his laptop and began scanning the office's wireless network. He easily tapped into the computer of Rendón, the party's strategist, and downloaded Uribe's work schedule and upcoming speeches. Sepúlveda says Rendón was furious–then hired him on the spot. Rendón says this never happened.

For decades, Latin American elections were rigged, not won, and the methods were pretty straightforward. Local fixers would hand out everything from small appliances to cash in exchange for votes. But in the 1990s, electoral reforms swept the region. Voters were issued tamper-proof ID cards, and nonpartisan institutes ran the elections in several countries. The modern campaign, at least a version North Americans might recognize, had arrived in Latin America.

Rendón had already begun a successful career based partly, according to his critics–and more than one lawsuit–on a mastery of dirty tricks and rumormongering. (In 2014, El Salvador's then-President Carlos Mauricio Funes accused Rendón of orchestrating dirty war campaigns throughout Latin America. Rendón sued

in Florida for defamation, but the court dismissed the case on the grounds that Funes couldn't be sued for his official acts.) The son of democracy activists, he studied psychology and worked in advertising. After accusing then-President Chávez of vote rigging in 2004, he left and never went back.

Sepúlveda's first hacking job, he says, was breaking into an Uribe rival's website, stealing a database of e-mail addresses, and spamming the accounts with disinformation. He was paid $15,000 in cash for a month's work, five times as much as he made in his previous job designing websites.

Sepúlveda was dazzled by Rendón, who owned a fleet of luxury cars, wore big flashy watches, and spent thousands on tailored coats. Like Sepúlveda, he was a perfectionist. His staff was expected to arrive early and work late. "I was very young," Sepúlveda says. "I did what I liked, I was paid well and traveled. It was the perfect job." But more than anything, their right-wing politics aligned. Sepúlveda says he saw Rendón as a genius and a mentor. A devout Buddhist and practitioner of martial arts, according to his own website, Rendón cultivated an image of mystery and menace, wearing only all-black in public, including the occasional samurai robe. On his website he calls himself the political consultant who is the "best paid, feared the most, attacked the most, and also the most demanded and most efficient." Sepúlveda would have a hand in that.

Rendón, says Sepúlveda, saw that hackers could be completely integrated into a modern political operation, running attack ads, researching the opposition, and finding ways to



COLOMBIA

Supported reelection of Alvaro Uribe for president, 2006; congressional elections, 2006; failed campaign of Oscar Iván Zuluaga for president, 2014



HONDURAS

Supported Porfirio Lobo Sosa, elected president 2009

NICARAGUA

Against Daniel Ortega, 2011

DIRTY WORK

suppress a foe's turnout. As for Sepúlveda, his insight was to understand that voters trusted what they thought were spontaneous expressions of real people on social media more than they did experts on television and in newspapers. He knew that accounts could be faked and social media trends fabricated, all relatively cheaply. He wrote a software program, now called Social Media Predator, to manage and direct a virtual army of fake Twitter accounts. The software let him quickly change names, profile pictures, and biographies to fit any need. Eventually, he discovered, he could manipulate the public debate as easily as moving pieces on a chessboard–or, as he puts it, "When I realized that people believe what the Internet says more than reality, I discovered that I had the power to make people believe almost anything."

According to Sepúlveda, his payments were made in cash, half upfront. When he traveled, he used a fake passport and stayed alone in a hotel, far from campaign staff. No one could bring a smartphone or camera into his room.

GETTY IMAGES (4)

Most jobs were initiated in person. Sepúlveda says Rendón would give him a piece of paper with target names, e-mail addresses, and phone numbers. Sepúlveda would take the note to his hotel, enter the data into an encrypted file, then burn the page or flush it down the toilet. If Rendón needed to send an e-mail, he used coded language. To "caress" meant to attack; to "listen to music" meant to intercept a target's phone calls.

Rendón and Sepúlveda took pains not to be seen together. They communicated over encrypted phones, which they replaced every two months. Sepúlveda says he sent daily progress reports and intelligence briefings from throwaway e-mail accounts to a go-between in Rendón's consulting firm.

Each job ended with a specific, color-coded destruct sequence. On election day, Sepúlveda would purge all data classified as "red." Those were files that could send him and his handlers to prison: intercepted phone calls and e-mails, lists of hacking victims, and confidential briefings he prepared for the campaigns. All phones, hard drives, flash drives, and computer servers were physically destroyed. Less-sensitive "yellow" data—travel schedules, salary spreadsheets, fundraising plans—were saved to an encrypted thumb drive and given to the campaigns for one final review. A week later it, too, would be destroyed.

For most jobs, Sepúlveda assembled a crew and operated out of rental homes and apartments in Bogotá. He had a rotating group of 7 to 15 hackers brought in from across Latin America, drawing on the various regions' specialties. Brazilians, in his view, develop the best malware. Venezuelans and Ecuadoreans are superb at scanning systems and software for vulnerabilities. Argentines are



**MEXICO**

Supported Enrique Peña Nieto, over a three-year period

**VENEZUELA**

Against Chávez and Maduro in 2012 and 2013

**COSTA RICA**

Supported Johnny Araya, failed presidential candidate for center-left National Liberation Party, 2014 election



**PANAMA**

Supported Juan Carlos Navarro, presidential candidate for the center-left Democratic Revolutionary Party, 2014 election

mobile intercept artists. Mexicans are masterly hackers in general but talk too much. Sepúlveda used them only in emergencies.

The assignments lasted anywhere from a few days to several months. In Honduras, Sepúlveda defended the communications and computer systems of presidential candidate Porfirio Lobo Sosa from hackers employed by his competitors. In Guatemala, he digitally eavesdropped on six political and business figures, and says he delivered the data to Rendón on encrypted flash drives at dead drops. (Sepúlveda says it was a small job for a client of Rendón's who has ties to the right-wing National Advancement Party, or PAN. The PAN says it never hired Rendón and has no knowledge of any of his claimed activities.) In Nicaragua in 2011, Sepúlveda attacked Ortega, who was running for his third presidential term. In one of the rare jobs in which he was working for a client other than Rendón, he broke into the e-mail account of Rosario Murillo, Ortega's wife and the government's chief spokeswoman, and stole a trove of personal and government secrets.

In Venezuela in 2012, the team abandoned its usual caution, animated by disgust with Chávez. With Chávez running for his fourth

term, Sepúlveda posted an anonymized YouTube clip of himself rifling through the e-mail of one of the most powerful people in Venezuela, Diosdado Cabello, then president of the National Assembly. He also went outside his tight circle of trusted hackers and rallied Anonymous, the hacktivist group, to attack Chávez's website.

After Sepúlveda hacked Cabello's Twitter account, Rendón seemed to congratulate him. *"Eres noticia* :)"—you're news—he wrote in a Sept. 9, 2012, e-mail, linking to a story about the breach. (Rendón says he never sent such an e-mail.) Sepúlveda provided screen shots of a dozen e-mails, and many of the original e-mails, showing that from November 2011 to September 2012 Sepúlveda sent long lists of government websites he hacked for various campaigns to a senior member of Rendón's consulting firm, lacing them with hacker slang ("Owned!" read one). Two weeks before Venezuela's presidential election, Sepúlveda sent screen shots showing how he'd hacked Chávez's website and could turn it on and off at will.

Chávez won but died five months later of cancer, triggering an emergency election, won by Nicolás Maduro. The day before Maduro claimed victory, Sepúlveda hacked his Twitter account and posted allegations of election fraud. Blaming "conspiracy hackings from abroad," the government of Venezuela disabled the Internet across the entire country for 20 minutes.

In Mexico, Sepúlveda's technical mastery and Rendón's grand vision for a ruthless political machine fully came together, fueled by the huge resources of the PRI. The years under President Felipe Calderón and the National Action Party (also, as in Partido Acción Nacional, PAN) were plagued by a grinding war against the drug cartels, which made kidnappings, street assassinations, and beheadings ordinary. As 2012 approached, the PRI ➡

63

offered the youthful energy of Peña Nieto, who'd just finished a successful term as governor.

Sepúlveda didn't like the idea of working in Mexico, a dangerous country for involvement in public life. But Rendón persuaded him to travel there for short trips, starting in 2008, often flying him in on his private jet. Working at one point in Tabasco, on the sweltering Caribbean coast, Sepúlveda hacked a political boss who turned out to have connections to a drug cartel. After Rendón's security team learned of a plan to kill Sepúlveda, he spent a night in an armored Chevy Suburban before returning to Mexico City.

Mexico is effectively a three-party system, and Peña Nieto faced opponents from both right and left. On the right, the ruling PAN nominated Josefina Vázquez Mota, its first female presidential candidate. On the left, the Democratic Revolution Party, or PRD, chose Andrés Manuel López Obrador, a former Mexico City mayor.

Early polls showed Peña Nieto 20 points ahead, but his supporters weren't taking chances. Sepúlveda's team installed malware in routers in the headquarters of the PRD candidate, which let him tap the phones and computers of anyone using the network, including the candidate. He took similar steps against PAN's Vázquez Mota. When the candidates' teams prepared policy speeches, Sepúlveda had the details as soon as a speechwriter's fingers hit the keyboard. Sepúlveda saw the opponents' upcoming meetings and campaign schedules before their own teams did.

Money was no problem. At one point, Sepúlveda spent $50,000 on high-end Russian software that made quick work of tapping Apple, BlackBerry, and Android phones. He also splurged on the very best fake Twitter profiles; they'd been maintained for at least a year, giving them a patina of believability.

Sepúlveda managed thousands of such fake profiles and used the accounts to shape discussion around topics such as Peña Nieto's plan to end drug violence, priming the social media pump with views that real users would mimic. For less nuanced work, he had a larger army of 30,000 Twitter bots, automatic posters that could create trends. One conversation he started stoked fear that the more López Obrador rose in the polls, the lower the peso would sink. Sepúlveda knew the currency issue was a major vulnerability; he'd read it in the candidate's own internal staff memos.



Sepúlveda's head. The upper tattoo is a QR code containing an encryption key

Just about anything the digital dark arts could offer to Peña Nieto's campaign or important local allies, Sepúlveda and his team provided. On election night, he had computers call tens of thousands of voters with prerecorded phone messages at 3 a.m. in the critical swing state of Jalisco. The calls appeared to come from the campaign of popular left-wing gubernatorial candidate Enrique Alfaro Ramírez. That angered voters—that was the point—and Alfaro lost by a slim margin. In another governor's race, in Tabasco, Sepúlveda set up fake Facebook accounts of gay men claiming to back a conservative Catholic candidate representing the PAN, a stunt designed to alienate his base. "I always suspected something was off," the candidate, Gerardo Priego, said recently when told how Sepúlveda's team manipulated social media in the campaign.

In May, Peña Nieto visited Mexico City's Ibero-American University and was bombarded by angry chants and boos from students. The rattled candidate retreated with his bodyguards into an adjacent building, hiding, according to some social media posts, in a bathroom. The images were a disaster. López Obrador soared.

The PRI was able to recover after one of López Obrador's consultants was caught on tape asking businessmen for $6 million to fund his candidate's broke campaign, in possible violation of Mexican laws. Although the hacker says he doesn't know the origin of that particular recording, Sepúlveda and his team had been intercepting the communications of the consultant, Luis Costa Bonino, for months. (On Feb. 2, 2012, Rendón appears to have sent him three e-mail addresses and a cell phone number belonging to Costa Bonino in an e-mail called "Job.") Sepúlveda's team disabled the consultant's personal website and directed journalists to a clone site. There they posted what looked like a long defense written by Costa Bonino, which casually raised questions about whether his Uruguayan roots violated Mexican restrictions on foreigners in elections. Costa Bonino left the campaign a few days later. He indicated recently that he knew he was being spied on, he just didn't know how. It goes with the trade in Latin America: "Having a phone hacked by the opposition is not a novelty. When I work on a campaign, the assumption is that everything I talk about on the phone will be heard by the opponents."

The press office for Peña Nieto declined to comment. A spokesman for the PRI said the party has no knowledge of Rendón working for Peña Nieto's or any other PRI campaign. Rendón says he has worked on behalf of PRI candidates in Mexico for 16 years, from August 2000 until today.

In 2012, Colombian President Juan Manuel Santos, Uribe's successor, unexpectedly restarted peace talks with the FARC, hoping to end a 50-year war. Furious, Uribe, whose father was killed by FARC guerrillas, created a party and backed an alternative candidate, Oscar Iván Zuluaga, who opposed the talks.

Rendón, who was working for Santos, wanted Sepúlveda to join his team, but Sepúlveda turned him down. He considered Rendón's willingness to work for a candidate supporting peace with the FARC a betrayal and suspected the consultant was going soft, choosing money over principles. Sepúlveda says he was motivated by ideology first and money second, and that if he wanted to get rich he could have made a lot more hacking financial systems than elections. For the first time, he decided to oppose his mentor.

Sepúlveda went to work for the opposition, reporting directly to Zuluaga's campaign manager, Luis Alfonso Hoyos. (Zuluaga denies any knowledge of hacking; Hoyos couldn't be reached for comment.) Together, Sepúlveda says, they came up with a plan to discredit the president by showing that the guerrillas continued to traffic in drugs and violence even as they talked about peace. Within months, Sepúlveda hacked the phones and e-mail accounts of more than 100 militants, including the FARC's leader, Rodrigo Londoño, also known as Timochenko. After assembling a thick file on the FARC, including evidence of the group's suppression of peasant votes in the countryside, Sepúlveda agreed to accompany Hoyos to the offices of a Bogotá TV news program and present the evidence.

It may not have been wise to work so doggedly and publicly against a party in power. A month later, Sepúlveda was smoking on the terrace of his Bogotá office when he saw a caravan of police vehicles pull up. Forty black-clad commandos raided the office to arrest him. Sepúlveda blamed his carelessness at the TV station for the arrest. He believes someone then turned him in. In court, he wore a bulletproof vest and sat surrounded by guards

64

PATRICK FRAZER/GDA/ZUMA PRESS

with bomb shields. In the back of the courtroom, men held up pictures of his family, making a slashing gesture across their throats or holding a hand over their mouths—stay silent or else. Abandoned by former allies, he eventually pleaded guilty to espionage, hacking, and other crimes in exchange for a 10-year sentence.

Three days after arriving at Bogotá's La Picota prison, he went to the dentist and was ambushed by men with knives and razors, but was saved by guards. A week later, guards woke him and rushed him from his cell, saying they had heard about a plot to shoot him with a silenced pistol as he slept. After national police intercepted phone calls revealing yet another plot, he's now in solitary confinement at a maximum-security facility in a rundown area of central Bogotá. He sleeps with a bulletproof blanket and vest at his bedside, behind bombproof doors. Guards check on him every hour. As part of his plea deal, he says, he's turned government witness, helping investigators assess possible cases against the former candidate, Zuluaga, and his strategist, Hoyos. Authorities issued an indictment for the arrest of Hoyos, but according to Colombian press reports he's fled to Miami.

When Sepúlveda leaves for meetings with prosecutors at the Bunker, the attorney general's Bogotá headquarters, he travels in an armed caravan including six motorcycles speeding through the capital at 60 mph, jamming cell phone signals as they go to block tracking of his movements or detonation of roadside bombs.

In July 2015, Sepúlveda sat in the small courtyard of the Bunker, poured himself a cup of coffee from a thermos, and took out a pack of Marlboro cigarettes. He says he wants to tell his story because the public doesn't grasp the power hackers exert over modern elections or the specialized skills needed to stop them. "I worked with presidents, public figures with great power, and did many things with absolutely no regrets because I did it with full conviction and under a clear objective, to end dictatorship and socialist governments in Latin America," he says. "I have always said that there are two types of politics—what people see and what really makes things happen. I worked in politics that are not seen."

Sepúlveda says he's allowed a computer and a monitored Internet connection as part of an agreement to help the attorney general's office track and disrupt drug cartels using a version of his Social Media Predator software. The government will not confirm or deny that he has access to a computer, or what he's using it for. He says he has modified Social Media Predator to counteract the kind of sabotage he used to specialize in, including jamming candidates' Facebook walls and Twitter feeds. He's used it to scan 700,000 tweets from pro-Islamic State accounts to learn what makes a good terror recruiter. Sepúlveda says the program has been able to identify ISIS recruiters minutes after they create Twitter accounts and start posting, and he hopes to share the information with the U.S. or other countries fighting the Islamist group. Samples of Sepúlveda's code evaluated by an independent company found it authentic and substantially original.

Sepúlveda's contention that operations like his happen on every continent is plausible, says David Maynor, who runs a security testing company in Atlanta called Errata Security. Maynor says he occasionally gets inquiries for campaign-related jobs. His company has been asked to obtain e-mails and other documents from candidates' computers and phones, though the ultimate client is never disclosed. "Those activities do happen



Juan José Rendón, political consultant

in the U.S., and they happen all the time," he says.

In one case, Maynor was asked to steal data as a security test, but the individual couldn't show an actual connection to the campaign whose security he wanted to test. In another, a potential client asked for a detailed briefing on how a candidate's movements could be tracked by switching out the user's iPhone for a bugged clone. "For obvious reasons, we always turned them down," says Maynor, who declines to name the candidates involved.

Three weeks before Sepúlveda's arrest, Rendón was forced to resign from Santos's campaign amid allegations in the press that he took $12 million from drug traffickers and passed part of it on to the candidate, something he denies.

According to Rendón, Colombian officials interviewed him shortly afterward in Miami, where he keeps a home. Rendón says that Colombian investigators asked him about Sepúlveda and that he told them Sepúlveda's role was limited to Web development.

Rendón denies working with Sepúlveda in any meaningful capacity. "He says he worked with me in 20 places, and the truth is he didn't," Rendón says. "I never paid Andrés Sepúlveda a peso."

Last year, based on anonymous sources, the Colombian media reported that Rendón was working for Donald Trump's presidential campaign. Rendón calls the reports untrue. The campaign did approach him, he says, but he turned them down because he dislikes Trump. "To my knowledge we are not familiar with this individual," says Trump's spokeswoman, Hope Hicks. "I have never heard of him, and the same goes for other senior staff members." But Rendón says he's in talks with another leading U.S. presidential campaign—he wouldn't say which—to begin working for it once the primaries wrap up and the general election begins. ● — *With Carlos Manuel Rodríguez and Matthew Bristow*

65

# EXHIBIT B

**Bloomberg the Company & its Products (http://www.bloomberg.com/company/?tophat=open)**
**Bloomberg Anywhere Remote Login (https://bba.bloomberg.net/)**
**Bloomberg Terminal Request a Demo (http://www.bloomberg.com/professional/request-demo/?utm_source=bbgmenu-demo&bbg**



# How to Hack an Election

**Andrés Sepúlveda rigged elections throughout Latin America for almost a decade. He tells his story for the first**

**time.**

By Jordan Robertson, Michael Riley, and Andrew Willis |
March 31, 2016
Photographs by Juan Arredondo
From **Bloomberg Businessweek**
(http://www.bloomberg.com/businessweek)
Versión en español
(http://www.bloomberg.com/features/2016-como-
manipular-una-eleccion/)

**It was just before midnight when Enrique Peña Nieto declared victory as**
the newly elected president of Mexico
(http://www.bloomberg.com/news/articles/2012-07-02/pena-nieto-claims-win-
in-mexico-election-as-pri-returns-to-power). Peña Nieto was a lawyer and a
millionaire, from a family of mayors and governors. His wife was a telenovela
star. He beamed as he was showered with red, green, and white confetti at the
Mexico City headquarters of the Institutional Revolutionary Party, or PRI,
which had ruled for more than 70 years before being forced out in 2000.
Returning the party to power on that night in July 2012, Peña Nieto vowed to
tame drug violence, fight corruption, and open a more transparent era in
Mexican politics.

Two thousand miles away, in an apartment in Bogotá's upscale Chicó Navarra
neighborhood, Andrés Sepúlveda sat before six computer screens. Sepúlveda
is Colombian, bricklike, with a shaved head, goatee, and a tattoo of a QR code
containing an encryption key on the back of his head. On his nape are the
words "</head>" and "<body>" stacked atop each other, dark riffs on coding.
He was watching a live feed of Peña Nieto's victory party, waiting for an
official declaration of the results.

When Peña Nieto won, Sepúlveda began destroying evidence. He drilled holes in flash drives, hard drives, and cell phones, fried their circuits in a microwave, then broke them to shards with a hammer. He shredded documents and flushed them down the toilet and erased servers in Russia and Ukraine rented anonymously with Bitcoins. He was dismantling what he says was a secret history of one of



Featured in *Bloomberg Businessweek*, April 4, 2016. Subscribe now. (https://subscribe.businessweek.com/servlet/OrdersGateway? cds_mag_code=BWK&cds_page_id=190089)

the dirtiest Latin American campaigns in recent memory.

For eight years, Sepúlveda, now 31, says he traveled the continent rigging major political campaigns. With a budget of $600,000, the Peña Nieto job was by far his most complex. He led a team of hackers that stole campaign strategies, manipulated social media to create false waves of enthusiasm and derision, and installed spyware in opposition offices, all to help Peña Nieto, a

right-of-center candidate, eke out a victory. On that July night, he cracked bottle after bottle of Colón Negra beer in celebration. As usual on election night, he was alone.

Sepúlveda's career began in 2005, and his first jobs were small—mostly defacing campaign websites and breaking into opponents' donor databases. Within a few years he was assembling teams that spied, stole, and smeared on behalf of presidential campaigns across Latin America. He wasn't cheap, but his services were extensive. For $12,000 a month, a customer hired a crew that could hack smartphones, spoof and clone Web pages, and send mass e-mails and texts. The premium package, at $20,000 a month, also included a full range of digital interception, attack, decryption, and defense. The jobs were carefully laundered through layers of middlemen and consultants. Sepúlveda says many of the candidates he helped might not even have known about his role; he says he met only a few.

His teams worked on presidential elections in Nicaragua, Panama, Honduras, El Salvador, Colombia, Mexico, Costa Rica, Guatemala, and Venezuela. Campaigns mentioned in this story were contacted through former and current spokespeople; none but Mexico's PRI and the campaign of Guatemala's National Advancement Party would comment.

As a child, he witnessed the violence of Colombia's Marxist guerrillas. As an adult, he allied with a right wing emerging across Latin America. He believed his hacking was no more diabolical than the tactics of those he opposed, such as Hugo Chávez and Daniel Ortega.

Many of Sepúlveda's efforts were unsuccessful, but he has enough wins that he might be able to claim as much influence over the political direction of modern Latin America as anyone in the 21st century. "My job was to do actions of dirty war and psychological operations, black propaganda, rumors—the whole dark side of politics that nobody knows exists but everyone can see," he says in Spanish, while sitting at a small plastic table in an outdoor courtyard

deep within the heavily fortified offices of Colombia's attorney general's office. He's serving 10 years in prison for charges including use of malicious software, conspiracy to commit crime, violation of personal data, and espionage, related to hacking during Colombia's 2014 presidential election. He has agreed to tell his full story for the first time, hoping to convince the public that he's rehabilitated—and gather support for a reduced sentence.

Usually, he says, he was on the payroll of Juan José Rendón, a Miami-based political consultant who's been called the Karl Rove of Latin America. Rendón denies using Sepúlveda for anything illegal, and categorically disputes the account Sepúlveda gave *Bloomberg Businessweek* of their relationship, but admits knowing him and using him to do website design. "If I talked to him maybe once or twice, it was in a group session about that, about the Web," he says. "I don't do illegal stuff at all. There is negative campaigning. They don't like it—OK. But if it's legal, I'm gonna do it. I'm not a saint, but I'm not a criminal." While Sepúlveda's policy was to destroy all data at the completion of a job, he left some documents with members of his hacking teams and other trusted third parties as a secret "insurance policy."

Sepúlveda provided *Bloomberg Businessweek* with what he says are e-mails showing conversations between him, Rendón, and Rendón's consulting firm concerning hacking and the progress of campaign-related cyber attacks. Rendón says the e-mails are fake. An analysis by an independent computer security firm said a sample of the e-mails they examined appeared authentic. Some of Sepúlveda's descriptions of his actions match published accounts of events during various election campaigns, but other details couldn't be independently verified. One person working on the campaign in Mexico, who asked not to be identified out of fear for his safety, substantially confirmed Sepúlveda's accounts of his and Rendón's roles in that election.

Sepúlveda says he was offered several political jobs in Spain, which he says he turned down because he was too busy. On the question of whether the U.S. presidential campaign is being tampered with, he is unequivocal. "I'm

100 percent sure it is," he says.

**Bloomberg** (http://bloomberg.com/)

Sepúlveda grew up poor in Bucaramanga, eight hours north of Bogotá by car. His mother was a secretary. His father was an activist, helping farmers find better crops to grow than coca plants, and the family moved constantly because of death threats from drug traffickers. His parents divorced, and by the age of 15, after failing school, he went to live with his father in Bogotá and used a computer for the first time. He later enrolled in a local technology school and, through a friend there, learned to code.

In 2005, Sepúlveda's older brother, a publicist, was helping with the congressional campaigns of a party aligned with then-Colombian President Alvaro Uribe. Uribe was a hero of the brothers, a U.S. ally who strengthened the military to fight the Revolutionary Armed Forces of Colombia (FARC). During a visit to party headquarters, Sepúlveda took out his laptop and began scanning the office's wireless network. He easily tapped into the computer of Rendón, the party's strategist, and downloaded Uribe's work schedule and upcoming speeches. Sepúlveda says Rendón was furious—then hired him on the spot. Rendón says this never happened.

For decades, Latin American elections were rigged, not won, and the methods were pretty straightforward. Local fixers would hand out everything from small appliances to cash in exchange for votes. But in the 1990s, electoral reforms swept the region. Voters were issued tamper-proof ID cards, and nonpartisan institutes ran the elections in several countries. The modern campaign, at least a version North Americans might recognize, had arrived in Latin America.

Rendón had already begun a successful career based partly, according to his critics—and more than one lawsuit—on a mastery of dirty tricks and rumormongering. (In 2014, El Salvador's then-President Carlos Mauricio Funes accused Rendón of orchestrating dirty war campaigns throughout Latin America. Rendón sued in Florida for defamation, but the court dismissed the case on the grounds that Funes couldn't be sued for his official acts.) The son of democracy activists, he studied psychology and worked in advertising before advising presidential candidates in his native Venezuela. After accusing then-President Chávez of vote rigging in 2004, he left and never went back.

Sepúlveda's first hacking job, he says, was breaking into an Uribe rival's website, stealing a database of e-mail addresses, and spamming the accounts with disinformation. He was paid $15,000 in cash for a month's work, five times as much as he made in his previous job designing websites.

Sepúlveda was dazzled by Rendón, who owned a fleet of luxury cars, wore big flashy watches, and spent thousands on tailored coats. Like Sepúlveda, he was a perfectionist. His staff was expected to arrive early and work late. "I was very young," Sepúlveda says. "I did what I liked, I was paid well and traveled. It was the perfect job." But more than anything, their right-wing politics aligned. Sepúlveda says he saw Rendón as a genius and a mentor. A devout Buddhist and practitioner of martial arts, according to his own website, Rendón cultivated an image of mystery and menace, wearing only all-black in public, including the occasional samurai robe. On his website he calls himself the

political consultant who is the "best paid, feared the most, attacked the most, and also the most demanded and most efficient." Sepúlveda would have a hand in that.

Rendón, says Sepúlveda, saw that hackers could be completely integrated into a modern political operation, running attack ads, researching the opposition, and finding ways to suppress a foe's turnout. As for Sepúlveda, his insight was to understand that voters trusted what they thought were spontaneous expressions of real people on social media more than they did experts on television and in newspapers. He knew that accounts could be faked and social media trends fabricated, all relatively cheaply. He wrote a software program, now called Social Media Predator, to manage and direct a virtual army of fake Twitter accounts. The software let him quickly change names, profile pictures, and biographies to fit any need. Eventually, he discovered, he could manipulate the public debate as easily as moving pieces on a chessboard—or, as he puts it, "When I realized that people believe what the Internet says more than reality, I discovered that I had the power to make people believe almost anything."

**According to Sepúlveda, his payments were made in cash, half upfront.**
When he traveled, he used a fake passport and stayed alone in a hotel, far from campaign staff. No one could bring a smartphone or camera into his room.

Most jobs were initiated in person. Sepúlveda says Rendón would give him a piece of paper with target names, e-mail addresses, and phone numbers. Sepúlveda would take the note to his hotel, enter the data into an encrypted file, then burn the page or flush it down the toilet. If Rendón needed to send an e-mail, he used coded language. To "caress" meant to attack; to "listen to music" meant to intercept a target's phone calls.

Rendón and Sepúlveda took pains not to be seen together. They communicated over encrypted phones, which they replaced every two months. Sepúlveda says he sent daily progress reports and intelligence briefings from throwaway e-mail accounts to a go-between in Rendón's consulting firm.

Each job ended with a specific, color-coded destruct sequence. On election day, Sepúlveda would purge all data classified as "red." Those were files that could send him and his handlers to prison: intercepted phone calls and e-mails, lists of hacking victims, and confidential briefings he prepared for the campaigns. All phones, hard drives, flash drives, and computer servers were physically destroyed. Less-sensitive "yellow" data—travel schedules, salary spreadsheets, fundraising plans—were saved to an encrypted thumb drive and given to the campaigns for one final review. A week later it, too, would be destroyed.

For most jobs, Sepúlveda assembled a crew and operated out of rental homes and apartments in Bogotá. He had a rotating group of 7 to 15 hackers brought in from across Latin America, drawing on the various regions' specialties. Brazilians, in his view, develop the best malware. Venezuelans and Ecuadoreans are superb at scanning systems and software for vulnerabilities. Argentines are mobile intercept artists. Mexicans are masterly hackers in general but talk too much. Sepúlveda used them only in emergencies.

The assignments lasted anywhere from a few days to several months. In Honduras, Sepúlveda defended the communications and computer systems of presidential candidate Porfirio Lobo Sosa from hackers employed by his competitors. In Guatemala, he digitally eavesdropped on six political and business figures, and says he delivered the data to Rendón on encrypted flash drives at dead drops. (Sepúlveda says it was a small job for a client of Rendón's who has ties to the right-wing National Advancement Party, or PAN. The PAN says it never hired Rendón and has no knowledge of any of his claimed activities.) In Nicaragua in 2011, Sepúlveda attacked Ortega, who was running for his third presidential term. In one of the rare jobs in which he was working for a client other than Rendón, he broke into the e-mail account of Rosario Murillo, Ortega's wife and the government's chief spokeswoman, and stole a trove of personal and government secrets.

In Venezuela in 2012, the team abandoned its usual caution, animated by disgust with Chávez. With Chávez running for his fourth term, Sepúlveda posted an anonymized YouTube clip (https://www.youtube.com/watch?v=4BJdZ5ruPic) of himself rifling through the e-mail of one of the most powerful people in Venezuela, Diosdado Cabello, then president of the National Assembly. He also went outside his tight circle of trusted hackers and rallied Anonymous, the hacktivist group, to attack Chávez's website.

After Sepúlveda hacked Cabello's Twitter account, Rendón seemed to congratulate him. "*Eres noticia*

:)"—you're news—he wrote in a Sept. 9, 2012, e-mail, linking to a story about the breach. (Rendón says he never sent such an e-mail.) Sepúlveda provided screen shots of a dozen e-mails, and many of the original e-mails, showing that from November 2011 to September 2012 Sepúlveda sent long lists of government websites he hacked for various campaigns to a senior member of Rendón's consulting firm, lacing them with hacker slang ("Owned!" read one). Two weeks before Venezuela's presidential election, Sepúlveda sent screen shots showing how he'd hacked Chávez's website and could turn it on and off at will.

Chávez won but died five months later of cancer, triggering an emergency election, won by Nicolás Maduro

(http://www.bloomberg.com/news/articles/2013-04-15/chavez-heir-maduro-wins-venezuela-presidency-to-continue-legacy). The day before Maduro claimed victory, Sepúlveda hacked his Twitter account and posted allegations of election fraud. Blaming "conspiracy hackings from abroad," the government of Venezuela disabled the Internet across the entire country for 20 minutes.

**In Mexico, Sepúlveda's technical mastery and Rendón's grand vision for a** ruthless political machine fully came together, fueled by the huge resources of the PRI. The years under President Felipe Calderón and the National Action Party (also, as in Partido Acción Nacional, PAN (http://www.pan.org.mx/)) were plagued by a grinding war against the drug cartels, which made kidnappings, street assassinations, and beheadings ordinary. As 2012 approached, the PRI offered the youthful energy of Peña Nieto, who'd just finished a successful term as governor.

Sepúlveda didn't like the idea of working in Mexico, a dangerous country for involvement in public life. But Rendón persuaded him to travel there for short trips, starting in 2008, often flying him in on his private jet. Working at one point in Tabasco, on the sweltering Gulf of Mexico, Sepúlveda hacked a political boss who turned out to have connections to a drug cartel. After Rendón's security team learned of a plan to kill Sepúlveda, he spent a night in an armored Chevy Suburban before returning to Mexico City.

Mexico is effectively a three-party system, and Peña Nieto faced opponents from both right and left. On the right, the ruling PAN nominated Josefina Vázquez Mota, its first female presidential candidate. On the left, the Democratic Revolution Party, or PRD, chose Andrés Manuel López Obrador, a former Mexico City mayor.

Early polls showed Peña Nieto 20 points ahead (http://www.bloomberg.com/news/articles/2012-06-28/pena-nieto-poised-to-return-mexico-s-once-lofty-pri-to-power-1-), but his supporters weren't taking chances. Sepúlveda's team installed malware in routers in the headquarters of the PRD candidate, which let him tap the phones and computers of anyone using the network, including the candidate. He took similar steps against PAN's Vázquez Mota. When the candidates' teams prepared policy speeches, Sepúlveda had the details as soon as a speechwriter's fingers hit the keyboard. Sepúlveda saw the opponents' upcoming meetings and campaign schedules before their own teams did.

Money was no problem. At one point, Sepúlveda spent $50,000 on high-end Russian software that made quick work of tapping Apple, BlackBerry, and Android phones. He also splurged on the very best fake Twitter profiles; they'd been maintained for at least a year, giving them a patina of believability.

Sepúlveda managed thousands of such fake profiles and used the accounts to shape discussion around topics such as Peña Nieto's plan to end drug violence, priming the social media pump with views that real users would mimic. For less nuanced work, he had a larger army of 30,000 Twitter bots, automatic posters that could create trends. One conversation he started stoked fear that the more López Obrador rose in the polls, the lower the peso would sink. Sepúlveda knew the currency issue was a major vulnerability; he'd read it in the candidate's own internal staff memos.

Just about anything the digital dark arts could offer to Peña Nieto's campaign or important local allies, Sepúlveda and his team provided. On election night, he had computers call tens of thousands of voters with prerecorded phone messages at 3 a.m. in the critical swing state of Jalisco. The calls appeared to come from the campaign of popular left-wing gubernatorial candidate Enrique Alfaro Ramírez. That angered voters—that was the point—and Alfaro lost by a slim margin. In another governor's race, in Tabasco, Sepúlveda set up fake Facebook accounts of gay men claiming to back a conservative Catholic candidate representing the PAN, a stunt designed to alienate his base. "I always suspected something was off," the candidate, Gerardo Priego, said recently when told how Sepúlveda's team manipulated social media in the campaign.

In May, Peña Nieto visited Mexico City's Ibero-American University and was bombarded by angry chants and boos from students. The rattled candidate retreated with his bodyguards into an adjacent building, hiding, according to some social media posts, in a bathroom. The images were a disaster. López Obrador soared.

The PRI was able to recover after one of López Obrador's consultants was caught on tape asking businessmen for $6 million to fund his candidate's broke campaign, in possible violation of Mexican laws. Although the hacker says he doesn't know the origin of that particular recording, Sepúlveda and his team had been intercepting the communications of the consultant, Luis

Costa Bonino, for months. (On Feb. 2, 2012, Rendón appears to have sent him three e-mail addresses and a cell phone number belonging to Costa Bonino in an e-mail called "Job.") Sepúlveda's team disabled the consultant's personal website and directed journalists to a clone site. There they posted what looked like a long defense written by Costa Bonino, which casually raised questions about whether his Uruguayan roots violated Mexican restrictions on foreigners in elections. Costa Bonino left the campaign a few days later. He indicated recently that he knew he was being spied on, he just didn't know how. It goes with the trade in Latin America: "Having a phone hacked by the opposition is not a novelty. When I work on a campaign, the assumption is that everything I talk about on the phone will be heard by the opponents."

The press office for Peña Nieto declined to comment. A spokesman for the PRI said the party has no knowledge of Rendón working for Peña Nieto's or any other PRI campaign. Rendón says he has worked on behalf of PRI candidates in Mexico for 16 years, from August 2000 until today.

**In 2012, Colombian President Juan Manuel Santos, Uribe's successor,** unexpectedly restarted peace talks with the FARC, hoping to end a 50-year war. Furious, Uribe, whose father was killed by FARC guerrillas, created a party and backed an alternative candidate, Oscar Iván Zuluaga, who opposed the talks.

Rendón, who was working for Santos, wanted Sepúlveda to join his team, but Sepúlveda turned him down. He considered Rendón's willingness to work for a candidate supporting peace with the FARC a betrayal and suspected the consultant was going soft, choosing money over principles. Sepúlveda says he was motivated by ideology first and money second, and that if he wanted to get rich he could have made a lot more hacking financial systems than elections. For the first time, he decided to oppose his mentor.

Sepúlveda went to work for the opposition, reporting directly to Zuluaga's campaign manager, Luis Alfonso Hoyos. (Zuluaga denies any knowledge of hacking; Hoyos couldn't be reached for comment.) Together, Sepúlveda says, they came up with a plan to discredit the president by showing that the guerrillas continued to traffic in drugs and violence even as they talked about peace. Within months, Sepúlveda hacked the phones and e-mail accounts of more than 100 militants, including the FARC's leader, Rodrigo Londoño, also known as Timochenko. After assembling a thick file on the FARC, including evidence of the group's suppression of peasant votes in the countryside, Sepúlveda agreed to accompany Hoyos to the offices of a Bogotá TV news program and present the evidence.

It may not have been wise to work so doggedly and publicly against a party in power. A month later, Sepúlveda was smoking on the terrace of his Bogotá office when he saw a caravan of police vehicles pull up. Forty black-clad

commandos raided the office to arrest him. Sepúlveda blamed his carelessness at the TV station for the arrest. He believes someone there turned him in. In court, he wore a bulletproof vest and sat surrounded by guards with bomb shields. In the back of the courtroom, men held up pictures of his family, making a slashing gesture across their throats or holding a hand over their mouths—stay silent or else. Abandoned by former allies, he eventually pleaded guilty to espionage, hacking, and other crimes in exchange for a 10-year sentence.

Three days after arriving at Bogotá's La Picota prison, he went to the dentist and was ambushed by men with knives and razors, but was saved by guards. A week later, guards woke him and rushed him from his cell, saying they had heard about a plot to shoot him with a silenced pistol as he slept. After national police intercepted phone calls revealing yet another plot, he's now in solitary confinement at a maximum-security facility in a rundown area of central Bogotá. He sleeps with a bulletproof blanket and vest at his bedside, behind bombproof doors. Guards check on him every hour. As part of his plea deal, he says, he's turned government witness, helping investigators assess possible cases against the former candidate, Zuluaga, and his strategist, Hoyos. Authorities issued an indictment for the arrest of Hoyos, but according to Colombian press reports he's fled to Miami.

When Sepúlveda leaves for meetings with prosecutors at the Bunker, the attorney general's Bogotá headquarters, he travels in an armed caravan including six motorcycles speeding through the capital at 60 mph, jamming cell phone signals as they go to block tracking of his movements or detonation of roadside bombs.

In July 2015, Sepúlveda sat in the small courtyard of the Bunker, poured himself a cup of coffee from a thermos, and took out a pack of Marlboro cigarettes. He says he wants to tell his story because the public doesn't grasp the power hackers exert over modern elections or the specialized skills needed to stop them. "I worked with presidents, public figures with great power, and

did many things with absolutely no regrets because I did it with full
conviction and under a clear objective, to end dictatorship and socialist
governments in Latin America," he says. "I have always said that there are two
types of politics—what people see and what really makes things happen. I
worked in politics that are not seen."

Sepúlveda says he's allowed a computer and a monitored Internet connection
as part of an agreement to help the attorney general's office track and disrupt
drug cartels using a version of his Social Media Predator software. The
government will not confirm or deny that he has access to a computer, or what
he's using it for. He says he has modified Social Media Predator to counteract
the kind of sabotage he used to specialize in, including jamming candidates'
Facebook walls and Twitter feeds. He's used it to scan 700,000 tweets from
pro-Islamic State accounts to learn what makes a good terror recruiter.
Sepúlveda says the program has been able to identify ISIS recruiters minutes
after they create Twitter accounts and start posting, and he hopes to share the
information with the U.S. or other countries fighting the Islamist group.
Samples of Sepúlveda's code evaluated by an independent company found it
authentic and substantially original.

Sepúlveda's contention that operations like his happen on every continent is
plausible, says David Maynor, who runs a security testing company in Atlanta
called Errata Security. Maynor says he occasionally gets inquiries for
campaign-related jobs. His company has been asked to obtain e-mails and
other documents from candidates' computers and phones, though the
ultimate client is never disclosed. "Those activities do happen in the U.S., and
they happen all the time," he says.

In one case, Maynor was asked to steal data as a security test, but the
individual couldn't show an actual connection to the campaign whose
security he wanted to test. In another, a potential client asked for a detailed

briefing on how a candidate's movements could be tracked by switching out the user's iPhone for a bugged clone. "For obvious reasons, we always turned them down," says Maynor, who declines to name the candidates involved.

Three weeks before Sepúlveda's arrest, Rendón was forced to resign from Santos's campaign amid allegations in the press that he took $12 million from drug traffickers and passed part of it on to the candidate, something he denies.

According to Rendón, Colombian officials interviewed him shortly afterward in Miami, where he keeps a home. Rendón says that Colombian investigators asked him about Sepúlveda and that he told them Sepúlveda's role was limited to Web development.

Rendón denies working with Sepúlveda in any meaningful capacity. "He says he worked with me in 20 places, and the truth is he didn't," Rendón says. "I never paid Andrés Sepúlveda a peso."

Last year, based on anonymous sources, the Colombian media reported that Rendón was working for Donald Trump's presidential campaign. Rendón calls the reports untrue. The campaign did approach him, he says, but he turned them down because he dislikes Trump. "To my knowledge we are not familiar with this individual," says Trump's spokeswoman, Hope Hicks. "I have never heard of him, and the same goes for other senior staff members." But Rendón says he's in talks with another leading U.S. presidential campaign—he wouldn't say which—to begin working for it once the primaries wrap up and the general election begins.

*—With Carlos Manuel Rodríguez and Matthew Bristow*

**Editor:** Bryant Urstadt
**Producer:** Laura Ratliff

Apr 11, 2016

**Building Parks for People Watching (http://www.bloomberg.com/features/2016-design/a/james-corner/)**

Apr 11, 2016

**Build a Chair in 3 Minutes (http://www.bloomberg.com/features/2016-design/a/brad-sewell/)**

Apr 11, 2016

**The Founder of Robinhood Wants You to Trade Stocks for Free (http://www.bloomberg.com/features/2016-**

Apr 11, 2016

**The Company That's Keeping the Polaroid Legacy Alive (http://www.bloomberg.com/features/2016-**

Apr 06, 2016

**The Supergroup Remaking *Star Wars* and *Jurassic World* in VR (http://www.bloomberg.com/features/2016-**

Apr 07, 2016

**How a Virtual Reality Skeptic Made the First Great Oculus Game (http://www.bloomberg.com/features/2016-**